## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**SHAHEEDRA JORDAN, ET AL.**

**VERSUS**

**SID J. GAUTREAUX III, ET AL.**

**CIVIL ACTION**

**NO. 21-48-JWD-SDJ**

## RULING AND ORDER ON SHERIFF DEFENDANTS' AND THE PARISH'S MOTIONS TO DISMISS

This matter comes before the Court on two of the four pending Rule 12(b)(6) motions in this case. The first is the *Motion to Dismiss* (Doc. 13) filed by defendants Sheriff Sid J. Gautreaux, III, in his capacity as Sheriff of East Baton Rouge Parish ("Gautreaux" or the "Sheriff"); Lieutenant Colonel Dennis Grimes, Warden of the East Baton Rouge Parish Prison ("Grimes"); Corporal Jacob Page; Deputy Kenyaki Domino; Corporal Damien King; Corporal Michael Britt; Corporal Justin Minor; Deputy Rodney Johnson; Deputy Joe Coleman; Sergeant Jermaine Cruz; Lieutenant Grant; and Captain Leader (collectively, "Sheriff Defendants"). This motion will be referred to as the *Sheriff Defs.' MTD*.

The second motion is the *Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted Pursuant to Federal Rules of Civil Procedure 12(b)(6)* (Doc. 15) filed by the Parish of East Baton Rouge (the "Parish"). This motion shall be referred to as the *Parish's MTD*.

The other two pending motions are the *Motion to Dismiss Plaintiffs' Complaint against CHEBR* (Doc. 25) filed by defendant CorrectHealth East Baton Rouge, LLC ("CorrectHealth") and the *Motion to Dismiss Plaintiffs' Complaint Against Musso and Llovet* (Doc. 26) filed by defendants Dr. Carlo Musso and Jean Llovet. The Court will rule on these two motions in a separate order.

Plaintiffs Shaheedra Jordan, Sahara Claiborne, Leiaja Claiborne (collectively, "Plaintiffs") oppose all motions. Relevant here, Plaintiffs file one opposition to both *Sheriff Defs.' MTD* and the *Parish's MTD.* (Doc. 24.)

Sheriff Defendants filed a reply in support of their motion. (Doc. 30.) The Parish, however, did not.

Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, *Sheriff Defs.' MTD* is granted in part and denied in part, and the *Parish's MTD* is denied.

## I.    Relevant Factual Background

### A.  Introduction

The case involves the suicide of a pretrial detainee at East Baton Rouge Parish Prison ("EBRPP"). Plaintiffs are the children of the deceased detainee, Shaheed Claiborne ("Claiborne"). (*First Am. Compl. with Jury Demand Filed with Consent of Opp.* ("*FAC*") ¶ 1, Doc. 9.) Plaintiffs bring this action under 42 U.S.C. § 1983 asserting individual and official capacity claims. (*Id.* ¶¶ 49–62.) Plaintiffs also assert state law claims. (*Id.* ¶¶ 63–73.)

As to the § 1983 official capacity claims, Plaintiffs sue the Parish as the "entity responsible for funding operations of the [EBRPP]" and as the party that "negotiates, approves, funds, and enters into contracts with other entities to provide medical and mental health services at the jail[.]" (*Id.* ¶ 1(a).) Defendant CorrectHealth was, during these events, "the private medical and mental health care provider under contract with [the] Parish to provide medical and mental health treatment and care to the individuals incarcerated at EBRPP." (*Id.* ¶ 1(o).) Sheriff Gautreaux is also sued in his official capacity, though the *FAC* does not detail the scope of his policymaking

authority. (*Id.* ¶ 1(b))    Captain Leader is alleged to be a "supervisory officer at EBRPP" and is sued in both his individual and official capacities. (*Id.* ¶ 1(m).)

The following allegations are taken from the *FAC*.  They are assumed to be true for purposes of this motion and construed in a light most favorable to Plaintiffs. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014).

### B.  Claiborne's Arrest and Processing

On January 18, 2020, Claiborne was devastated by the loss of his mother, who was a renowned civil rights activist and whose death received considerable publicity in the news media and on social media. (*FAC* ¶¶ 4–8, Doc. 9.)  Following his mother's death, Claiborne was in a state of severe emotional distress. (*Id.* ¶ 8.)

On that day, Claiborne tried to gain entry to a drug and alcohol recovery center before it opened. (*Id.*)  He was refused admission. (*Id.* ¶ 9.)  He then began kicking and ramming the door to gain entry. (*Id.*)

Claiborne "was subsequently involved in a minor altercation with bystanders, but soon after got into his vehicle to leave the property." (*Id.* ¶ 10.)  But, shortly thereafter, he "re-entered the property and crashed his vehicle into an electric pole, knocking out the power to the business." (*Id.* ¶ 11.)  At the time of the crash, he was seen having "red dilated eyes[.]" (*Id.* ¶ 12.)

Claiborne was then arrested by the Baton Rouge Police Department ("BRPD"). (*Id.* ¶ 13.) Captain Sandridge of the BRPD called defendant Corporal Page of the EBRPP. (*Id.* ¶ 14.) Sandridge informed Page that Claiborne was "in route," and he advised Page to be on "high alert." (*Id.* ¶ 14.)  The captain also told Page that Claiborne "was very strong and had 'mental health issues.' " (*Id.*)

When Claiborne arrived, he was "medically processed by Supervisor Nurse Brumfield." (*Id.* ¶ 15.) While Claiborne was in Medical Intake, Lieutenant Grimes informed Page that, "due to mental health concerns, Mr. Claiborne should be placed in a one-man cell until he received a mental health assessment; subsequently, Corporal Page relayed this information to Nurse Brumfield, who put Mr. Claiborne on mental health observation shortly thereafter." (*Id.* ¶ 16.)

As Claiborne was "being dressed out in the intake bathroom," he "was talking to himself" and "repeating[,] 'Lord, give me the strength to remain calm.' " (*Id.* ¶ 17.)  Plaintiffs allege:

> Corporal Page and Deputy Baker issued Mr. Claiborne a yellow smock rather than a cloth jumpsuit, per his mental health observation status. The reason for the issuance of yellow smock is the risk of suicide known to the Sheriff and its medical staff of inmates suffering mental health issues. The choice of the smock was because of the known risk of suicide Mr. Claiborne potentially presented.

(*Id.* ¶ 18.)  Claiborne called his family, and then Page took him to "N01—the special needs housing unit—to Cell #3." (*Id.*)

### C. Claiborne's Suicide

On Sunday, January 19, 2020, one day following his arrest, "a member of the medical staff, John Doe #6, met with . . . Claiborne and removed him from mental health observation, and the required restrictions thereof." (*FAC* ¶ 20, Doc. 9.) Doe #6 did this "[d]espite all of the knowledge of the Sheriff's Office and its medical staff of . . . Claiborne's mental health crisis and symptoms[.]" (*Id.*)

Doe #6 gave Claiborne a cloth jumpsuit to replace the yellow smock he had previously been given. (*Id.* ¶ 21.)  Plaintiffs allege, "This is the same kind of cloth jumpsuit not originally provided to Mr. Claiborne due to his acute mental health issues, which were known to the Sheriff's Office and its medical staff— including the risk of Mr. Claiborne committing suicide." (*Id.*)

Plaintiffs then provide a time line of events of Monday, January 20, 2020:

- "[A]t 1:35am, according to video surveillance, a smock or clothing garment was taken from an inmate, possibly Mr. Claiborne." (*Id.* ¶ 22.)

- "At 1:43am, [defendant] Deputy Domino made rounds and can be seen on video surveillance speaking to an inmate near the first few cells." (*Id.* ¶ 23.)

- "At 2:22am, Deputy Domino made rounds and can be seen on video surveillance walking about halfway down the line before returning to the control cage." (*Id.* ¶ 24.)

- Between 2:22 a.m. and 3:14 a.m., "a period of 52 minutes[,]" the "[m]otion-detection triggered video surveillance of N01 displayed 'no activations.' " (*Id.* ¶ 25.)

- "At 3:14am, Deputy Domino began rounds, and knowing Mr. Claiborne was in Cell #3, Deputy Domino walked directly and immediately to Cell #3 where he found Mr. Claiborne hanging from his cell bars by his recently-issued cloth jumpsuit." (*Id.* ¶ 26.)   "At this time, Deputy Domino called for assistance, and [defendants] Corporal King, Corporal Britt, Corporal Minor, and Deputy Johnson arrived thereafter." (*Id.* ¶ 27.)  At first, they tried to untie the knots in the jumpsuit, but that did not work. (*Id.*)  They eventually got a knife to cut Claiborne down. (*Id.*)

- Around 3:18 a.m., Claiborne was taken down, and the officers began to administer CPR. (*Id.* ¶ 28.)

- About one minute later, Nurses Foy and Chapman arrived to aid with CPR. (*Id.* ¶ 29.) Chapman told Page that Claiborne "might have had a faint pulse, but she could not feel it." (*Id.*)

- "Not until 3:21am—at least a full seven minutes after Mr. Claiborne was found hanging— was EMS notified." (*Id.* ¶ 30.)  Around this time, Nurse Brumfield came with oxygen, followed by BR Fire and Rescue. (*Id.* ¶ 31.)

- "Around 3:44am, EMS arrived to assist, leaving around six to ten minutes later having determined that Mr. Claiborne was deceased." (*Id.* ¶ 32.)

Plaintiffs allege that an "investigation and subsequent report by Detective Auzenne" showed that Claiborne "had been displaying odd behavior in the hours prior to his death[.]" (*Id.* ¶ 33.)  "The inmate in Cell #1 heard Mr. Claiborne talking out loud to God[.]" (*Id.*)  Another "inmate in Cell #2 heard Mr. Claiborne singing church music and songs[.]" (*Id.*)  "The inmate in Cell #5

heard Mr. Claiborne singing and talking to himself, and [he] heard him repeatedly state that he was going to kill himself." (*Id.*)  In addition, this inmate used reflections in the windows near his cell and saw "Claiborne climb to the upper bars of his cell, then later saw him hanging and called for help. It appears that no one ever came, and that all the other inmates were asleep at the time." (*Id.*)

Moreover, Deputy Domino's report said that, from 5:00 p.m. to 3:14 a.m., "Claiborne had been exhibiting 'bizarre' behavior such as speaking loudly, using unknown jargon, racking gates, spitting on the floor, talking about his deceased mother, and singing spiritual songs." (*Id.* ¶ 34.) According to the *FAC*, Deputy Domino did not ask that Claiborne "be returned to the special needs housing unit" and "did not take any action in recognition of this 'bizarre' behavior, including redressing [ ] Claiborne in a smock rather than a cloth jumpsuit." (*Id.* ¶ 35.)

### D.  Sheriff Defendants' Alleged Failures

Plaintiffs then make various complaints about Sheriff Defendants' conduct.  For instance, "an EBRPP staff member removed [Claiborne] from mental health observation less than 24 hours after his arrival and provided him with the cloth jumpsuit that he used mere hours later to hang himself[,]" even though Claiborne gave "obvious indications that [he] was suffering an emotional breakdown and was in acute mental health distress following the tragic death of his beloved mother just days before his arrest[.]" (*FAC* ¶ 36, Doc. 9.)

Further, "[d]espite his observably bizarre behavior for several hours prior to his death," defendants Page, Domino, King, Britt, Minor, Johnson, Coleman, Cruz, Grant, Leader, and John Does #1–5 "failed to take the necessary actions to ensure Mr. Claiborne's safety." (*Id.* ¶ 37.) Plaintiffs say these defendants failed to "physically walk the halls between 2:22am and 3:14am – close to an hour – to monitor Mr. Claiborne's cell even though they had knowledge of his acute

emotional distress[.]" (*Id.*)  Plaintiffs also plead that these defendants failed "to respond to the calls for help by the inmate in Cell #5," which "permitted Mr. Claiborne to hang himself." (*Id.*)

### E.  Official Capacity Claims

#### *1. Against Gautreaux and Grimes*

The *FAC* also alleges that these defendants, "as the result of *de facto* policies and practices permitted by defendants Gautreaux and Grimes, failed to monitor prisoner living areas, including the isolation cells in Unit II's N01." (*FAC* ¶ 38, Doc. 9.)  Plaintiffs claim:

> Upon information and belief, N01 is designated for prisoners with serious mental health needs and contains at least two cells designated for suicidal prisoners—cells one and two—because they are close to the control unit occupied by EBRPP staff. Such proximity allows monitoring of suicidal prisoners without having to physically make monitoring rounds, i.e. walk the hallway in front of the cells. Defendant Page, by failing to place Mr. Claiborne in Cell #1 or #2, enabled Mr. Claiborne to hang himself.

(*Id.*)

Plaintiffs also plead that these defendants, because of *de facto* policies allowed by Gautreaux, Grimes, CorrectHealth, Musso, and Llovet, "failed to provide Mr. Claiborne sufficient access to qualified medical and mental health care." (*Id.* ¶ 39.)  Further, due to the *de facto* policies of CorrectHealth and the other supervisors, Brumfield, Foy, and Chapman "failed to provide Mr. Claiborne sufficient medical and mental health care prior to, and resulting in, his death." (*Id.* ¶ 40.) *De facto* policies "permitted by" defendants CorrectHealth, Musso, Llovet, Gautreaux, and Grimes also caused EBRPP employees not to be "trained and/or supervised to address and refer prisoners' serious mental health care needs to CorrectHealth . . . , including those exhibited by Mr. Claiborne, resulting in deliberate indifference to prisoners' serious mental healthcare needs." (*Id.* ¶ 41.)[1]

---

[1] Plaintiffs also allege that "Defendants CorrectHealth . . . , Musso, and Llovet failed to adequately staff and train employees responsible for providing constitutionally adequate medical and mental health care at EBRPP." (*FAC* ¶ 41, Doc. 9.)

Gautreaux, Grimes, CorrectHealth, Musso, and Llovet also allowed *de facto* policies which caused John Doe #6 to fail to "provide appropriate care when he/she removed Mr. Claiborne from mental health observation, less than 24 hours after[ ]he was brought in, even though several staff members had knowledge of his dangerous and fragile[ ]mental state and/or had witnessed bizarre and alarming behavior by Mr. Claiborne." (*Id.* ¶ 42.)

### 2. Against the Parish

Plaintiffs also make the following allegations related to the Parish:

> Defendant Parish failed to provide sufficient funding and oversight to all defendants, resulting in unconstitutional conditions of confinement at the EBRPP. The Parish's policy of not sufficiently funding and overseeing the EBRPP caused defects in physical design and manner of operation, including inadequate staffing, inadequate medical and mental health care, inadequate supervision techniques, and/or poor sightlines at the EBRPP, resulting in a continuous pattern of constitutional deprivations for all prisoners in EBRPP, including Mr. Claiborne. Despite overwhelming, publicly documented testimony by countless staff members and consultants, Parish continues to ignore the dangerous conditions of EBRPP, which directly resulted in the death of Mr. Claiborne.

(*Id.* ¶ 43.)

### 3. Allegations and Other Examples in Support of Customs and Knowledge Thereof

Plaintiffs next devote twenty-nine subparagraphs to establishing how the "failures of all defendants are well known and consistent with a pattern and practice resulting in a decrepit physical facility, rampant violence, and deliberate indifference to the serious medical and mental health care needs of prisoners at EBRPP[.]" (*FAC* ¶ 44, Doc. 9.)  Examples include:

- statistics about the number of deaths between 2012 and 2016 (twenty-five men) and about how that compares to the national prison average (two and a half times higher), (*id.* ¶ 44(a); *see id*. ¶ 44(aa));

8

- instances of others who were injured, assaulted, or died at EBRPP, (*see, e.g.*, *id.* ¶¶ 44(d), (g), (h), (k), (r), (t), (u)), including those who suffered from mental illness, (*id.* ¶¶ 44(e), (f), (l), (y)), and including those who died by suicide (*id.* ¶¶ 44(c), (s));

- the fact that jail conditions "were squarely before the metropolitan council at least ten times," (*id.* ¶ 44(b)), along with details of one metro council meeting where Gautreaux and other EBRPP personnel spoke about the deplorable conditions of the prison, (*id.* ¶ 44(m)), and details of another where (a) "Defendant Llovet either couldn't or declined to answer a majority of questions posed by the . . . Metro Council regarding deaths at EBRPP," (*id.* ¶ 44(x)), and (b) metro council members spoke critically of the prison, (*id.*);

- public statements by Grimes, Gautreaux, and other public figures about the conditions of the jail, (*id.* ¶ 44(i), (n), (o));

- information from former detainees who describe the prison as the "dungeon" and who say that "guards routinely fail to make their rounds and prisoners engage in violence on a daily basis," (*id.* ¶ 44(v));

- the report of the Parish's consultant, Health Management Associates ("HMA"), and its evaluation of the healthcare at EBRPP, (*id.* ¶ 44(p));

- the inadequacy of the Parish's response to the HMA report by hiring CorrectHealth, and by failing to adequately fund EBRPP in light of the report (*id.* ¶ 44(q));

- statistics about the number of deaths since CorrectHealth took over healthcare at EBRPP (at least twenty, as of December 2020), (*id.* ¶ 44(z));

- June 2019 statements by Dr. Homer Venters, "who spent several years overseeing the medical program in New York City's notorious Rikers Island jail and later became one of its biggest critics;" who, after touring EBRPP and after "not[ing] its practice of keeping suicidal inmates and others experiencing severe mental illness in solitary confinement at least 23 hours per day," said that the cells were "the most dangerous units I have observed in an American jail or prison;" and who pointed out "numerous suicide risks including the open bars, more than one of which had cloth ties affixed to bars at the time of our tour," (*id.* ¶ 44(w)); and

- representations by a different expert who inspected the jail in connection with a different case related to Covid-19 to the effect that EBRPP is the "worst jail he had ever seen in his 16-year career and as bad as a jail that was 100 years old," (*id.* ¶ 44(c)).

Plaintiffs claim these "numerous, yet non-exhaustive, examples" show a "culture of violence and indifference to prisoner welfare that is harmful to all prisoners, including to Mr. Claiborne."(*FAC* ¶ 45, Doc. 9.)

### F.  Counts

Plaintiffs assert twelve counts. (*FAC* ¶¶ 49–74, Doc. 9.)  Again, they arise under § 1983 and state law. (*See id.*)

In Count 1, Plaintiffs assert a § 1983 claim for the "establishment of a system in which prisoners with serious mental issues are denied access to appropriate medical care." (*Id.* at 25 (cleaned up).) Defendants Gautreaux and the Parish are named in this count in their official capacities. (*Id.* ¶ 49)  Plaintiffs claim that these defendants violated their Fourteenth Amendment rights "by coordinating with CorrectHealth . . . to provide inadequate and insufficient services for medical and mental health care that they knew would result in the deprivation of adequate medical and mental health care for prisoners with . . . serious mental health conditions." (*Id.*)  Gautreaux and the Parish harmed them "by the insufficiency of the contract and the failure to make other accommodations to provide mental health services because they resulted in the death of Mr. Claiborne, who was deprived of appropriate mental health and medical treatment after he was booked into EBRPP[.]" (*Id.*)  Plaintiffs say these defendants acted with deliberate indifference. (*Id.* ¶ 50.)

Count 2 asserts a § 1983 claim in part against Gautreaux, Grimes, and Leader. (*FAC* ¶ 51, Doc. 9.)[2]  Plaintiffs assert:

> [These defendants] in their individual and official capacities failed
> to supervise their subordinates, namely, Defendants Page, Domino,
> King, Britt, Minor, Johnson, Coleman, Cruz, Grant, and John Does
> #1-#5, to ensure that these subordinates did not ignore prisoners'

---

[2] Count 2 is also asserted against CorrectHealth, Musso, and Llovet. (*FAC* ¶ 51, Doc. 9; *see also id.* ¶¶ 53–54.)

> obvious signs of medical and/or mental health distress, and/or fail to
> properly monitor prisoners showing signs of mental health crisis.

(*Id.*)  Plaintiffs allege in a conclusory way that these defendants were "aware of the need to supervise their subordinates in order to ensure that they did not violate prisoners' rights" but that they "ignored that need and acted unreasonably and with deliberate indifference and disregard for the safety of [ ] Claiborne[.]" (*Id.* ¶ 52.)

Count 3 asserts § 1983 claims of deliberate indifference against CorrectHealth and the healthcare providers. (*Id.* ¶¶ 55–58.) Those claims need not be addressed here.

Count 4 pleads *Monell* violations "based on [the] establishment of policies, patterns or practices pursuant to which prisoners with serious mental health conditions are denied access to appropriate medical care." (*Id.* at 28 (cleaned up).)  Plaintiffs claim that Gautreaux, the Parish, and CorrectHealth violated their Fourteenth Amendment rights. (*Id.* ¶ 59.)  These allegations, too, are largely conclusory and rely upon those allegations described above. (*Id.* ¶¶ 59–62.)

Counts 5 through 12 assert state law claims.  Plaintiff alleges that Page, Domino, King, Britt, Minor, Johnson, Coleman, Cruz, Grant, Leader, John Does #1–5 (in addition to the healthcare providers) engaged in intentional and negligent conduct toward Claiborne in the provision of appropriate mental health treatment. (*FAC* ¶ 63, Doc. 9.)  Count 6 alleges that Gautreaux and CorrectHealth are liable for respondeat superior. (*Id.* ¶ 64.)  Count 7 pleads a loss of consortium claim against all defendants. (*Id.* ¶ 65.)  Count 8 alleges a wrongful death claim, (*id.* ¶¶ 66–67), and Count 9 pleads a survival action, (*id.* ¶ 68).  Count 10 asserts a claim under the direct action statute against Gautreaux's insurer. (*Id.* ¶ 69.)  Count 11 asserts a claim against Gautreaux for failing to "provide medical and mental health treatment within EBRPP that was adequate and reasonable as required by law." (*Id.* ¶¶ 70–71.)  Finally, Count 12 claims that Gautreaux, Grimes, Leader, Page, Brumfield, and John Doe #6 breached their duty under state law

to protect Claiborne by placing him "in Cell #3 rather than Cells #1 or #2 where he would be more easily visible, by releasing him from mental health observation and issuing him a cloth jumpsuit, and by not checking on him for close to one hour despite his obvious mental health breakdown." (*FAC* ¶ 73, Doc. 9.)

## II.    Rule 12(b)(6) Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346–47 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor

does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia*, *S.A. De* C.V., No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503.

### III.    Section 1983 Claims Against Gautreaux, Grimes, and Leader

#### A.  Parties' Arguments

##### *1. Sheriff Defendants' Memorandum (Doc. 13-1)*

Sheriff Defendants first attack Plaintiffs' claim that Gautreaux is liable for the insufficiency of the contract with CorrectHealth. (Doc. 13-1 at 11–12.) Sheriff Defendants maintain that the single decision exception for official capacity claims does not apply. (*Id.* at 12.) Further, CorrectHealth was under contract with the Parish to provide medical and mental health treatment, not with Gautreaux, and the law imposes duties on the Parish to provide a health care provider. (*Id.*) Plaintiffs also fail to allege an underlying constitutional violation by Gautreaux or one of his employees. (*Id.* at 13.)

Sheriff Defendants next argue that Plaintiffs fail to establish a *Monell* claim against them. (*Id.*) First, Plaintiffs fail to identify a policy or practice that deprived prisoners generally or Claiborne in particular of treatment. (*Id.* at 14.) "Rather, Plaintiff improperly infers a policy merely because harm resulted from some interaction with a governmental entity." (*Id.*)

Further, Plaintiffs do not allege a policy or custom of Sheriff Gautreaux with respect to medical treatment. (*Id.*) To the contrary, Plaintiffs allege that CorrectHealth was under contract with the Parish to provide treatment and that John Doe #6 removed Claiborne from mental health observations and the restrictions thereof. (*Id.*)

Indeed, Plaintiffs do not allege that any East Baton Rouge Sheriff's Office ("EBRSO") deputy or employee violated Claiborne's constitutional rights. (*Id.*) Without an underlying violation, Plaintiffs cannot establish liability or causation. (*Id.* at 14–15.)

As to the failure to supervise claims against Gautreaux, Grimes, and Leader, Plaintiffs do not allege any personal involvement by any of these defendants. (*Id.* at 15.) They also fail to articulate a specific policy or custom that caused the deprivation. (*Id.* at 15–16) These allegations are barebones and conclusory. (*Id.* at 17–18.) Plaintiffs do not allege specifically how these defendants failed to supervise the deputies or what the specific policies or customs were that allegedly caused the deprivation. (*Id.* at 18.) Additionally, Plaintiffs fail to show a widespread custom of guards ignoring inmates showing signs of mental health crises or failing to monitor inmates showing signs of mental health problems. (*Id.*) And, again, they fail to allege any underlying constitutional violation by a deputy, so the failure to supervise and monitor claim fails. (*Id.*)

14

The official capacity claims against Captain Leader fall because Plaintiffs have not shown that she is a final decision-maker or policymaker. (*Id.* at 19.)  The Sheriff is the governmental entity responsible for constitutional violations. (*Id.*)

Lastly, the claims against Gautreaux, Grimes, and Leader in their individual capacities should be dismissed for qualified immunity.  (*Id.*)  Plaintiffs have not alleged facts demonstrating that every reasonable officer in these defendants' shoes would know that he or she was violating Claiborne's rights. (*Id.*)

### 2. Plaintiffs' Opposition (Doc. 24)

Plaintiffs argue they have successfully pled their *Monell* claims.  (Doc. 24 at 9.)  Plaintiffs say that they appropriately brought suit against the Sheriff as final policymaker. (*Id.* at 13.) Further, Plaintiffs contend that they "repeatedly demonstrated that Sheriff Gautreaux had actual, constructive knowledge of the constitutional deficiencies of EBRPP." (*Id.* at 14.)  Plaintiffs then refer to public comments by Sheriff Gautreaux about the condition of the jail. (*Id.*)  Plaintiffs complain that Claiborne was "left alone for close to an hour without supervision, and although he displayed extremely bizarre behavior in front of numerous deputies and jail staff, was denied adequate mental health treatment." (*Id.*)  Plaintiffs showed that the conditions were objectively deficient, and that is all that is required. (*Id.* at 14–15.)

Additionally, Sheriff Gautreaux acted with deliberate indifference. (*Id.* at 15.)  Gautreaux knew of the risks of persons incarcerated at EBRPP and knew about the problems at the jail, but he ignored those risks. (*Id.*)  Plaintiffs also demonstrated a pervasive pattern of serious deficiencies. (*Id.*)  The conditions at EBRPP amount to a *de facto* pattern or practice, and the conditions did not reasonably relate to a governmental interest. (*Id.*)

Plaintiffs next argue that Captain Leader is a final policymaker. (*Id.* at 16.)  She was the supervisory official over the subordinates in the unit where Claiborne was housed, and she told detectives about the events that happened. (*Id.*)  The deputies named in this suit are subject to her supervision, so she is liable in her official capacity. (*Id.*)

Plaintiffs then contend that Gautreaux, Grimes, and Leader failed to supervise the deputy defendants "to ensure that these subordinates did not ignore prisoners' obvious signs of medical and/or mental health distress, and/or fail to properly monitor prisoners showing signs of mental health crisis." (*Id.* at 16–17.)  As to the deliberate indifference prong, it was well known that the quality of health care at EBRPP was incredibly bad, and "Defendants had been exposed to information concerning the risks and must have known about them, such that it is apparent that they [had] actual knowledge of the risk." (*Id.* at 18.)  Plaintiffs again reiterate that there is "substantial and overwhelming evidence that EBRPP is a dangerous, violent facility that routinely denies detainees health care and other necessities, and that this knowledge was public and well-known, including by [ ] Gautreaux, Grimes, and Leader." (*Id.* at 18.)  Plaintiffs cite another opinion of this Court which noted "affidavits of detainees in EBRPP . . . demonstrate 'the prevalence of (1) guards failing to make rounds and falsifying logbooks, (2) inmates being segregated, (3) dangerous drugs, (4) violence from guards, and (5) "very bad" medical care conditions in EBRPP.' " (*Id.* (citing Ex. A at 58).)  Plaintiffs say these defendants should have placed mentally ill individuals in visible cells and made more frequent rounds so as not to leave the mentally ill alone for extended periods of time. (*Id.* at 18–19.)

Plaintiffs call Sheriff Defendants' arguments that the deputies did not know about Claiborne's suicidal intentions "preposterous on their face." (*Id.* at 19.)  Claiborne was placed in the special needs wing, was assigned to mental health observation, was placed in a one-man cell,

and was given a yellow smock that was a clear indicator he was a suicide risk. (*Id.*) Other men in the unit observed "Claiborne's strange words and actions throughout the evening," and Deputy Domino's report said that, between 5:00 p.m. and 3:14 a.m., "Claiborne had been exhibiting 'bizarre' behavior such as speaking loudly, using unknown jargon, racking gates, spitting on the floor, talking about his deceased mother, and singing spiritual songs." (*Id.*) If Domino witnessed such behavior over ten hours, "it is reasonable to believe the other deputies on the unit witnessed it as well." (*Id.*) If the deputies claim ignorance, they were deliberately indifferent and "not doing their jobs of caring for the men in their unit." (*Id.* at 19–20.) All of this demonstrates that the deputies had the requisite knowledge. (*Id.*)

As to qualified immunity, Plaintiffs assert:

> Since 2003, it has been clear that a supervisor can be liable personally for the omissions by his subordinates as to whom he has a duty to supervise and whose actions the supervisor has the ability to control. *Billops v. Sandoval*, 401 F. Supp. 2d 766, 774 (S.D. Tex. 2005) (quoting *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1408-15 (5th Cir. 1995)). Since at least 1986, the law has been equally clear in this circuit that jails have a duty to provide treatment to detained individuals with a mental illness. *Partridge v. Two Unknown Police Officers of Houston*, [791 F.2d 1182, 1187 (5th Cir. 1986)]. For decades, jailers such as Defendants Gautreaux, Grimes, and Leader have "owe[d] a constitutionally rooted duty to their prisoners to provide them reasonable protection from injury" and jails such as EBRPP cannot be "administered in a manner virtually indifferent to the safety of prisoners.["] *Stokes v. Delcambre*, [710 F.2d 1120, 1124 (5th Cir. 1983)].

(*Id.* at 20–21.) Plaintiffs rely on *Mitchell v. Gautreaux*, No. 16-722, 2017 WL 2346839, at *15 (M.D. La. May 30, 2017), where, purportedly, "[p]laintiffs alleged a history of similar conduct by a deputy, Gautreaux knew or should have known of this risk of harm, but failed to properly train/supervise the deputy to thwart further harm to others." (*Id.* at 21.) Plaintiffs also cite *Pugh v. Rockwall Cnty.*, *Tex.*, No. 98-2142, 2000 WL 730426, at *61 (N.D. Tex. May 19, 2000), where

17

the court allegedly found "that a reasonably prudent sheriff would not have refrained from making sure that the jail staff checked the locks and did what was possible to monitor inmates." (*Id.*) Plaintiffs say that "Defendants Gautreaux, Grimes, and Leader knew or should have known of the deplorable conditions of the jail, the lack of adequate medical and mental healthcare, and their deputies' inability to properly care for the incarcerated individuals under their care." (*Id.*) Plaintiffs close by saying that the Court should defer ruling on qualified immunity until limited discovery is conducted. (*Id.* at 21–23.)

Plaintiffs maintain that they are not relying on the single incident exception. (*Id.* at 23.) Rather, they argue that the Sheriff is responsible for his deputies' role in providing care. (*Id.*) Plaintiffs then cite certain examples of other inmate assaults and deaths to show Gautreaux's actual or constructive knowledge of problems with the jail. (*Id.* at 23–25.)

Plaintiffs next contend that Corporal Page had adequate knowledge of Claiborne's mental health issues to escort him to Cell #1 or #2 so he could be properly observed. (*Id.* at 25.) Page was advised that Page should be on "high alert" and that Claiborne should be placed in a one-man cell until he got a mental health assessment. (*Id.*) Page and Deputy Baker also issued Claiborne a yellow smock, per his mental health observation status, because of his risk of suicide. (*Id.* at 25–26.) Despite that, Page sent Claiborne to Cell #3, which lacked the direct line of site that Cells #1 and #2 had. (*Id.* at 26.) According to Plaintiffs:

> Corporal Page was the first person to be alerted to Mr. Claiborne's mental health issues, was aware of his attempts to enter the treatment facility and his smashing into a pole, was advised he needed a mental health assessment, witnessed him talking to himself, and personally issued him the yellow smock that is made to protect suicidal detainees. He breached his duty to Mr. Claiborne when he placed him in a cell where he could not be properly monitored, despite his severe emotional and mental health needs.

(*Id.*)

18

### 3. Sheriff Defendants' Reply (Doc. 30)

Sheriff Defendants reply first that Count 1 of the operative complaint should be dismissed because Plaintiffs have failed to allege facts showing that "any policy or decision of Sheriff Gautreaux was the moving force behind the alleged constitutional violation of establishing a system at the Jail through a contract with CorrectHealth that denied appropriate medical/mental health care to inmates, including Mr. Claiborne." (Doc. 30 at 3.)  Sheriff Defendants maintain, *inter alia*, that actual or constructive knowledge is only one of three elements for municipal liability, and Plaintiffs do not address Sheriff Defendants' arguments that Plaintiffs fail to allege "a policy or custom [that] was the moving force behind the alleged constitutional violation of coordinating with CorrectHealth to establish a system of providing inadequate mental health care to inmates at the Jail." (*Id.* at 3–4.)  Plaintiffs also fail to demonstrate how CorrectHealth's provision of services were inadequate or how problems with the contract were a moving force of the constitutional violation. (*Id.* at 4.)

Sheriff Defendants next contend that Plaintiffs' Count 4 should also be dismissed. Plaintiffs do not identify a specific policy of Sheriff Gautreaux that deprived Claiborne of treatment for serious mental disorders. (*Id.* at 4–5.)  While entities can be liable for violations of state law, here, the Parish is under an obligation to provide adequate medical care, not Gautreaux. (*Id.* at 5.)  Plaintiffs fail to satisfy the elements of a *Monell* claim. (*Id.* at 5–6.)  Indeed, Plaintiffs admit that Gautreaux is not responsible for medical care but rather only responsible for his deputies' role in that care. (*Id.* at 6 (quoting Doc. 24 at 23).)   While Plaintiffs refer to other examples of deputies failing to provide adequate care or protection to specific inmates, Plaintiffs fail to show Gautreaux's knowledge of those incidents or what role, if any, EBRSO deputies had in those deprivations. (*Id.* at 6–7.)  Plaintiffs also fail to allege they committed the specific violation

19

here: "deprivation of medical treatment to inmates with serious mental health issues." (*Id.* at 7.) Plaintiffs also do not provide examples of sufficiently numerous, similar incidents, and they do not allege an underlying constitutional violation by any deputy. (*Id.*)

Sheriff Defendants then seek dismissal of the failure to supervise claims. (*Id.* at 8.) Sheriff Defendants begin by arguing that Captain Leader is not a final policymaker, as the Sheriff is the proper party. (*Id.* at 8–9.)  Next, these defendants say that Plaintiffs fail to respond to their argument that Plaintiffs do not allege any specific defects in training and supervision. (*Id.* at 9.) Again, Sheriff Defendants are not responsible for the provision of medical care, so they cannot have failed to supervise the medical providers on that issue. (*Id.* at 10.)  Plaintiffs address only the deliberate indifference prong and do so by improperly relying on inmate declarations in another case. (*Id.*)  Plaintiffs also fail to allege a pattern of inadequate training or supervision, much less that Gautreaux, Grimes, and Leader had knowledge of same. (*Id.*)  Plaintiffs cannot simply point to all prior "bad" acts; they must "point to the specific violation in question." (*Id.* at 11.)  Plaintiffs must also allege that these defendants had knowledge of the deficiencies in training and supervision, and they have failed to do so. (*Id.*)

Again, Plaintiffs fail to allege an underlying constitutional violation by any deputy.  Sheriff Defendants point to *Estate of Bonilla by & through Bonilla v. Orange Cty., Tex.*, 982 F.3d 298, 306 (5th Cir. 2020), a Fifth Circuit decision which purportedly found that courts are "reluctant to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." (*Id.* at 13 (cleaned up).)  Sheriff Defendants also point to *Smith v. Harris Cty.*, *Tex.* 956 F.3d 311, 319 (5th Cir. 2020), which purportedly found that "non-medical jail staff may generally trust the professionals to provide appropriate medical attention." (*Id.* at 13–14.)  While Deputy Domino may have known that Claiborne acted strangely, that is not sufficient to put the

deputies on notice of his suicidal tendencies, particularly given the fact that the medical professional determined that Claiborne no longer needed to be on mental health observation and was not suicidal. (*Id.* at 14–15.)  There are no allegations that the other deputies (Page, King, Britt, Minor, Johnson, Coleman, Cruz, Grant, or Leader) observed or knew of the "peculiar" behavior Claiborne exhibited, and Plaintiffs' argument that the Court should infer knowledge misapplies the standard for deliberate indifference. (*Id.* at 15.)

Finally, Gautreaux, Grimes, and Leader are entitled to qualified immunity. (*Id.*)  "Plaintiffs attempt to define 'clearly established law' at a high level of generality rather than the particular facts alleged in this case." (*Id.* at 16.)  Plaintiffs here "have failed to identify a case with similar facts where an officer acting under similar circumstances as . . . Gautreaux, Grimes, or Leader were found liable for failure to supervise." (*Id.*)  The cases Plaintiffs cite are either inapplicable or distinguishable. (*Id.* at 16–17.)  Plaintiffs are not entitled to limited discovery until they first plead allegations that can overcome qualified immunity. (*Id.* at 17–18.)

## B.  Applicable Law

### 1. Monell Liability

#### a.  Generally

"An official capacity suit is the equivalent of a suit against the entity of which the officer is an agent.  To determine whether a public official is liable in his official capacity, the Court looks to the jurisprudence discussing whether a municipality or local government entity is liable under section 1983." *Romain v. Governor's Office of Homeland Sec.*, No. 14-660, 2016 WL 3982329, at *6 (M.D. La. July 22, 2016) (citations and quotations omitted).  At the outset, it should be noted that "a federal court may [not] apply a 'heightened pleading standard'—more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure—in civil rights

21

cases alleging municipal liability under . . . § 1983." *Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993).

"Section 1983 offers no *respondeat superior* liability." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). "Municipalities face § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . .' " *Id.* (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). That is, "[a] municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.' " *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). "To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.' " *Id.* (quoting *Monell*, 436 U.S. at 691). The Plaintiff must allege "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Id.* at 541–42 (cleaned up).

### b.  Official Policy

"A municipality is liable under § 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.), *on reh'g,* 739 F.2d 993 (5th Cir. 1984). "Official policy is:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute

> a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Id.*

With respect to practices and customs: "A pattern is tantamount to official policy when it is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.' " *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579). "Where prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.' " *Id.* (quoting *Webster,* 735 F.2d at 842). "It is thus clear that a plaintiff must demonstrate 'a pattern of abuses that transcends the error made in a single case.' " *Id.* at 850–51 (quoting *Piotrowski,* 237 F.3d at 582 (citations omitted)). "A pattern requires similarity and specificity; '[p]rior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question.' " *Id.* at 851 (quoting *Estate of Davis ex rel. McCully v. City of N. Richland Hills,* 406 F.3d 375, 383 (5th Cir. 2005)).

"A pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.' " *Id.* (quoting *McConney v. City of Houston,* 863 F.2d 1180, 1184 (5th Cir. 1989)). Thus, in *Pineda*, the Fifth Circuit held that eleven instances of warrantless entry did not support a pattern of unconstitutional warrantless entry. *Pineda*, 291 F.3d at 329. In *Peterson*, the Fifth Circuit found that twenty-seven complaints of excessive force between 2002 and 2005 were insufficient to constitute a pattern, as almost all of the incidents involved "small crimes," and the police force was large. *Peterson*, 588 F.3d at 851.

*c.*    Moving Force of Constitutional Violation

"The third prong requires a plaintiff to prove 'moving force' causation." *Valle*, 613 F.3d at 542.  "To succeed, 'a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.' " *Id.* (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). "That is, 'the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.' " *Id*. (quoting *Brown*, 520 U.S. at 411).  "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.' " *Id.* (quoting *Piotrowski*, 237 F.3d at 579).

Additionally, "Plaintiffs must meet a heightened standard of causation in order to hold a municipality liable under § 1983." *Id.* at 546 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391–92 (1989)). Plaintiffs must show that the municipal policy was the " 'moving force' that caused the specific constitutional violation." *Id.* (citing *Brown v. Bryan Cty, Okl.*, 219 F.3d 450, 461 (5th Cir. 2000)).  "In other words, the plaintiff must establish a 'direct causal link' between the municipal policy and the constitutional injury." *Id.* (citing *Brown*, 520 U.S. at 404).

*d.*    Failure-To Claims and Deliberate Indifference

To state a claim against a municipality for failure to train, a "plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Valle*, 613 F.3d at 544 (citation omitted). "All failure to act claims, such as . . .  failure to train [or] supervise . . . involve the same basic

elements: inadequacy, deliberate indifference, and causation." *Snow v. City of El Paso, Texas*, 501 F. Supp. 2d 826, 833 n. 5 (W.D. Tex. 2006) (citations omitted).

"The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Valle*, 613 F.3d at 544 (quoting *Bryan County*, 219 F.3d at 457). "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* (quoting *City of Canton*, 489 U.S. at 390). Additionally, "for liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)).

"[D]eliberate indifference is a stringent standard of fault, requiring [allegations] that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation and quotations omitted). Plaintiffs "must show that 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.' " *Valle*, 613 F.3d at 547 (quoting *City of Canton*, 489 U.S. at 390). In *Connick*, the Supreme Court summarized this standard as follows:

> Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution. A less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities[.] . . . *see also* [*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)]

(opinion of Brennan, J.) (" [M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ...").

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick*, 563 U.S. at 61–62 (citations and quotations mostly omitted).[3]

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (2011) (citation omitted).  The Supreme Court advises that the heightened standard of fault and causation for these claims is intended to prevent federal courts from engaging "in an endless exercise of second-guessing municipal employee-training programs.  This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism." *City of Canton*, 389 U.S. at 392 (citation omitted).

*e.* Need for an Underlying Constitutional Violation

"The Supreme Court has explained that a municipality cannot be liable '[i]f a person has suffered no constitutional injury at the hands of the individual police officer.' " *Bustos v. Martini*

---

[3] A showing "of deliberate indifference is difficult, although not impossible, to base on a single incident." *Valle*, 613 F.3d at 549 (citation omitted). "The 'single incident exception' is extremely narrow; a plaintiff must prove that the *highly predictable consequence* of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Id.* (emphasis by *Valle*, citations and quotations omitted).

*Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Thus, official capacity "claims fail without an underlying constitutional violation." *Whitley v. Hanna*, 726 F.3d 631, 648–49 (5th Cir. 2013) (citing *Bustos*, 599 F.3d at 467 ("Because [plaintiff] has alleged no constitutional injury attributable to the Officers, [plaintiff] has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights.")).

Likewise, if a plaintiff fails to state a viable claim against individual deputies for deliberate indifference, then he has also failed to satisfy the causation element of a Section 1983 claim against a superior for failure to train and supervise. *See Martinez v. City of N. Richland Hills*, 846 F. App'x 238, 244–45 (5th Cir. 2021) (citing *Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006) ("[i]t is facially evident that [the test for supervisory liability] test cannot be met if there is no underlying constitutional violation.")).

### 2. Rights of Pretrial Detainees

#### a. Generally

"Municipalities can be held liable for violating a person's constitutional rights under § 1983." *Sanchez v. Young County, Texas (Sanchez II)*, 956 F.3d 785, 791 (5th Cir.), *cert. denied*, 141 S. Ct. 901 (2020) (citing *Monell*, 436 U.S. at 690). "For pretrial detainees, such rights include the right to medical care, [*Sanchez v. Young County (Sanchez I)*, 866 F.3d 274, 279 (5th Cir. 2017)], and the right to be protected from known suicidal tendencies, *Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997)." *Id.* "These procedural and substantive due-process rights stem from the Fourteenth Amendment." *Id.* (citing *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979))).

"This circuit characterizes such § 1983 violations of a pretrial detainee's rights as either episodic-acts-or-omissions claims or conditions-of-confinement claims." *Id.* (citing *Hare*, 74 F.3d at 644). "For both claims, a plaintiff has two burdens: to show (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *Id.* (citing *Monell*, 436 U.S. at 694).

### b.   Conditions-of-Confinement Claims

"[Conditions-of-confinement]  claims are challenges to the 'general conditions, practices, rules, or restrictions of pretrial confinement.' " *Id.* (quoting *Hare*, 74 F.3d at 644). "The issue is whether the conditions 'amount to punishment.' " *Id.* (quoting *Bell*, 441 U.S. at 535).

"To prevail on a conditions-of-confinement claim, a plaintiff must show a condition—a 'rule,' a 'restriction,' an 'identifiable intended condition or practice,' or 'sufficiently extended or pervasive' 'acts or omissions' of jail officials—that is not reasonably related to a legitimate government objective and that caused the constitutional violation." *Sanchez II*, 956 F.3d at 791 (quoting *Duvall v. Dallas County*, 631 F.3d 203, 207 (5th Cir. 2011) (quoting *Hare*, 74 F.3d at 645))). Thus, for purposes of such a claim, a plaintiff need not show deliberate indifference on the part of the municipality. *See Duvall,* 631 F.3d at 207   ("[A] plaintiff must show deliberate indifference on the part of the municipality only in a case in which the constitutional violation resulted from an episodic act or omission of a state actor."). However, the standards for a *Monell* claim and for a conditions of confinement claim are similar and frequently overlap. *See Duvall*, 631 F.3d at 208 ("The jury found that Duvall's injury was caused by a policy or custom of the County. Although the jury found this fact in response to the court's instruction on municipal liability under the *Monell* test, the jury's finding satisfies the need for such a showing in connection with the underlying [conditions-of-confinement] constitutional violation as well. . . . We see no

meaningful difference between these showings. . . . [W]e are convinced that the jury's finding of

a custom or policy under the municipal-liability jury instruction satisfies the custom-or-policy

element for purposes of the underlying constitutional violation.").

The Fifth Circuit "has repeatedly held that municipalities or supervisors may face liability

under section 1983 where they breach duties imposed by state or local law." *O'Quinn v. Manuel*,

773 F.2d 605, 608–09 (5th Cir. 1985) (citations omitted).  "The critical point for this case is that

such liability may result if municipal officials have actual or constructive knowledge of

constitutional violations and fail to carry out their duty to correct them." *Id.* at 609 (citation

omitted).

"The general statutory scheme is that the parish is responsible for the expenses of

establishing, maintaining and operating a jail and for all expenses of feeding, clothing, and

providing medical treatment to prisoners. The sheriff has the duty of operating a jail and seeing to

it that prisoners are properly cared for, fed, and clothed." *Boudreaux v. St. Mary Par. Council*, No.

07-0614, 2009 WL 1787678, at *4 (W.D. La. June 18, 2009) (citing *Amiss v. Dumas*, 411 So. 2d

1137, 1141 (La. App. 1 Cir. 1982)).  "Where a municipal body is vested with this sort of fiscal

obligation to a jail, its liability for insufficient funding or maintenance will depend on its

knowledge of conditions at the jail." *O'Quinn*, 773 F.2d at 609.

The Fifth Circuit has described those "case[s] in which a plaintiff demonstrated

deficiencies in the conditions of confinement that amounted to punishment before he was judged

guilty and thus violated due process of law" (and warranted the imposition of liability) as "rare."

*Shepherd v. Dallas County*, 591 F.3d 445, 449 (5th Cir. 2009).  More specifically, the appellate

court has said, "[p]roving a pattern is a heavy burden, one that has rarely been met in our caselaw."

*Id.* at 452.  *Shepherd* further stated:

> [I]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks. Allegations of insufficient funding are similarly unavailing. Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.

*Id.* at 454.

Thus, in *Shepherd*, the Fifth Circuit affirmed a jury's finding of unconstitutional conditions of confinement when "serious injury and death were the inevitable results of the jail's" practices. *Id.* Similarly, in *Duvall*, the Fifth Circuit affirmed a jury's finding of a *de facto* policy of subjecting inmates to a disease when "the Jail experienced around 200 infections per month[,]" and the County was aware of the "bizarrely high incidence" of the disease. *Duvall*, 631 F.3d at 208.

Conversely, in *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456 (5th Cir. 2015) (which cited the above from *Shepherd* and *Duvall* as comparative authority), the Fifth Circuit found that "Plaintiffs' evidence of one other death that took place in the jail four months prior [was] not sufficient to show that the jail's medical staffing was constitutionally inadequate." *Id.* at 469–70. *Estate of Henson* relied on *Shepherd*'s statement that "[i]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate." *Id.* (quoting *Shepherd*, 591 F.3d at 454).

However, "specific examples of other instances of detainees who suffered [decedent's] fate . . . are not required to meet the 'condition or practice' element." *Montano v. Orange County, Tex.,* 842 F.3d 865, 876 (5th Cir. 2016). For instance, in *Sanchez II*, the Fifth Circuit recently found that the district court erred in finding that there was insufficient evidence of an "unofficial custom or practice—much less *pervasive* acts—of failing to monitor detainees." *Sanchez II*, 956 F.3d at

30

792.[4]

Finally, again, "Plaintiffs must meet a heightened standard of causation in order to hold a municipality liable under § 1983." *Valle*, 613 F.3d at 542 (citation omitted). Plaintiffs must show that the municipal policy was "the 'moving force' that caused the specific constitutional violation." *Id*. (citation omitted). "A direct causal connection must exist between the policy and the alleged constitutional deprivation. This connection must be more than a mere 'but for' coupling between cause and effect." *Estate of Bonilla by & through Bonilla v. Orange Cty., Texas*, 982 F.3d 298, 312 (5th Cir. 2020) (cleaned up).

However, the Fifth Circuit has emphasized that it does "not require a plaintiff to show that a policy or practice was the *exclusive* cause of the constitutional deprivation." *Sanchez II*, 956 F.3d at 795 (cleaned up). "Courts may consider how individual policies or practices interact with one another within the larger system." *Id.* (cleaned up). "This is because confinement conditions may be constitutionally inadequate if, when viewed in combination, they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Id.* (cleaned up).

### c.  Episodic Acts or Omissions

"An episodic acts or omissions claim arises where 'the complained-of harm is a particular act or omission of one or more officials.'" *Estate of Bonilla*, 982 F.3d at 304 (quoting *Flores*, 124 F.3d at 738). "More specifically, the Fourteenth Amendment protects pretrial detainees' right to medical care and to 'protection from known suicidal tendencies.'" *Id.* at 304–05 (quoting *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (citing *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019)); *Hare*, 74 F.3d at 639). "A government official violates a Fourteenth Amendment right when the official acts with deliberate indifference to a detainee's serious medical needs." *Id.*

---

[4] *Sanchez II*'s reasoning will be discussed in greater detail *infra* in the section addressing the Parish's liability.

at 305 (citing *Baldwin*, 964 F.3d at 326).  "Deliberate indifference is an extremely high standard to meet." *Id.* (quoting *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001))

To sufficiently demonstrate deliberate indifference, Plaintiffs must allege "that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' that the defendants actually 'dr[e]w the inference,' and that the defendants 'disregard[ed] that risk by failing to take reasonable measures to abate it.' " *Id.* (quoting *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *Hyatt*, 843 F.3 at 179 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006))).

The Fifth Circuit "has previously observed that '[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting.' " *Est. of Bonilla*, 982 F.3d at 306 (quoting *Domino*, 239 F.3d at 756)  In *Est. of Bonilla*, the appellate court summarized prior case law on this issue:

> In *Flores v. County of Hardeman*, the court determined that the sheriff did not act with deliberate indifference when he took off of suicide watch an inmate who later committed suicide, despite the fact that the deceased had just been arrested after a one-hour standoff with police and "was not acting like himself." 124 F.3d at 738–39. Similarly, in *Sibley v. Lemaire*, the plaintiff offered evidence that jail personnel had "observed [Sibley] holding his Bible upside down while appearing to read from it, cleaning the walls of his cell with toilet paper, lying next to his toilet and staring into it . . . . [and] kicking the door to his cell." 184 F.3d 481, 484 (5th Cir. 1999). Sibley was having a psychotic episode and eventually blinded himself by attempting to remove his own eyes. Nonetheless, the court concluded that "[a]lthough Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself." *Id.* at 489.

*Id.*  "The common thread is a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." *Id.*

Thus, in *Estate of Bonilla*, the Fifth Circuit found that the district court correctly granted summary judgment on the episodic acts or omissions claim, remarking that the plaintiffs' position not only "lack[ed] support in the case law" but also "lack[ed] logical force, given the varied, individualized nature of mental illness." *Id.* The appellate court explained that the decedent in *Bonilla* "presented with fewer warning signs than either Flores or Sibley." *Id.* "The circumstances of her arrest, booking and detention did not raise questions concerning her mental stability or capacity for self-harm. She had no history of suicidal tendencies. The evidence indicates that Bonilla did not request medical help, and her behavior in detention was unremarkable prior to her suicide." *Id.* The Fifth Circuit concluded that the "evidence did not give rise to reasonable inferences that the individual defendants were aware of Bonilla's suicidal tendency, much less that they disregarded the risk." *Id.* at 306.

*Sibley* was cited with approval by *Estate of Bonilla* and serves as an even stronger example of the high bar for these claims. In *Sibley*, the plaintiff "underwent a psychotic episode while being detained in an isolation cell." 184 F.3d at 483. He was placed in that cell following "erratic behavior," and he "could only be observed by looking through a slot in the door." *Id.* at 484.

On the day after he was arrested, he was examined by the parish coroner, who found that the plaintiff should be transferred to a mental health center. *Id.* However, because there were no available beds, the coroner put the plaintiff on a waiting list. *Id.*

The following day, a deputy notified the correctional center nurse that the plaintiff needed to see a doctor. *Id.* A different doctor concluded that the plaintiff should be transferred but, given the lack of beds, plaintiff was again put on a waiting list. *Id.* That doctor (Dr. Amy) completed a Physician's Emergency Commitment form, which said that plaintiff "could be having delusions" and was not violent on the exam but did get arrested for battery. *Id.* The appellate court continued:

> In dictated notes from his visit, Dr. Amy further noted: "I was called to see patient at the jail for grossly bizarre behavior. On arrival, patient was pacing around his cell reading an upside down Bible with photographs lined up on the bed like he was holding services. Patient had a very bizarre affect." In a handwritten note at the bottom of the copy of Dr. Amy's typewritten, dictated notes, he wrote in hand: "He is on the list at Acadiana Mental Health & *really* needs to go there."
>
> Dr. Amy left with instructions that he should be called if necessary. Sibley concedes that, up to that point, "[a]lthough [his] conduct was strange and indecorous, there was no suggestion of any potentially self-harming behavior prior to or during Dr. Amy's visit."

*Id*. Thus, as explained above:

> Throughout this time period, Sibley's behavior was erratic—he was observed holding his Bible upside down while appearing to read from it, cleaning the walls of his cell with toilet paper, and lying next to his toilet and staring into it. On Sunday, November 26, Sibley was found kicking the door to his cell.

*Id.*

On the day of the incident, "a deputy discovered that Sibley had urinated on himself and his mattress, thrown his food around, and thrown his Bible and family pictures into the toilet." *Id.* Sibley "was removed to another cell while his cell was cleaned. He was offered a shower but declined one because he apparently believed the devil would come up through the drain." *Id.* "A deputy testified that he checked on him at 9:15 p.m. and observed him sitting on his bed chanting[,]" and, fifteen minutes later, the same deputy saw Sibley plucking out his eyes with his fingers. *Id.* at 484–85.

The Fifth Circuit found no error in the district court's granting of summary judgment on the deliberate indifference claims. *Id.* at 489–90. The key issue was whether the deputies "were either aware or should have been aware of an unjustifiably high risk that Sibley would hurt himself

and failed to act." *Id.* at 489.  While the deputies may have been negligent, their conduct did not amount to deliberate indifference:

> Although Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself. The record does clearly establish that Sibley's actions in blinding himself are highly unusual and unpredictable, even for someone suffering a psychotic episode.

*Id.* at 489–90.  Thus, the Fifth Circuit found no error in the district court's conclusion that the guards did not act with deliberate indifference and were entitled to qualified immunity. *Id.* at 490.

### 3. Individual Capacity Claims

"Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "In determining whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the first prong, the Court has largely provided the basis for such claims.  The Court detailed at length the standard for episodic acts or omissions claims in the previous section. Further, for supervisors not personally involved in the alleged constitutional violations, the legal elements of an individual's supervisory liability and a municipality's liability for failure to train

35

and/or supervise are similar enough such that the same analysis applies to both individual and official capacity claims. *See Lively v. Theriot*, No. 13-2756, 2015 WL 3952159, at *9 n.7 (W.D. La. June 29, 2015) (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452–54 nn.7–8 (5th Cir. 1994) (en banc); *see also Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) ("The standard applicable to failure to train allegations against supervisors is based on that for municipal liability." (citing *Doe*, 15 F.3d at 452–54 and nn.7–8)).

As to the second prong, "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

"Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotations omitted)).

" 'Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers.' " *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552 (internal quotation marks omitted)). "But . . . [a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official

in the defendant's shoes would have understood that he was violating it.' " *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779–80 (2014)).

Phrased another way, "[w]hen considering a defendant's entitlement to qualified immunity, [the Court] must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].' " *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))). "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Morgan*, 659 F.3d at 371–72 (internal quotations omitted) (quoting *al-Kidd*, 563 U.S. at 742, 131 S. Ct. 2074)). "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Id.* (quoting *Morgan*, 659 F.3d at 372).

**C.  Analysis**

*1. Summary*

The Court construes Count 1 (alleging systematic deficiencies, (*FAC* ¶ 49, Doc. 9)) as a conditions-of-confinement claim and Count 4 (alleging unlawful policies and practices, (*id.* ¶¶ 59–62)) as a *Monell* claim based on episodic acts or omissions.  For both, "a plaintiff has two burdens: to show (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *Sanchez II*, 956 F.3d at 791 (citing *Monell*, 436 U.S. at 694).  Count 2 alleges a failure to supervise against these defendants, and that claim also requires, *inter alia*, moving force causation. *Valle*, 613 F.3d at 544.

37

Having carefully considered the matter, the Court will grant the motion as to the § 1983 claims against Gautreaux, Grimes, and Leader. In sum, each of these claims—for conditions of confinement, under *Monell*, and for supervisory liability—fail for lack of causation. That is, Plaintiffs have failed to demonstrate a direct causal link between the conduct of or condition caused by any Sheriff Defendant and the harm Claiborne suffered. Additionally, the supervisory liability claims fail for the additional reason that Plaintiffs have not specifically identified the deficiencies in training or supervision. The Court will examine each of these issues in turn.

### 2. Conditions-of-Confinement Claims

Again, "three elements must be established to prove an unconstitutional condition of confinement:

> (1) a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . or that the jail official's acts or omissions were sufficiently extended or pervasive; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of a detainee's constitutional rights

*Estate of Bonilla*, 982 F.3d at 308–09 (cleaned up).

Plaintiffs likely satisfy the first two requirements. Plaintiffs allege that there are *de facto* polices of "fail[ing] to monitor prisoner living areas," (*FAC* ¶ 38, Doc. 9); "fail[ing] to provide Mr. Claiborne sufficient access to qualified medical and mental health care," (*id.* ¶ 39); and "fail[ing] to provide Mr. Claiborne sufficient medical and mental health care prior to, and resulting in, his death," (*id.* ¶ 40). Likewise, in Count 1, Plaintiffs complain that Gautreaux "establish[ed] [ ] a system in which prisoners with serious mental health issues are denied access to appropriate medical care" and that Gautreaux did so "by coordinating with CorrectHealth . . . to provide inadequate and insufficient services for medical and mental health care that they knew would result in the deprivation of adequate medical and mental health care for prisoners with . . . serious mental

health conditions." (*FAC* ¶ 49, Doc. 9.)  Gautreaux harmed Claiborne "by the insufficiency of the contract and the failure to make other accommodations to provide mental health services[.]" (*Id.*) Further, Plaintiffs have alleged twenty-nine subparagraphs extensively detailing the considerable problems and deficiencies at EBRPP. (*Id.* ¶ 44.)  None of these policies appear "reasonably related to a legitimate governmental objective." *Estate of Bonilla*, 982 F.3d at 309.

However, "[a] direct causal connection must exist between the policy and the alleged constitutional deprivation. This connection must be more than a mere 'but for' coupling between cause and effect." *Id.* at 312 (cleaned up).

Plaintiffs object that Sheriff Defendants "failed to provide Mr. Claiborne sufficient access to qualified medical and mental health care." (*Id.* ¶ 39.)  But, as Sheriff Defendants point out, "[t]he general statutory scheme is that the parish is responsible for the expenses of establishing, maintaining and operating a jail and for all expenses of feeding, clothing, and providing medical treatment to prisoners. The sheriff has the duty of operating a jail and seeing to it that prisoners are properly cared for, fed, and clothed." *Boudreaux*, 2009 WL 1787678, at *4.  Thus, any inadequacy concerning the contract with CorrectHealth, which appears to be the primary basis of Count 1, would fall on the Parish, not Sheriff Defendants.  Indeed, Plaintiffs concede this point, stating that, "[w]hile Defendant Gautreaux is not responsible for the medical care that individuals housed at EBRPP receive, he is certainly responsible for his deputies' role in that care." (Doc. 24 at 23.)

Ultimately, the alleged failure to provide medical care and access to medical care boil down to one single allegedly unlawful condition attributable to Gautreaux: the failure to properly monitor.  But even this is insufficient to impose liability, as the *FAC* fails to demonstrate how this policy caused Claiborne harm.

Though Plaintiffs pled that Corporal Page was told to be on "high alert" and that Claiborne had "mental health issues[,]" (*FAC* ¶ 14, Doc. 9), Page responded appropriately by placing Claiborne in a one-man cell "*until he received a mental health assessment*" and by "relay[ing] this information to Nurse Brumfield, who put Mr. Claiborne on mental health observation shortly thereafter[,]" (*id.* ¶ 16 (emphasis added)).  Page and Deputy Baker also gave Claiborne a "smock rather than a cloth jumpsuit, *per his mental health observation status.*" (*Id.* ¶ 18 (emphasis added).) Thus, by Plaintiffs' own allegations, the cloth jumpsuit and precautions were dependent on Claiborne's mental health assessment and status. (*See id.* ¶¶ 16, 18.)

Even more critically, Plaintiffs allege that "a member of the medical staff, John Doe #6, met with . . . Claiborne and removed him from mental health observation, *and the required restrictions thereof.*" (*Id.* ¶ 20 (emphasis added).)  Thus, Plaintiffs plainly allege that a healthcare provider removed any restrictions.  "When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention." *Smith v. Harris Cty., Tex.*, 956 F.3d 311, 319 (5th Cir. 2020) (quoting *Miranda v. Cty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018)); *cf. id.* ("While hindsight tells us that Hawkins's medical treatment proved inadequate, non-medical employees at the jail had no reason to believe, much less actual knowledge, that Hawkins needed additional accommodations following his discharge.").[5]

---

[5] The Court notes that Plaintiffs cite another opinion of this Court which noted "affidavits of detainees in EBRPP . . . demonstrate the prevalence of (1) guards failing to make rounds and falsifying logbooks, (2) inmates being segregated, (3) dangerous drugs, (4) violence from guards, and (5) 'very bad' medical care conditions in EBRPP." (Doc 24 at 18. (citing Ex. A. at 58).)  Items (2), (3), and (4) have little to do with this case and thus did not cause any constitutional violation.  Items (1) and (5) are more relevant, but they have been addressed above.  In any event, these allegations were not made in the operative complaint and thus are not properly before the Court.  *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) ("In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." (citations omitted)); *see also Apollo Energy, LLC v. Certain*

Further, Plaintiffs complain about the failure to monitor given Claiborne's increasingly bizarre behavior. (*See FAC* ¶¶ 17, 33, Doc. 9.)  But, as the Fifth Circuit authority cited above amply demonstrate, Claiborne's behavior, while strange, was not so strange as to put any Sheriff Defendant deputies on notice that Claiborne was a high risk of suicide. *See Estate of Bonilla*, 982 F.3d at 306; *Sibley*, 184 F.3d at 489; *see also, infra.*

Thus, as a matter of fact and law, Plaintiffs' complaints of systematic deficiencies, individually or in combination, fail.  Even construing the *FAC* in a light most favorable to Plaintiffs, the deputies had no reason to monitor more than they already did, as the medical provider had removed restrictions and as Claiborne's odd behavior did not, by itself, mean he was suicidal. Phrased another way, there was simply no direct causal link between the numerous deficiencies with EBRPP detailed in the complaint, (*FAC* ¶ 44, Doc. 9), and Claiborne's death. Consequently, the conditions-of-confinement claim fails.  *See Estate of Bonilla*, 982 F.3d at 311 (finding plaintiffs failed to satisfy the causation requirement of their conditions-of-confinement claim because "there [were] crucial gaps between the Defendants' failure to provide Xanax and Bonilla's decision to take her own life" such that "[a] jury would have to resort to impermissible speculation to conclude that there was a 'direct causal link' between the alleged constitutional violation—Defendants' failure to distribute Xanax to Bonilla during her 10-hour stay—and her death."); *Martinez*, 846 F. App'x at 247 ("Martinez's complaint does not . . . plead any facts that would permit the conclusion that the unidentified custom or policy was the 'moving force' behind the detention officers' alleged misconduct.").

### 3. Monell Claim

The *Monell* claims based on episodic acts or omissions are more easily dispensed with.

---

*Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 677–78 (M.D. La. 2019) (deGravelles, J.) ("[A] motion to dismiss is evaluated on the operative complaint, not a plaintiff's opposition." (citations omitted)).

Again, *Monell* claims fail for lack of an underlying constitutional violation. *See Whitley*, 726 F.3d at 648–49 (citing *Bustos*, 599 F.3d at 467).  As to the underlying claim, to establish deliberate indifference, Plaintiffs must allege "that the defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, that the defendants actually drew the inference, and that the defendants disregarded that risk by failing to take reasonable measures to abate it." *Estate of Bonilla*, 928 F.3d at 305 (cleaned up).

As to Corporal Page, the Court has already addressed any claim against him.  His decision to place Claiborne in Cell #3 is insulated by John Doe #6's removing of Claiborne's mental health restrictions. *Cf. Smith*, 956 F.3d at 319.  That is, Page is not deliberately indifferent to a risk of serious harm when a medical provider told him there was no such risk. *Cf. id.*

As to the other deputies, Deputy Domino is the only Sheriff Defendant who is alleged to have made rounds by Claiborne's cell on the day of the incident. (*FAC* ¶¶ 24–27, Doc. 9.)  Some of the deputies—King, Britt, Minor, and Johnson—"arrived shortly [after]" Domino "called for assistance," (*id.* ¶ 27), and others—Coleman, Cruz, and Grant—are simply alleged to have been at the prison and "fail[ed] to physically walk the halls . . . to monitor [ ] Claiborne's cell," (*id.* ¶ 37).  This is critical because "[d]eliberate indifference . . . cannot be shown through the actions of the cumulative group. Instead, each named member of that group must be shown to have acted, independently, with deliberate indifference." *Martinez*, 846 F. App'x at 243 (internal citation omitted).

Thus, as alleged, Deputy Domino is the only deputy who observed Claiborne's strange behavior on the night of the incident, (s*ee FAC* ¶ 33, Doc. 9), and he is the only deputy who is even remotely alleged to have knowledge of a substantial risk of harm. *See Martinez*, 846 F. App'x at 244 (finding that, because plaintiff "assert[ed] no specific, substantive allegations against

[certain] defendants . . . other than that they were working at the Jail at some point during [plaintiff's] incarceration[,]" such "allegations [were] not sufficient to state a claim for deliberate indifference because they fail to show these Defendants acted or failed to act with the required mental state.").

As to Deputy Domino, Claiborne's behavior is on par with Sibley's, yet the Fifth Circuit found in *Sibley* that "[a]lthough Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself." 184 F.3d at 489.  Likewise, nothing Claiborne did rose to the level that Deputy Domnio "could have only concluded that he posed a serious risk of harm to himself," and Domino cannot be said to have known of an "unjustifiably high risk that [Claiborne] would hurt himself and [yet] failed to act." *Id.* at 489. This conclusion is particularly warranted given the Fifth Circuit's recent statement that there is a "common thread" in the case law reflecting "a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." *Estate of Bonilla,* 928 F.3d at 306.

Plaintiffs argue that an inmate overheard Claiborne say he would kill himself, (*FAC* ¶¶ 33, Doc. 9), and Plaintiffs maintain that the inference can be made that Domino and the others heard this.  However, no such allegation is made in the *FAC*, and, in any event, such an inference would collapse deliberate indifference into a negligence standard and impose liability on Sheriff Defendants based on what Plaintiffs say the deputies *should* have heard rather than what they in fact heard. *See Estate of Bonilla*, 982 F.3d at 305 ("Even if an officer responds without the due care a reasonable person would use—such that the officer is only negligent—there will be no liability." (cleaned up)); *Sibley*, 184 F.3d at 489 n.7 ("We note here the difference between

negligence and deliberate indifference. A reasonably prudent man may well have deemed it necessary to call Dr. Amy in the light of Sibley's worsening condition. To be deliberately indifferent, however, the deputies would have had to have chosen not to call Dr. Amy with the expectation that some harm would result to Sibley.").  Without even an allegation that Domino and the others "actually drew the inference" that Claiborne would kill himself, Plaintiffs' claims fail. *See Martinez*, 846 F. App'x at 244 (affirming dismissal of claims against certain defendants because "there [were] no allegations to support that they actually drew the inference that their acts or omissions could *cause* [plaintiff] serious harm and that they acted or failed to act with the intent to harm [plaintiff].").

In sum, because Plaintiffs have failed to allege an underlying constitutional violation against any Sheriff Defendant, Plaintiffs have failed to adequately allege a *Monell* claim against them.  Consequently, these claims will be dismissed.

### 4. Failure-to-Supervise Claims

Additionally, Plaintiffs' claims for failure to supervise fall for two reasons.  First, again, there is no underlying constitutional violation by any individual Sheriff's deputy, so any supervisor claim against Gautreaux, Grimes, and Leader must necessarily fail. *See Martinez*, 846 F. App'x at 244–45 (citing *Rios*, 444 F.3d at 425); *Lively*, 2015 WL 3952159, at *9 (finding that summary judgment was proper because "plaintiffs have failed to demonstrate that the Sheriff's subordinate Deputies violated Davis' Constitutional rights[,]" so "a direct causal connection between the Sheriff's alleged inadequate training, supervision or discipline and a constitutional deprivation [was] lacking.").

Second, Plaintiffs failed to sufficiently plead the specific problems with these Sheriff Defendants' training and supervision.  Here, Count 2 alleges:

> [These defendants] in their individual and official capacities failed
> to supervise their subordinates, namely, Defendants Page, Domino,
> King, Britt, Minor, Johnson, Coleman, Cruz, Grant, and John Does
> #1-#5, to ensure that these subordinates did not ignore prisoners'
> obvious signs of medical and/or mental health distress, and/or fail to
> properly monitor prisoners showing signs of mental health crisis.

(*FAC* ¶ 51, Doc. 9.)  Elsewhere, Plaintiffs plead that *de facto* policies "permitted by" these defendants caused EBRPP employees to not be "trained and/or supervised to address and refer prisoners' serious mental health care needs to CorrectHealth . . ., including those exhibited by [ ] Claiborne, resulting in deliberate indifference to prisoners' serious mental healthcare needs." (*Id.* ¶ 41.)

Again, "[i]n resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Valle*, 613 F.3d at 544 (quoting *City of Canton*, 489 U.S. at 390).  "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Goodman*, 571 F.3d at 395 (quoting *Roberts*, 397 F.3d at 293).  Here, Plaintiffs do not allege what the specific issues with the training and supervision of these three supervisor defendants were.  Plaintiffs only offer conclusory allegations, and that is insufficient.

Thus, even assuming Plaintiffs had adequately alleged a sufficient number of prior similar instances of deficiencies in training and supervision, and even assuming Plaintiffs had pointed to sufficiently analogous, controlling case law demonstrating that every reasonable officer in these Sheriff Defendants' shoes would know, beyond doubt, that their conduct was unlawful under clearly established law (which requires that the Court "define[] the contours of the right in question with a high degree of particularity," *McLin*, 866 F.3d at 695), Plaintiffs' individual and official capacity claims against Gautreaux, Grimes, and Leader based on supervisor liability fail. Consequently, they will be dismissed.

## IV.    State Law Claims Against Sheriff Defendants

### A.  Parties' Arguments

#### 1. Sheriff Defendants' Original Memorandum (Doc. 13-1)

Sheriff Defendants next move to dismiss the state law claims. (Doc. 13-1 at 20.)  They maintain that Plaintiffs do not demonstrate that the deputies knew or should have known of Claiborne's suicidal intentions. (*Id.* at 22.)  The behavior described in the *FAC* was not sufficient to put Domino on notice that Claiborne was suicidal or that he needed immediate healthcare. (*Id.*) "Claiborne's suicide was neither foreseeable nor easily associated with any duty that was allegedly breached by Deputy Domino." (*Id.*)  Plaintiffs fail to allege any facts about the other deputies (Page, King, Britt, Minor, Johnson, Coleman, Cruz, Grant, or Leader) indicating that they were aware of Claiborne's "peculiar" behavior on the night of the suicide. (*Id.* at 23.)

Additionally, Plaintiffs have no state law claims for failure to protect. (*Id.* at 23.)  Again, though Page brought Claiborne to Cell #3 rather than Cell #1 or Cell #2, Page was entitled to rely upon Nurse Brumfield's decision to not put Claiborne on suicide watch.  (*Id.* at 24.)  As to Gautreaux, Grimes, and Leader, Plaintiffs fail to allege that these Defendants had anything to do with Claiborne's death. (*Id.* at 24–25.) Further, any claim of vicarious liability against Gautreaux falls for lack of an underlying tort. (*Id.* at 26.)

Plaintiffs also purportedly fail to allege how Sheriff Defendants breached their duty to provide medical care. (*Id.* at 27.) Again, the Parish has a duty to provide medical treatment, not the Sheriff. (*Id.*)  Any claims about CorrectHealth are more properly brought against those defendants. (*Id.*)

Finally, the loss of consortium, wrongful death, and survival claims must be dismissed. (*Id.* at 28.) These claims are dependent on the other state law claims, all of which should be dismissed. (*Id.*)

### 2. Plaintiffs' Opposition (Doc. 24)

Plaintiffs devote few pages to the state law claims and instead incorporate arguments made for the § 1983 claims. (Doc. 24 at 26–27.) Plaintiffs argue that Sheriff Defendants knew or should have known of Claiborne's "mental health struggles," and that Domino observed it firsthand. (*Id.*) The contentions about Corporal Page, Warden Grimes, Captain Leader, Sheriff Gautreaux, and Deputy Page were also discussed with respect to deliberate indifference to mental health needs. (*Id.* at 27.) Sheriff Gautreaux's position on respondeat superior is based solely on the purported absence of other state law claims, as is the argument about survival action and wrongful death damages. (*Id.* at 27–28.) Sheriff Gautreaux's failure to provide adequate medical care was also "discussed and examined extensively above." (*Id.* at 27.)

### 3. Sheriff Defendants' Reply (Doc. 30)

As to the failure-to-protect claims, Sheriff Defendants assert that Plaintiffs failed to address these arguments as to Gautreaux, Grimes, and Leader, so these claims are deemed waived. (Doc. 30 at 19.) As to Corporal Page, the mere fact that he was aware of "mental health issues" did not put him on notice that Claiborne was going to commit suicide. (*Id.* at 19–20.) Again, Page should be able to rely on John Doe #6's medical judgment. (*Id.*)

As to the other state law claims, Plaintiffs have failed to demonstrate that any of the individual Sheriff Defendant deputies deprived Claiborne of medical care or knew of his suicidal intentions. (*Id.* at 20.) Plaintiffs also fail to address Sheriff Defendants' argument that Gautreaux

had no duty to provide medical treatment; Plaintiffs instead only vaguely say they have discussed and examined the issue without providing any citations.

### B.  Applicable Law

"In Louisiana, negligence claims are governed by a duty-risk analysis under Louisiana Civil Code article 2315." *Newsome-Goudeau v. Louisiana*, No. 17-909, 2020 WL 5665615, at *6 (W.D. La. Sept. 22, 2020) (Foote, J.) (citing *Chanthasalo v. Deshotel*, No. 2017-CA-0521 (La. App. 4 Cir. 12/27/17), 234 So. 3d 1103, 1107). "To establish a claim for negligence, a plaintiff must establish five elements: duty, breach, cause-in-fact, scope of the duty/risk, and damages." *Id.* (citing *Chanthasalo*, 234 So. 3d at 1107.).

"In Louisiana, prison authorities owe a duty of reasonable care to protect inmates from harm." *Id.* (citing *Harper v. Goodwin*, 41,053 (La. App. 2 Cir. 5/17/06), 930 So. 2d 1160, 1163). "However, in order for prison officials to have a duty to protect inmates from suicide, there must be evidence that they 'either knew or should have known of an inmate's suicidal tendencies.' " *Id.* (quoting *Leonard v. Torres*, No. 2016-1484 (La. App. 1st Cir. 9/26/17), ––– So. 3d ––––, 2017 WL 4301898, at *12; *Scott v. State*, 618 So. 2d 1053, 1058 (La. App. 4 Cir. 1993); *Estate of Shelvin v. Neustrom*, 2015-63 (La. App. 3 Cir. 10/7/15), 197 So. 3d 707, 713). "Thus, the duty of prison authorities does not extend to protecting inmates from unknown suicidal tendencies." *Id.*

### C.  Analysis

Having carefully considered the matter, the Court will deny the *Sheriff Defs.' MTD* with respect to the state law claims. As to Count 5 (negligent and intentional conduct), again, deputies act with deliberate indifference when they choose not to take certain action "with the expectation that some harm would result," but negligence occurs when deputies fail to act as a reasonably prudent person under the circumstances. *See Sibley*, 184 F.3d at 489 n.7; *see also Estate of Bonilla*,

982 F.3d at 305 (saying that, when "an officer responds without the due care a reasonable person would use . . . the officer is only negligent" (cleaned up)).

Here, while Plaintiffs' allegations may not adequately plead that the deputies were deliberately indifferent to Claiborne's risk of suicide, when construing the allegations of the *FAC* in a light most favorable to Plaintiffs and when drawing reasonable inferences in their favor, a reasonable juror could conclude that they were negligent in not hearing Claiborne say he would kill himself, as the other inmate indicated. At the very least, a reasonable juror could infer that all of the guards who were within earshot of Domino's request for assistance should have heard Claiborne's warnings about self-harm and thus should have known about his suicidal tendencies. *Cf. Newsome-Goudeau*, 2020 WL 5665615, at *6. Further, while John Doe #6's removal of medical restrictions may insulate the deputies from § 1983 liability, that shielding does not prevent a reasonable jury from concluding that the deputies were in some way comparatively at fault for what happened. Thus, the motion to dismiss Count 5 will be denied.

The same can be said of the failure-to-protect claims (Count 12) against Gautreaux, Grimes, Leader, and Page. Again, a reasonable jury could conclude (1) that Page was contributorily negligent with John Doe #6, and (2) that the supervisor defendants should have done a better job protecting inmates given the deplorable conditions allegedly occurring at EBRPP.

As to the failure to provide medical treatment, the Court explained above how the Parish has the statutory duty to provide medical treatment for prisoners, not the Sheriff. Plaintiffs conceded that the Sheriff is only responsible for the role his deputies play in the provision of care. (*See* Doc. 24 at 23.) But, as explained above, a reasonable jury could find these deputy defendants at fault, so this claim will at least survive for discovery.

Given this finding, the loss of consortium (Count 7), wrongful death (Count 8), and survival action (Count 9) claims survive as well. *Cf. Newsome-Goudeau*, 2020 WL 5665615, at *6. And, of course, Gautreaux can be vicariously liable when there is an underlying tort.

Accordingly, for all the reasons articulated above, Sheriff Defendants' motion will be denied with respect to the state law claims. These causes of action survive.

## V.    Section 1983 Claims Against the Parish

### A.    Parties' Arguments

The Parish argues first that it had only two duties with respect to the jail under Louisiana law, one of which was to "to appoint a physician to attend to the prisoners confined in parish jails or enter into a contract with a healthcare provider to do so." (Doc. 15-1 at 4.) If the Parish enters into a contract, then it must also "abid[e] by its obligations under the healthcare services contract." (*Id.*) CorrectHealth is the entity responsible for providing adequate medical care and fulfilling its obligations under the contract. (*Id.*) Thus, Plaintiffs have failed to state a viable claim against the Parish. (*Id.*)

Further, for *Monell* liability, Plaintiffs must allege specific policies or practices and a pattern of similar violations. (*Id.* at 6.) Plaintiffs must also adequately allege deliberate indifference. (*Id.*) Here, Plaintiffs fail to allege specific policies or to explain how the "system" is deficient. (*Id.* at 7.) Further, Plaintiffs fail to allege beyond conclusions that any policy was "so common and well-settled as to constitute a custom that fairly represents municipal policy." (*Id.*)

Plaintiffs respond in part through their opposition to the *Sheriff Defs.' MTD*, but Plaintiffs also say that the Parish is the "policymaker for funding and oversight of EBRPP[.]" (Doc. 24 at 11.) Plaintiffs argue that they pled that the Parish breached these duties in ways that established a "continuous pattern of constitutional deprivations for all prisoners in EBRPP, including [ ]

Claiborne." (*Id.* (quoting *Original Compl.* ¶ 43, Doc. 1).)  Plaintiffs also pled actual or constructive

knowledge by the Parish through extensive allegations of mismanagement. (*Id.*)  Despite that

knowledge, the Parish gave only a slight increase in funding. (*Id.* at 12.)

Plaintiffs also argue that they demonstrated deliberate indifference by the Parish, which

knew of the terrible conditions of EBRPP yet ignored those risks. (*Id.* at 15.)  Ultimately, the

conditions at EBRPP reflected a de facto policy of extended or pervasive misconduct, and, because

the Parish cannot show that those conditions at the prison "reasonably related to a legitimate

government interest," the Parish's motion should be denied. (*Id.* at 15–16.)

### B.  Law and Analysis

Plaintiffs plead two counts against the Parish: Count 1 (conditions of confinement) and

Count 4 (*Monell*).  As stated above, the standards for a *Monell* claim and for a conditions of

confinement claim are similar and frequently overlap.  *See Duvall*, 631 F.3d at 208.

Again, "to prevail on a conditions-of-confinement claim, a plaintiff must show a

condition—a rule, a restriction, an identifiable intended condition or practice, or sufficiently

extended or pervasive acts or omissions of jail officials—that is not reasonably related to a

legitimate government objective and that caused the constitutional violation." *Sanchez II*, 956 F.3d

at 791 (cleaned up).  For this claim, a plaintiff need not show deliberate indifference on the part of

the municipality. *See Duvall,* 631 F.3d at 207

Further, again, the Fifth Circuit "has repeatedly held that municipalities or supervisors may

face liability under section 1983 where they breach duties imposed by state or local law." *O'Quinn*

*v. Manuel*, 773 F.2d 605, 608–09 (5th Cir. 1985) (citations omitted).  "The critical point for this

case is that such liability may result if municipal officials have actual or constructive knowledge

of constitutional violations and fail to carry out their duty to correct them." *Id.* (citation omitted).

"The general statutory scheme is that the parish is responsible for the expenses of establishing, maintaining and operating a jail and for all expenses of feeding, clothing, and providing medical treatment to prisoners." *Boudreaux*, 2009 WL 1787678, at *4 (citing *Amiss v. Dumas*, 411 So. 2d 1137 (La. App. 1 Cir. 1982)). "Where a municipal body is vested with this sort of fiscal obligation to a jail, its liability for insufficient funding or maintenance will depend on its knowledge of conditions at the jail." *O'Quinn*, 773 F.2d at 609. Further, "a parish can be liable for damages under federal law for failure to contract for and fund constitutionally adequate medical and mental health care." *Thompson v. Ackal*, No. 15-02288, 2016 WL 1371192, at *5 (W.D. La. Feb. 2, 2016), *report and recommendation adopted*, No. 15-02288, 2016 WL 1370597 (W.D. La. Apr. 5, 2016); *see also Roper v. Marino*, No. 92–3988, 1995 WL 222185, at *2 (E.D. La. Apr. 13, 1995) (denying summary judgment because there were "fact issues as to whether medical services and personnel were sufficient at the St. Charles Parish Jail.").[6]

Here, Plaintiffs have sufficiently alleged a viable conditions-of-confinement claim against the Parish. Plaintiffs sue the Parish as the "entity responsible for funding operations of the [EBRPP]" and as the party that "negotiates, approves, funds, and enters into contracts with other entities to provide medical and mental health services at the jail[.]" (*FAC* ¶ 1(a), Doc. 9.) Plaintiffs also make the following allegations related to the Parish:

> Defendant Parish failed to provide sufficient funding and oversight
> to all defendants, resulting in unconstitutional conditions of
> confinement at the EBRPP. The Parish's policy of not sufficiently
> funding and overseeing the EBRPP caused defects in physical
> design and manner of operation, including inadequate staffing,
> inadequate medical and mental health care, inadequate supervision
> techniques, and/or poor sightlines at the EBRPP, resulting in a
> continuous pattern of constitutional deprivations for all prisoners in

---

[6] *See also* La. Rev. Stat. Ann. § 15:703(A) ("The governing authority of each parish shall appoint annually a physician who shall attend the prisoners who are confined in parish jails whenever they are sick."); *id.* § 15:703(B) ("In lieu of appointing a physician, the governing authority of any parish may enter into a contract with a health care provider, licensed or regulated by the laws of this state, to provide requisite health care services, as required in this Section.").

> EBRPP, including Mr. Claiborne. Despite overwhelming, publicly documented testimony by countless staff members and consultants, Parish continues to ignore the dangerous conditions of EBRPP, which directly resulted in the death of Mr. Claiborne.

(*Id.* ¶ 43.)  Thus, contrary to the Parish's position, Plaintiffs provide highly specific allegations about the Parish's practices with respect to EBRPP and how they are defective.

Further, Plaintiffs allege that the Parish had adequate notice about the problems.  The Court need not repeat all the allegations of systematic deficiencies contained in *FAC* ¶ 44, Doc. 9, but Plaintiffs specifically allege that, from 2012 to 2016, jail conditions "were squarely before the metropolitan council at least ten times," (*id.* ¶ 44(b)), along with details of one metro council meeting where Gautreaux and other EBRPP personnel spoke about the deplorable conditions of the prison, (*id.* ¶ 44(m)), and details of another meeting where (a) "Defendant Llovet either couldn't or declined to answer a majority of questions posed by the . . . Metro Council regarding deaths at EBRPP," (*id.* ¶ 44(x)), and (b) metro council members spoke critically of the prison, (*id*). Further, Plaintiffs refer to public statements by Grimes, Gautreaux, and other public figures about the conditions of the jail. (*Id.* ¶ 44(i), (n), (o).)  Plaintiffs also cite to the report of the Parish's consultant, HMA, and its evaluation of the healthcare at EBRPP, (*id.* ¶ 44(p)), and they plead the inadequacy of the Parish's response to the HMA report in hiring CorrectHealth and in making an insufficient increase in the budget that was less than the HMA recommendation, (*id.* ¶ 44(q)).  All of these allegations, particularly when combined with the numerous other incidents involving prisoners with mental health issues, (*id.* ¶¶ 44(e), (f), (l), (u)), and those who committed suicide there, (*id.* ¶¶ 44(c), (s)), demonstrate that the Parish had ample notice of deficiencies at the jail.

The Parish responds that Plaintiffs must establish a sufficient number of prior similar incidents to impose liability, but that is an incomplete characterization of the law for conditions-of confinement claims.  The Fifth Circuit has said that "specific examples of other instances of

detainees who suffered [decedent's] fate . . . are not required to meet the 'condition or practice' element." *Montano v. Orange County, Tex.,* 842 F.3d 865, 876 (5th Cir. 2016). For instance, in *Sanchez II*, the Fifth Circuit found that the district court erred in finding that there was insufficient evidence of an "unofficial custom or practice—much less *pervasive* acts—of failing to monitor detainees." 956 F.3d at 792.

The Fifth Circuit based this conclusion on a number of facts. First, contrary to the lower court's ruling, there were reports from the Texas Commission on Jail Standards "about inadequate detainee monitoring from before and after [decedent's] death[,]" which served as "evidence that jailers failed to monitor other detainees." *Id.*

Second, there was evidence of ratification, as, after the death, the "sheriff neither punished any jailers involved nor took any actions to correct the jail's alleged deficiencies." *Id.* at 792–93. The Fifth Circuit said:

> When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy. *See Duvall*, 631 F.3d at 208–09 (upholding jury finding that a county jail maintained an unconstitutional condition where there was evidence that the county policymaker knew of unconstitutional conditions yet failed to revise its policies); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city)[.]

*Id.* at 793 (citation omitted).

Third, there was certain evidence of discrepancies between cell-check logs and video recordings of the decedent's cell, with six hours of recordings missing without explanation. *Id.* The appellate court explained, "[a] jury might then reasonably conclude that, in light of multiple reports that the jail inadequately monitored detainees, such dishonesty and an apparent cover-up

is 'typical of extended or pervasive misconduct.' " *Id.* (quoting *Hare*, 74 F.3d at 645; also citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 895 (5th Cir. 1980) (holding that inconsistent testimony "present[s] questions of credibility which require jury resolution")).

With respect to the failure-to-assess claims, the Fifth Circuit said, "[o]ne way a plaintiff can prove the existence of a de facto policy is through the 'consistent testimony of jail employees.' " *Id.* at 794 (quoting *Montano*, 842 F.3d at 875). The *Sanchez II* court then cited the testimony of "[a]t least three jailers" and held that, "consistent jailer testimony about a de facto policy creates a factual dispute that precludes summary judgment." *Id.*

Here, as stated above, Plaintiffs allege some of these factors with respect to the Parish. As in *Sanchez II*, there was a public report about the unconstitutional conditions (from HMA), (*FAC* ¶ 44(p), Doc. 9), and a reasonable juror could find ratification of these conditions from the Parish's failure to correct the extensive problems despite the numerous specific deaths and public meetings. Further, as in *Sanchez II*, there was consistent testimony from Gautreaux, Grimes, public figures, and EBRPP personnel about the deplorable conditions at the prison. (*Id.* ¶¶ 44(b), (m), (x), (i), (n), (o).)

In sum, contrary to the Parish's position, Plaintiffs' *FAC* (1) articulates specific policies and conditions which serve no legitimate governmental function, and (2) supports the existence of these pervasive conditions through extensive allegations. Accordingly, the Parish's motion to dismiss will be denied.

## VI.   Leave to Amend

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955). The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone,
> and the pull to decide cases on the merits rather than on the
> sufficiency of pleadings, district courts often afford plaintiffs at least
> one opportunity to cure pleading deficiencies before dismissing a
> case, unless it is clear that the defects are incurable or the plaintiffs
> advise the court that they are unwilling or unable to amend in a
> manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

One leading treatise has further explained:

> As the numerous case[s] . . . make clear, dismissal under Rule
> 12(b)(6) generally is not immediately final or on the merits because
> the district court normally will give the plaintiff leave to file an
> amended complaint to see if the shortcomings of the original
> document can be corrected. The federal rule policy of deciding cases
> on the basis of the substantive rights involved rather than on
> technicalities requires that the plaintiff be given every opportunity
> to cure a formal defect in the pleading. This is true even when the
> district judge doubts that the plaintiff will be able to overcome the
> shortcomings in the initial pleading. Thus, the cases make it clear
> that leave to amend the complaint should be refused only if it
> appears to a certainty that the plaintiff cannot state a claim. A district
> court's refusal to allow leave to amend is reviewed for abuse of
> discretion by the court of appeals. A wise judicial practice (and one
> that is commonly followed) would be to allow at least one
> amendment regardless of how unpromising the initial pleading
> appears because except in unusual circumstances it is unlikely that
> the district court will be able to determine conclusively on the face
> of a defective pleading whether the plaintiff actually can state a
> claim for relief.

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Here, though Plaintiffs previously amended their complaint, they did not do so in response to a ruling by this Court assessing the sufficiency of their claims. Thus, "the Court will act in accordance with the 'wise judicial practice' and general rule and grant Plaintiff[s'] request." *Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 519 (M.D. La. 2021) (deGravelles, J.) (citing *JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 641–42 (M.D. La. 2018) (deGravelles, J.); *Fetty v. Louisiana State Bd. of Private Sec. Examiners*, —— F. Supp. 3d ——,

No. 18-517, 2020 WL 520026, at *15 (M.D. La. Jan. 31, 2020) (deGravelles, J.) ("because Plaintiffs did not amend their complaint in response to a ruling by this Court, and because of the above 'wise judicial practice,' the Court will grant Plaintiffs one final opportunity to amend their complaint to state viable claims against the Board Members." (citing *JMCB*, 336 F. Supp. 3d at 641–42)); *Murphy v. Bos. Sci. Corp.*, No. 18-31, 2018 WL 6046178, at *1 (M.D. La. Nov. 19, 2018) (deGravelles, J.) (reaching same result) (citing, inter alia, *JMCB, supra*).

The Court makes two notes in closing.  First, the Court believes an amendment is particularly warranted here, as Plaintiffs may be able to cure some of the deficiencies detailed above.  But, second, the Court passed on a number of questions in reaching this decision (such as the issue of qualified immunity, or the ability to bring an official capacity claim against Leader). In amending the *FAC*, Plaintiffs should correct any other deficiencies they may find appropriate in light of Sheriff Defendants' motion.  If they fail to do so, and if Sheriff Defendants ultimately prove successful on a second motion to dismiss, the Court will be less inclined to grant leave to amend, given the notice Plaintiffs had of these potential issues and the opportunity to cure.

## VII.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss* (Doc. 13) filed by Sheriff Defendants is **GRANTED IN PART AND DENIED IN PART.**  All § 1983 claims by Plaintiffs against Sheriff Defendants are **DISMISSED WITHOUT PREJUDICE**.  However, the *Sheriff Defs.' MTD* is denied with respect to Plaintiffs' state law claims.

**IT IS FURTHER ORDERED** that Plaintiffs shall have twenty-eight (28) days from the Court's ruling on the other two pending motions (Docs 25 and 26) in which to amend the operative

complaint to cure the deficiencies detailed in this ruling.  Failure to do so will result in the dismissal of the claims against Sheriff Defendants with prejudice.

      **IT IS FURTHER ORDERED** that the *Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted Pursuant to Federal Rules of Civil Procedure 12(b)(6)* (Doc. 15) filed by the Parish of East Baton Rouge is **DENIED**.

      Signed in Baton Rouge, Louisiana, on <u>March 25, 2022</u>.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**