## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**SHAHEEDRA JORDAN, ET AL.**

**VERSUS**

**SID J. GAUTREAUX III, ET AL.**

**CIVIL ACTION**

**NO. 21-48-JWD-SDJ**

## RULING AND ORDER ON CORRECTHEALTH
## AND ITS SUPERVISORS' MOTIONS TO DISMISS

This matter comes before the Court on two Rule 12(b)(6) motions. The first is the *Motion to Dismiss Plaintiffs' Complaint against CHEBR* (Doc. 25) filed by Defendant CorrectHealth East Baton Rouge, LLC ("CorrectHealth"). The second is the *Motion to Dismiss Plaintiffs' Complaint Against Musso and Llovet* (Doc. 26) filed by Defendants Dr. Carlo Musso and Jean Llovet (collectively at times, "CorrectHealth Supervisors"). Plaintiffs Shaheedra Jordan, Sahara Claiborne, and Leiaja Claiborne have filed two separate but identical oppositions. (Docs. 37, 38.) CorrectHealth and its Supervisors have filed a combined reply. (Doc. 39.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, CorrectHealth Supervisor's motion is granted, and CorrectHealth's motion is granted in part and denied in part.

### I.    Relevant Factual and Procedural Background

#### A.  Introduction

The case involves the suicide of a pretrial detainee at East Baton Rouge Parish Prison ("EBRPP"). Plaintiffs are the children of the deceased detainee, Shaheed Claiborne ("Claiborne"). (*First Am. Compl. with Jury Demand Filed with Consent of Opp.* ("*FAC*") ¶ 1, Doc. 9.) Plaintiffs

brought this suit under 42 U.S.C. § 1983 and state law asserting a number of claims against various individuals and entities connected to the jail.

Specifically, Plaintiffs sued Sheriff Sid Gautreaux in his official capacity as the policymaker responsible for operating EBRPP. (*Id.* ¶ 1(b).) Plaintiffs also named individual officers at EBRPP who were purportedly involved in the underlying events, (*id.* ¶¶ 1 (d)–(l), (n)) as well as certain supervisory officials with responsibilities at EBRPP, (*id.* ¶¶ 1 (c), (m)).  The officers and supervisors are, collectively with Gautreaux, "Sheriff Defendants."

Plaintiffs also bring this action against the Parish, the "entity [which is] responsible for funding operations of the [EBRPP]." (*Id.* ¶ 1(a).)  The Parish "negotiates, approves, funds, and enters into contracts with other entities to provide medical and mental health services at the jail[.]" (*Id.*)

The Court previously ruled on motions to dismiss filed by Sheriff Defendants and the Parish. (Doc. 45.)  In sum, all § 1983 claims brought against Sheriff Defendants were dismissed, but the state law claims against them survived. (*Id.* at 57.)  The Court also denied the Parish's motion. (*Id.* at 58.)

Additionally, in that ruling, the Court gave a full recitation of the relevant facts and law applicable to Plaintiffs' claims. (*Id.* at 2–12, 21–37.) The Court will not repeat all facts and law contained in that ruling but will instead summarize and supplement where appropriate.

Relevant here, Defendant CorrectHealth was, during these events, "the private medical and mental health care provider under contract with [the] Parish to provide medical and mental health treatment and care to the individuals incarcerated at EBRPP." (*FAC* ¶ 1(o), Doc. 9.)  Musso was "the President and Managing Member of CorrectHealth[,]" and Llovet was the entity's "director of clinical services[.]" (*Id.* ¶ 1(t), (u).)

Other individuals associated with CorrectHealth—Nurses Brumfield, Foy, and Chapman, and John Doe #6 (collectively, "CorrectHealth Employees")—were also named in this suit, (*id.* ¶¶ 1(p), (q), (r), (s)), but they do not join in the instant motions, (*see* Docs. 25, 26). CorrectHealth employees were all medical and mental healthcare providers working at EBRPP during Claiborne's time there and were all allegedly involved in the torts that befell him. (*FAC* ¶¶ 1(p), (q), (r), (s), Doc. 9), CorrectHealth, its Supervisors, and its Employees are, collectively, "CorrectHealth Defendants."

**B.  Claiborne's Arrest and Booking**

On January 18, 2020, Claiborne was in a state of severe emotional distress following the death of his mother. (*Id.* ¶ 8.)  That day, he tried to gain entry into a drug and alcohol recovery center before it opened, and, when he was refused admission, he began kicking and ramming the door to gain entry. (*Id.* ¶ 9.)

Claiborne "was subsequently involved in a minor altercation with bystanders, but soon after got into his vehicle to leave the property." (*Id.* ¶ 10.)  But, shortly thereafter, he "re-entered the property and crashed his vehicle into an electric pole, knocking out the power to the business." (*Id.* ¶ 11.)  At the time of the crash, he was seen having "red dilated eyes[.]" (*Id.* ¶ 12.)

A captain with the Baton Rouge Police Department ("BRPD") arrested Claiborne and informed Corporal Page of the EBRPP that he was "in route" and that Page should be on "high alert." (*Id.* ¶¶ 13–14.)  BRPD also told Page that Claiborne "was very strong and had 'mental health issues.' " (*Id.* ¶ 14.)

When Claiborne arrived, he was "medically processed by Supervisor Nurse Brumfield." (*Id.* ¶ 15.)  While Claiborne was in Medical Intake, Lieutenant Grimes informed Page that, "due to mental health concerns, [ ] Claiborne should be placed in a one-man cell until he received a

mental health assessment; subsequently, Corporal Page relayed this information to Nurse Brumfield, who put [ ] Claiborne on mental health observation shortly thereafter." (*Id.* ¶ 16.)

As Claiborne was "being dressed out in the intake bathroom," he "was talking to himself" and "repeating[,] 'Lord, give me the strength to remain calm.' " (*Id.* ¶ 17.) Plaintiffs allege:

> Corporal Page and Deputy Baker issued Mr. Claiborne a yellow smock rather than a cloth jumpsuit, per his mental health observation status. The reason for the issuance of yellow smock is the risk of suicide known to the Sheriff and its medical staff of inmates suffering mental health issues. The choice of the smock was because of the known risk of suicide Mr. Claiborne potentially presented.

(*Id.* ¶ 18.) Claiborne called his family, and then Page took him to "N01—the special needs housing unit—to Cell #3." (*Id.* ¶ 19.)

### C. Claiborne's Suicide

On Sunday, January 19, 2020, one day following his arrest, "a member of the medical staff, John Doe #6, met with . . . Claiborne and removed him from mental health observation, and the required restrictions thereof." (*Id.* ¶ 20.) Doe #6 did this "[d]espite all of the knowledge of the Sheriff's Office and its medical staff of [ ] Claiborne's mental health crisis and symptoms[.]" (*Id.*)

Doe #6 gave Claiborne a cloth jumpsuit to replace the yellow smock he had previously been given. (*Id.* ¶ 21.) Plaintiffs allege, "This is the same kind of cloth jumpsuit not originally provided to Mr. Claiborne due to his acute mental health issues, which were known to the Sheriff's Office and its medical staff— including the risk of Mr. Claiborne committing suicide." (*Id.*)

As detailed in the last ruling, Deputy Domino made rounds in the early morning hours of January 20, 2020, though Plaintiffs emphasize a 52-minute gap between 2:22 a.m. and 3:14 a.m. in which no one checked on Claiborne. (*See Id.* ¶¶ 22–27.) At 3:14 a.m., Domino found Claiborne "hanging from his cell bars by his recently-issued cloth jumpsuit." (*Id.* ¶ 26.) Domino called for

4

assistance, and other deputies arrived. (*Id.* ¶ 27.) They eventually cut him down and began to administer CPR. (*Id.* ¶¶ 27–28.)

About one minute later, Nurses Foy and Chapmen arrived to aid with CPR. (*Id.* ¶ 29.) Chapman told Page that Claiborne "might have had a faint pulse, but she could not feel it." (*Id.*) "Not until 3:21am—at least a full seven minutes after Mr. Claiborne was found hanging— was EMS notified." (*Id.* ¶ 30.) Around this time, Nurse Brumfield came with oxygen, followed by BR Fire and Rescue. (*Id.* ¶ 31.) "Around 3:44am, EMS arrived to assist, leaving around six to ten minutes later having determined that Mr. Claiborne was deceased." (*Id.* ¶ 32.)

Plaintiffs allege that an "investigation and subsequent report by Detective Auzenne" showed that Claiborne "had been displaying odd behavior in the hours prior to his death." (*Id.* ¶ 33.) "The inmate in Cell #1 heard [ ] Claiborne talking out loud to God." (*Id.*) Another "inmate in Cell #2 heard [ ] Claiborne singing church music and songs." (*Id.*) "The inmate in Cell #5 heard Mr. Claiborne singing and talking to himself, and [he] heard him repeatedly state that he was going to kill himself." (*Id.*) In addition, this inmate used reflections in the windows near his cell and saw "Claiborne climb to the upper bars of his cell, then later saw him hanging and called for help. It appears that no one ever came, and that all the other inmates were asleep at the time." (*Id.*)

Moreover, Deputy Domino's report said that, from 5:00 p.m. to 3:14 a.m., "Claiborne had been exhibiting 'bizarre' behavior such as speaking loudly, using known jargon, racking gates, spitting on the floor, talking about his deceased mother, and singing spiritual songs." (*Id.* ¶ 34.) According to the *FAC*, Deputy Domino did not ask that Claiborne "be returned to the special needs housing unit" and "did not take any action in recognition of this 'bizarre' behavior, including redressing [ ] Claiborne in a smock rather than a cloth jumpsuit." (*Id.* ¶ 35.)

### D. Official Capacity Claims

#### 1. CorrectHealth Defendants' Alleged Failures

Plaintiffs allege that certain defendants, including Brumfield and John Doe #6, "as the result of *de facto* policies and practices permitted by Defendants . . . CorrectHealth . . ., Musso, and Llovet failed to provide [ ] Claiborne access to qualified medical and mental health care." (*Id.* ¶ 39.)  Further, Brumfield, Foy, and Chapman, due to such customs allowed by CorrectHealth, Musso, and Llovet, "failed to provide [ ] Claiborne sufficient medical and mental health care prior to, and resulting in, his death." (*Id.* ¶ 40.)

Additionally, CorrectHealth and its Supervisors also "failed to adequately staff and train employees responsible for providing constitutionally adequate medical and mental health care at EBRPP." (*Id.* ¶ 41.)  Because of *de facto* policies and practices allowed by these defendants (among others), "EBRPP employees are not trained and/or supervised to address and refer prisoners' serious mental health care needs to CorrectHealth . . ., including those exhibited by [ ] Claiborne resulting in deliberate indifference to prisoners' serious mental healthcare needs." (*Id.*)

The policies and customs of these defendants also caused John Doe #6 to fail "to provide appropriate care when he/she removed [ ] Claiborne from mental health observation, less than 24 hours after[ ] he was brought in, even though several staff members had knowledge of his dangerous and fragile[ ] mental state and/or had witnessed bizarre and alarming behavior by [ ] Claiborne." (*Id.* ¶ 42.)

#### 2. Allegations and Other Examples in Support of Customs and Knowledge Thereof

The *FAC* then devotes a number of paragraphs to the systematic failures "resulting in a decrepit physical facility, rampant violence, and deliberate indifference to the serious medical and mental health care needs of prisoners at EBRPP." (*Id.* ¶¶ 44.)  Examples include:

- statistics about the number of deaths at EBRPP between 2012 and 2016 (twenty-five men) and about how that compares to the national prison average (two and a half times higher), (*id.*¶ 44(a); *see id.* ¶ 44(aa));

- instances of others who were injured, assaulted, or died at EBRPP, (*see, e.g.*, ¶¶ 44(d), (g), (h), (k), (r), (t), (u)), including those who suffered from mental illness, (*id.* ¶¶ 44(e), (f), (l), (y)) and including those who died by suicide (*id.* ¶¶ 44(c), (s));

- the fact that jail conditions "were squarely before the metropolitan council at least ten times," (*id.* ¶ 44(b)), along with details of one Metro Council meeting in particular in August 2015 where "professionals at EBRPP argued for critical additional resources from" the council, with details including how (a) medical staff at the prison criticizing "the lack of functional equipment, understaffing and low salaries, and a shortage of standard supplies such as heart monitoring equipment; (b) Dr. Whitfield, who had been with EBRPP for sixteen years, "confirm[ing] that there had been a 'significant decline in the quality of care' for detainees over the previous even years" and saying that "We do have a ticking time bomb" and "We have a sicker inmate population, and without proper resources, supplies and more boots on the ground in the form of nursing staff, we are unable to efficiently care for the patients', increasing morbidity, mortality and, ultimately, liability;" (c) Whitfield summarizing the small medical staff "required to treat and assess the prison's more than 1,500 inmates"; (d) Nurse Vincent Bradley saying she often has to work 15-hour days, well over her standard 12 hour shift, to finish a day's work; (e) medical personal saying that "there should be a minimum of five nurses on staff per shift, however, sometimes there were only one or two nurses per shift;" and (f) Councilwoman Banks-Daniel describing the healthcare situation at EBRPP as "catastrophic," (*id.* ¶ 44(m));

- public statements by Grimes, Gautreaux, and other public figures about the conditions of the jail, (*id.* ¶ 44(i), (n), (o));

- information from former detainees who describe the prison as the "dungeon" and who say that "guards routinely fail to make their rounds and prisoners engage in violence on a daily basis," (*id.* ¶ 44(v));

- the 2016 report of the Parish's consultant, Health Management Associates (HMA), and its evaluation of the healthcare at EBRPP, an assessment (a) which included that the jail (i) was underfunded, (ii) "not adequately staffed by health care providers to address the medical needs of the detained patients," (iii) had "infirmary rooms [which] were found to be wholly unfit for delivering medical care," and (iv) had "[a]dditional policies [like] limited access to sick call slips [that] further disrupt medical treatment for detainees," and (b) which ultimately "found healthcare at EBRPP to be 'episodic and inconsistent' and which "recommended doubling the parish's annual corrections healthcare budget from about $5 million to about $10 million, (*id.* ¶ 44(p));

7

- the inadequacy of the Parish's response to the HMA report by hiring CorrectHealth, (a) which "fac[ed] criticism in Savannah[, Georgia,] after officials there hired an independent monitor to assess medical services in their jail following a string of deaths," with the "monitor describ[ing] a number of problems that could trigger 'potential loss of life;' " and (b) which failed to increase staffing levels for health care workers at the jail" and instead "decreased them," (*id.* ¶ 44(q));

- statistics about the number of deaths since CorrectHealth took over healthcare at EBRPP (at least 20, as of December 2020), (*id.* ¶ 44(z));

- statistics about the jail's death rate in 2018, (a) which was 381 per 100,000 inmates; (b) which was "more than double the national average, and more than three times Louisiana's statewide average during that time"; and (c) which must be seen in the context of the facts (i) that CorrectHealth "is required to conduct a mortality review each time an inmate dies, according to accreditation standards . . . to examine the circumstances surrounding the death and assess whether additional preventative steps could be taken in the future, and (ii) that CorrectHealth "has refused to release those investigations", (*id.* ¶¶ 44(aa));

- June 2019 statements by Dr. Homer Venters, "who spent several years overseeing the medical program in New York City's notorious Rikers Island jail and later became one of its biggest critics;" who, after touring EBRPP and after "not[ing] its practice of keeping suicidal inmates and others experiencing severe mental illness in solitary confinement at least 23 hours per day," said that the cells were "the most dangerous units I have observed in an American jail or prison;" and who pointed out "numerous suicide risks including the open bars, more than one of which had cloth ties affixed to bars at the time of our tour," (*id.* ¶ 44(w)); and

- representations by a different expert who inspected the jail in connection with a different case related to Covid-19 to the effect that EBRPP is the "worst jail he had ever seen in his 16-year career and as bad as a jail that was 100 years old," (*id.* ¶ 44(cc)).

Plaintiffs claim these "numerous, yet non-exhaustive, examples" show a "culture of violence and indifference to prisoner welfare that is harmful to all prisoners, including to [ ] Claiborne." (*Id.* ¶ 45.)

### E.  Counts

Plaintiffs assert twelve counts. (*FAC* ¶¶ 49–74, Doc. 9.)  Again, they arise under § 1983 and state law. (*See id.*)

Count 1 is asserted against Gautreaux and the Parish. (*Id.* ¶¶ 49–50.) Count 1 alleges various systematic deficiencies. (*Id.*)

Count 2 asserts a § 1983 claim in part against CorrectHealth, Musso, and Llovet. (*Id.* ¶ 53.)[1] Plaintiffs assert:

> [These defendants], in their individual and official capacities, failed to supervise their subordinates, namely Defendants Brumfield, Foy, Chapman, and John Doe #6, to ensure that these subordinates did not ignore prisoners' obvious signs of medical and/or mental health distress, and/or fail to properly monitor prisoners show signs of mental health crisis. They also failed to ensure that their subordinates provided reasonable and sufficient treatment for prisoners' mental health conditions and properly monitored prisoners who were being treated. The plaintiffs were directly harmed by this failure to supervise because it caused the death of Mr. Claiborne, who received patently insufficient treatment for his serious mental health needs from the specified defendants.

(*Id.*) Plaintiffs allege in a conclusory way that these defendants were "aware of the need to supervise their subordinates in order to ensure that they did not violate prisoners' rights" but that they "ignored that need and acted unreasonably and with deliberate indifference and disregard for the safety of [ ] Claiborne[.]" (*Id.* ¶ 54.)

Count 3 asserts § 1983 claims of deliberate indifference against CorrectHealth and its Supervisors and Employees. (*Id.* ¶¶ 55–58.) Plaintiffs allege that these defendants "acted unreasonably, recklessly, maliciously, and/or with deliberate indifference and disregard for the constitutional and civil rights and life and serious mental health needs of the deceased, [ ] Claiborne." (*Id.* ¶ 56.) Plaintiffs claim these defendants "had the duty and ability to intervene to prevent the violations of Claiborne's right "but failed to do so." (*Id.* ¶ 57.) Further, "these Defendants acted as a final policy maker when they placed [ ] Claiborne in Cell #3, depriving him of the ability to be easily seen by guards, and deprived [ ] Claiborne of reasonable and adequate

---

[1] Count 2 is also asserted against Gautreaux, Grimes, and Leader. (*FAC* ¶¶ 51–52, Doc. 9.)

mental health care, having been delegated the authority to do so by," *inter alia*, CorrectHealth. (*Id.* ¶ 58.)

Count 4 pleads *Monell* violations "based on [the] establishment of policies, patterns or practices pursuant to which prisoners with serious mental health conditions are denied access to appropriate medical care." (*Id.* at 59 (cleaned up).) Plaintiffs claim that Gautreaux, the Parish, and CorrectHealth violated their Fourteenth Amendment rights. (*Id.*) These allegations, too, are largely conclusory and rely upon those allegations described above. (*Id.* ¶¶ 59–62.)

Counts 5 through 12 assert state law claims. Plaintiff alleges that the CorrectHealth Employees (in addition to the Sheriff officers) engaged in intentional and negligent conduct toward Claiborne in the provision of appropriate mental health treatment. (*Id.* ¶ 63.) Count 6 alleges that Gautreaux and CorrectHealth are liable under the respondeat superior doctrine. (*Id.* ¶ 64.) Count 7 pleads a loss of consortium claim against all defendants. (*Id.* ¶ 65.) Count 8 alleges a wrongful death claim, (*id.* ¶¶ 66–67), and Count 9 pleads a survival action, (*id.* ¶ 68.) Count 10 asserts a claim under the direct action statute against defendants' insurer. (*Id.* ¶ 69.) Count 11 pleads a claim against Gautreaux for failing to "provide medical and mental health treatment within EBRPP that was adequate and reasonable as required by law." (*Id.* ¶¶ 70–71.) Finally, Count 12 claims that Brumfield and John Doe #6, among others, breached their duty under state law to protect Claiborne by placing him in Cell #3 rather than Cells #1 or #2 "where he would be more easily visible, by releasing him from mental health observation and issuing him a cloth jumpsuit, and by not checking on him for close to one hour despite his obvious mental health breakdown." (*Id.* ¶ 73.)

## II.    Relevant Standards and Preliminary Matters

### A.    Rule 12(b)(6) Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 [ ] (2009)]; *Twombly*, 55[0] U.S. at 556 [ ]. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without

11

> discovery, the facts set forth a plausible claim for relief under a
> particular theory of law provided that there is a "reasonable
> expectation" that "discovery will reveal relevant evidence of each
> element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0]
> U.S. at 556 [ ].

*Diamond Servs. Corp. v. Oceanografia*, *S.A. De* C.V., No. 10-00177, 2011 WL 938785, at *3

(W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in

the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03

(5th Cir. 2014).  The task of the Court is not to decide if the plaintiff will eventually be successful,

but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503.

### B. Consideration of Evidence

CorrectHealth and its Supervisors attach certain medical records to CorrectHealth's

motion, (Doc. 25-2), and a Certificate of Accreditation with their reply, (Doc. 39-1)  The Court

must first decide whether to consider these documents.

"In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the

factual information to which the court addresses its inquiry is limited to (1) the facts set forth in

the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice

may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop.

Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted).  However, "[a]lthough a court may also

consider documents attached to either a motion to dismiss or an opposition to that motion when

the documents are referred to in the pleadings and are central to a plaintiff's claims, the court need

not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir.

2020) (per curiam) (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)

(using permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference)).

Here, the Court will exercise its discretion and not consider the documents. These exhibits are not referenced in the *FAC*, and they are not subject to judicial notice. Thus, in order to consider these documents, the Court would have to convert CorrectHealth's motion to dismiss to one for summary judgment and give Plaintiffs a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Given that this case is still in its infancy, a motion for summary judgment is premature at this time, so the Court will exercise its discretion and not review the evidence.

### III. Section 1983 Claims Against CorrectHealth

#### A. Parties' Arguments

##### 1. CorrectHealth's Original Memorandum (Doc. 25-1)

CorrectHealth first seek dismissal of the failure to train and supervise claims (Count 2) and *Monell* claim (Count 4) because Plaintiffs purportedly failed to sufficiently plead a custom or policy. (Doc. 25-1 at 3.) Plaintiffs did not adequately allege (a) sufficiently numerous prior incidents, as required for Count 4, and (b) deliberate indifference by untrained employees, as required for Count 2. (*Id.* at 5.) CorrectHealth then disputes Plaintiffs' claims of systematic deficiencies. (*Id.* at 5–8.)

CorrectHealth highlights that many of the reports of deaths and jail conditions occurred at a time before CorrectHealth provided medical care to EBRPP. (*Id.* at 6.) Indeed, most of the examples occurred three years before CorrectHealth started providing services to the jail in January 2017 and four to eight years before Claiborne's incarceration at EBRPP in January 2020. (*Id.*) Thus, the other similar incidents do not suffice to establish a policy or custom. (*Id.*)

13

Further, Plaintiffs cannot rely on a single death or any and all prior bad acts; rather, they must point to prior incidents that are sufficiently similar to the instant case. (*Id*. at 7.) Plaintiffs rely on previous deaths and one suicide, but they fail to demonstrate that these occurred from any failure to train and supervise by medical staff or from constitutionally inadequate medical treatment. (*Id.*) While conditions are alleged, Plaintiffs do not show that such conditions occurred when Claiborne was at EBRPP or where he was located. (*Id.*) Moreover, no details are given about the other deaths and suicide to indicate they were the result of the failure to train or supervise medical staff or the result of constitutionally inadequate mental health treatment. (*Id.*)

CorrectHealth also argues that the failure to train claim fails because Plaintiffs have not alleged (1) that CorrectHealth did not train the medical staff involved in Claiborne's care, and (2) that any failure was causally connected to Claiborne's death. (*Id.* at 8–9.) As to the first, Plaintiffs did not plead how the training program was deficient, much less that CorrectHealth failed to provide staff with the "minimal training to detect '*obvious* medical needs of detainees with *known demonstrable*, and serious medical disorders.' " (*Id.* at 10 (quoting *Whitt v. Stephens Cnty.*, 529 F.3d 278, 284 (5th Cir. 2008) (emphasis in *Whitt*)).) Plaintiffs' allegations are conclusory. (*Id.*) Further, Claiborne's medical records, which are attached to the CorrectHealth's motion, reflect that Claiborne denied suicidal ideations from the time of his arrest to his mental health evaluation, and he "exhibited a coherent and logical thought process" and "displayed no problem in his thought content," among other less serious indications. (*Id.* at 11.)

As to causation, the *FAC* is deficient in a number of ways. (*Id.* at 12–13.) First, the allegations are conclusory. (*Id.* at 13.) Second, the Fifth Circuit has emphasized that suicides are hard to predict. (*Id.*) And, third, Plaintiffs lump all defendants together. CorrectHealth relies on

*Ratliff v. Aransas Cty, Tex.*, 948 F.3d 281, 285 (5th Cir.), *cert. denied*, 141 S. Ct. 376 (2020), to support its position that Plaintiffs' claims are conclusory and insufficient.

The individual capacity claim against CorrectHealth should also be dismissed. (Doc. 25-1 at 14.) Both the Supreme Court and this Court have found that entities like CorrectHealth can only be liable if their policies caused constitutional violations. (*Id.* at 14–15.) Here, they did not. (*Id.*)

CorrectHealth next maintains that Plaintiffs fail to establish a *Monell* claim because they have not shown an underlying constitutional violation. (*Id.* at 15.)  According to CorrectHealth, the Fifth Circuit recently found that allegations like the ones in this case—that Plaintiff was denied appropriate treatment after he was booked and that he was removed from mental health observation—are insufficient to impose liability. (*Id.*)  Moreover, Plaintiffs' conclusory allegations are again contradicted by the medical records, which the Fifth Circuit has said can rebut allegations of deliberate indifference and which have been found in other cases to show that treatment was negligent or grossly negligent but not deliberately indifferent. (*Id.* at 15–16.) Additionally, after recounting the medical records, CorrectHealth asserts that, while the *FAC* alleges that Plaintiff behaved strangely, there are no allegations that CorrectHealth Employees knew about those facts. (*Id.* at 16–17.)  Further, Domino was the one who monitored Claiborne on the night of the suicide, not CorrectHealth Employees, and there is nothing to show that they knew. (*Id.* at 17–18.)  Thus, while CorrectHealth Employees may have been negligent or even grossly negligent, they cannot be said to be deliberately indifferent. (*Id.*)

CorrectHealth closes its brief by arguing that it cannot be liable for punitive damages. (*Id.* at 18–19.)  Because municipalities are not liable for punitive damages under § 1983, one district court in this circuit has held that private prison management companies like CorrectHealth cannot be liable for punitive damages either. (*Id.* (citing *Moore v. LaSalle*, 429 F. Supp. 3d 285, 289-91

(W.D. La. 2019).)  For the same reasons, Plaintiffs' punitive damage claim should be dismissed. (*Id.*)

## 2. Plaintiffs' Opposition (Doc. 37)

Plaintiffs first argue that they have stated a viable *Monell* claim against CorrectHealth based on policies and "practices that deprived prisoners of treatment for serious mental health disorders." (Doc. 37 at 16 (cleaned up).)  CorrectHealth had actual knowledge of these problems from lawsuits, public acknowledgements by officials, testimony of jail and medical staff, and the HMA report. (*Id.*)  Plaintiffs pled that "EBRPP had a mental-health system that was inadequately funded, understaffed, and dangerous to EBRPP detainees with mental health medical needs before CorrectHealth, and EBRPP contracted with CorrectHealth," which had issues of its own. (*Id.*)  CorrectHealth was an official policymaker " responsible for the provision of all staffing, training, policies, and procedures for medical and mental health personnel and all healthcare provided to prisoners in EBRPP, including [ ] Claiborne." (*Id.* at 16–17.)  Plaintiffs also alleged "specific instances of death during CorrectHealth's contract with EBRPP prior to and after [ ] Claiborne's death[.]" (*Id.* at 17.)  Plaintiffs claim that CorrectHealth's conduct reflects a pervasive misconduct amounting to conditions and *de facto* policies and that these conditions are not reasonably related to legitimate governmental interests. (*Id.* at 17–18.)

Further, these policies and conditions were the moving force of Claiborne's death. (*Id.* at 18.)  Plaintiffs assert:

> CorrectHealth . . . displayed deliberate indifference when after [ ] Claiborne was arrested it was communicated to EBRPP that [ ] Claiborne had mental health issues, was bipolar with a prescription, after it was communicated to CorrectHealth's staff he should be placed in a one-man cell, and after he was issued a yellow smock for suicide risk, only one day after his arrest a member of CorrectHealth's medical staff removed him from mental health observation and required restrictions. This removal from mental

16

> health observation occurred despite reports from Deputies and neighboring Detainees that Mr. Claiborne was still exhibiting mental health issues.

(*Id.*)

As to the medical records, Plaintiffs respond that "these initial notes were taken during intake when medical staff was informed that he was having mental health issues." (*Id.* at 19.) Moreover, the Court cannot properly assess the "actual substance and quality of the evaluation" which occurred the next day because the records are "threadbare" and consist of a "spreadsheet list of questions and responses." (*Id.*)  In any event, the question of whether Defendants acted with deliberate indifference is a factual issue best analyzed after the parties can "develop their claim and submit evidence." (*Id.* (citing *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995)).)

CorrectHealth also cannot escape liability by arguing that the failure to classify Claiborne as a suicide risk does not amount to deliberate indifference. (*Id.*)  Plaintiffs adequately pled descriptions of other cases involving detainees with mental health issues sufficient to show that this is a widespread practice; this is a condition of confinement claim, not one of episodic acts or omissions. (*Id.*)

While Plaintiffs need not establish deliberate indifference for a conditions of confinement claim, if the Court were to assess their claims as episodic acts or omissions claims, Plaintiffs have met their burden. (*Id.* at 21.)  CorrectHealth Supervisors knew of the risks for the mentally ill at EBRPP, yet they ignored those risks.  (*Id.*)  Indeed, the *FAC* specifically alleges that Llovet either could not or would not answer most of the questions asked by the Metro Council near the time of Claiborne's death. (*Id.* at 21–22.)  Further, Musso is the President and Managing Member of CorrectHealth, and he would have full knowledge of the issues detailed in the *FAC* and the systematic deficiencies at EBRPP. (*Id.* at 22.)

Plaintiffs then reiterate the facts of the *FAC*: Claiborne's assignment to mental health observation, his being placed in a yellow smock (which indicated his suicide risk), and his bizarre behavior at the time of his arrest and on the night of his death. (*Id.*)  The *FAC* also specifically alleges the various deficiencies with CorrectHealth, including the failure to adequately provide for Claiborne's medical needs. (*Id.* at 22–23.)

As to the failure to supervise claims, Plaintiffs argue that they described "publicly known deficiencies in the health care system at EBRPP" and that "CorrectHealth knew or should have known, when it took over health care at EBRPP, that the system's deficiencies created high risks of constitutional violations." (*Id.* at 24 (cleaned up).)  The *FAC* details the many deficiencies as shown by the considerable number of other deaths, statistics regarding same, the HMA report, and concerns with budgeting and understaffing. (*Id.*)

As to punitive damages, CorrectHealth relies on the Western District case of *Moore*, but even *Moore* said that it was a matter of first impression and that the Fifth Circuit has not directly addressed the issue. (*Id.* at 27–28)  In fact, *Moore* is currently on appeal at the Fifth Circuit, so it is hardly dispositive. (*Id.*)

### 3. CorrectHealth's Reply (Doc. 39)

CorrectHealth begins by highlighting that Plaintiffs failed to oppose dismissal of their individual capacity claims against CorrectHealth. (Doc. 39 at 1–2.)  Consequently, this claim should be dismissed. (*Id.*)

CorrectHealth then contends that Plaintiffs are "attempt[ing] to fit a square peg into a round hole" by framing their episodic acts or omissions claims as one for conditions of confinement. (*Id.* at 2.)  Plaintiffs focus on the particular acts or failures to act by individual officials—specifically, the single professional who cleared Claiborne from mental health status observation—and this

makes their claim one for episodic acts or omissions. (*Id.*)  The harm suffered by Plaintiffs is the medical decision by that professional, not Claiborne's ability to be seen by medical staff. (*Id.* at 3.)   Plaintiffs actually support CorrectHealth's position by various representations in their opposition. (*Id.*)  Framed another way, Plaintiffs' complaint is not that he was denied access to mental health care and medical staff but rather that he was seen by one who engaged in deliberate indifference. (*Id.* at 3–4.) Consequently, the conditions of confinement claim should be dismissed. (*Id.* at 4.)

Further, Plaintiffs allege that understaffing was an unlawful condition of confinement, but that is not proper. (*Id.*)  According to CorrectHealth, the Fifth Circuit has found that understaffing is not an adequate basis for a conditions of confinement claim. (*Id.* (citations omitted).)

Plaintiffs also refer to inadequate funding as a condition of confinement, but this too is insufficient. (*Id.* at 4.)  First, the Parish is responsible for funding, not CorrectHealth.  (*Id.* at 4–5.) Second, the Fifth Circuit has found that "allegations of insufficient funding are unavailing," and, third, funding decisions have a reasonable relationship to a legitimate governmental interest. (*Id.* at 5.)

Next, CorrectHealth argues that Plaintiffs have not identified policies or customs that are the moving force of constitutional violations. (*Id.* at 5–6.)  Plaintiffs complain about Claiborne's placement in Cell #3, but that is not within the scope of CorrectHealth's responsibilities.  (*Id.* at 6–7.)  Indeed, Plaintiffs allege that Page was responsible for placing Claiborne in the wrong cell, and the medical records show that medical staff recommended that Claiborne be placed in general population. (*Id.* at 7.)  Further, CorrectHealth does not have final authority over physical design of the jail, as that is, by the *FAC*'s own allegation, the responsibility of the Parish. (*Id.*)  Monitoring is also a matter for the Sheriff officers, not CorrectHealth. (*Id.*)   Ultimately, none of the

CorrectHealth Defendants possess final policymaking authority over the relevant parts of the jail that caused Claiborne harm. (*Id.* at 7–8.)

CorrectHealth next argues that Plaintiffs have not shown a widespread policy or custom of which Musso and Llovet had knowledge. (*Id.* at 8–9.) Plaintiffs allege only that CorrectHealth Supervisors are final policymakers, not that they knew about sufficiently numerous and similar prior incidents. (*Id.* at 9.) Further, Plaintiffs refer to incidents occurring before CorrectHealth took over, but they fail to explain how such incidents reflect a pattern for CorrectHealth or how such incidents are sufficiently similar to the suicide in question. (*Id.* at 9–10.) No details are given about the other prior incidents, and Plaintiffs certainly do not show they happened because of CorrectHealth or its Supervisors failure to train or supervise or because of CorrectHealth's constitutionally inadequate medical treatment, at least enough to establish actual or constructive knowledge. (*Id.*) Plaintiffs' reliance on incidents involving CorrectHealth at other jails is equally unavailing. (*Id.* at 10–11.) The HMA report also does Plaintiffs no good, as (1) CorrectHealth's actions were accredited by the National Commission on Correctional Health Care, according to a certificate attached to the reply; and (2) the HMA report was based on conditions between 2012 and 2016, which is of limited relevance to a suicide occurring in 2020. (*Id.* at 11.) Llovet's conduct at a council meeting also has nothing to do with any claim. (*Id.* at 12.)

DOJ statistics are also irrelevant to the instant motion. (*Id.*) The Fifth Circuit has reached this result with respect to DOJ reports that are not on "all fours" with the case at hand; the total number of deaths are not comparable to the number of deaths that were suicides, which is not comparable to the number of suicides resulting from the failure to train/supervise or from constitutionally inadequate mental health treatment. (*Id.* at 12–13 (citing *Mealey v. Gautreaux*,

No. 16-716, 2020 WL 515853, at *20 (M.D. La. Jan. 31, 2020) (citing *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 810 (5th Cir. 2017)).)

Plaintiffs complain that inmates were denied medical care, but, according to CorrectHealth, that is belied by the fact that Claiborne received an evaluation within a day of being brought to EBRPP. (*Id.* at 13.)  In any event, this is a complaint about the type of medical care he received, not a refusal to provide medical care. (*Id.*)  This is mere unsuccessful treatment, not deliberate indifference. (*Id.*)  CorrectHealth cites a number of cases from the Fifth Circuit which purportedly find that conduct such as the one exhibited by John Doe #6 does not amount to deliberate indifference. (*Id.* at 13–14 (citing, *inter alia*, *Young v. McCain*, 760 F. App'x 251, 256 (5th Cir. 2019)).)

Additionally, Plaintiffs' authority (an unreported S.D. Tex. case) involves considerably more egregious conduct.  (*Id.* at 14–15.)  Thus, it is distinguishable.

CorrectHealth also argues that Plaintiffs fail to state a claim against CorrectHealth or its Supervisors for Claiborne's removal from mental health observation. (*Id.* at 15.)  According to CorrectHealth, Plaintiffs did not respond to its argument that John Doe #6's failure to classify Claiborne as a suicide risk does not subject CorrectHealth to liability.  (*Id.*)  CorrectHealth says that the *FAC* sets forth no facts to show that any CorrectHealth employee knew Claiborne was suffering a severe emotional breakdown before his arrest, and Deputy Domino is the only one in a position to witness any bizarre behavior on the night of the suicide. (*Id.*)  CorrectHealth explains:

> In fact, the only factual allegations pertaining to [CorrectHealth] staff are as follows: (1) Brumfield did the intake assessment of Decedent and placed him on mental health observation; (2) John Doe #6 conducted a mental health evaluation on Decedent and removed him from mental health observation; and (3) Chapman, Foy, and Brumfield responded medically after Decedent committed suicide. These factual allegations cannot create a plausible claim for denial of inadequate medical care.

21

(*Id.* at 16.)

CorrectHealth next contends that Plaintiffs fail to identify particular problems with its training program that caused any constitutional injury. (*Id.* at 16–17.)  Indeed, Plaintiffs do not rebut CorrectHealth's argument that they did not allege with specificity how the organization (or Musso or Llovet) failed to supervise subordinates. (*Id.* at 17.)  Plaintiffs do not highlight specific defects in the training or how John Doe #6 was not trained. (*Id.*)  Further, there is no causal connection between the failure to train and supervise and the death. (*Id.*)  Thus, these claims should be dismissed. (*Id.*)

### B.  Law and Analysis

#### 1. Summary

Again, Plaintiffs assert the following § 1983 claims against CorrectHealth: (a) a failure to train and supervise claim, in CorrectHealth's individual and official capacities (Count 2), (*FAC* ¶¶ 41, 51–54, Doc. 9); (b) a claim for deliberate indifference to Claiborne's right to appropriate medical care (Count 3), (*id.* ¶¶ 55–58); and (c) a *Monell* claim that CorrectHealth established policies and customs under which prisoners with serious mental health conditions were denied access to appropriate medical care (Count 4), (*id.* ¶¶ 59–62).

As with the Court's ruling on Sheriff Defendants' motion, the Court construes the *FAC* as alleging a claim for episodic acts or omissions claim as well as a conditions-of-confinement claim against CorrectHealth, which Plaintiffs can plead in the alternative. *See, infra.*  Again, the law governing each of these claims was largely contained in the Court's prior ruling, (Doc. 45 at 21–37), and those standards are incorporated by reference and only briefly summarized here.

Having carefully considered the matter, the Court finds that most of Plaintiffs' claims will be dismissed.  Any *Monell* claim for episodic acts and omissions falls for a lack of an underlying

constitutional violation.  The failure to train and supervise claims fails for this reason too and because Plaintiffs have not specificized how the training or supervision was defective.  However, the conditions of confinement claim will survive, as the *FAC* contains enough factual matter, taken as true, to raise a reasonable hope or expectation that discovery will reveal relevant evidence supporting each element of the claim.

### *2. Claim for Deliberate Indifference and Monell Claim for Episodic Acts or Omissions*

"The test to determine liability for a private prison-management corporation under § 1983 is more or less identical to the test employed to determine municipal or local government liability." *Woodward v. Lopinto*, No. 18-4236, 2021 WL 1969446, at *5 (E.D. La. May 17, 2021) (quoting *Alfred v. Corr. Corp. of Am.*, No. 08-0643, 2009 WL 789649, at *2, n.1 (W.D. La. Mar. 24, 2009) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  "Municipalities face § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . ." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (quoting *Monell*, 436 U.S. at 694).

That is, "[a] municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.' " *Valle v. City of Hous.*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)).  "To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.' " *Id.* (quoting *Monell*, 436 U.S. at 691).  The Plaintiff must allege "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Id.* at 541–42 (cleaned up).

Critically, as to the last prong, "[t]he Supreme Court has explained that a municipality

cannot be liable '[i]f a person has suffered no constitutional injury at the hands of the individual police officer.' " *Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (quoting *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)).   Thus, official capacity "claims fail without an underlying constitutional violation." *Whitley v. Hanna*, 726 F.3d 631, 648–49 (5th Cir. 2013) (citing *Bustos*, 599 F.3d at 467 ("Because [plaintiff] has alleged no constitutional injury attributable to the Officers, [plaintiff] has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights.")).

Here, Plaintiffs fail to state a viable claim against any CorrectHealth Employee.  "[A] § 1983 cause of action asserting . . . a lack of proper inmate medical care requires 'deliberate indifference' to the prisoner's 'serious medical needs.' " *Young*, 760 F. App'x at 256 (quoting *Estelle v. Gamble*, 429 U.S. 97, 101–05 (1976) (internal quotation marks and citations omitted)); *see also Hare v. City of Corinth, Miss.*, 74 F.3d 633, 647–48 (5th Cir. 1996) (recognizing that deliberate indifference standard applies to episodic acts or omissions claims for convicted prisoners and pretrial detainees).  To sufficiently demonstrate deliberate indifference, Plaintiffs must allege "that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' that the defendants actually 'dr[e]w the inference,' and that the defendants 'disregard[ed] that risk by failing to take reasonable measures to abate it.' " *Est. of Bonilla by & through Bonilla v. Orange Cnty., Texas*, 982 F.3d 298, 305 (5th Cir. 2020) (quoting *Hyatt v. Thomas*, 843 F.3d at 177 (5th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994))); *See also Hyatt*, 843 F.3 at 179 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).

"The 'extremely high standard' of deliberate indifference requires that prison officials 'refused to treat [the prisoner], ignored his complaints, intentionally treated him incorrectly, or

24

engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Young*, 760 F. App'x at 256 (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (internal quotation marks and citations omitted)). "Allegations of unsuccessful medical treatment, negligence, neglect, medical malpractice, or a mistaken judgment do not amount to deliberate indifference to serious medical needs." *Id.* (citing *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). " '[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment.' " *Id.* (quoting *Domino*, 239 F.3d at 756 (internal quotation marks and citation omitted)).

Here, Plaintiffs do not come remotely close to satisfying this "extremely high standard" for most of the CorrectHealth staff.  Nurse Brumfield "medically processed" Claiborne, after which time Claiborne was given the yellow smock. (*FAC* ¶¶ 16, 18, Doc. 9.)  There is little by way of negligence alleged here. Nurses Foy, Chapman, and Brumfield merely responded to the deputies' distress call after Claiborne was discovered hanging in his cell. (*Id.* ¶¶ 29–32.)  While they waited "at least a full seven minutes after Claiborne was found hanging" to notify EMS, (*id.* ¶ 30), such conduct, as alleged, is, at worst, negligent or grossly negligent; it does not reflect deliberate indifference. *See Sibley v. Lemaire*, 184 F.3d 481, 489 n.7 (5th Cir. 1999) ("We note here the difference between negligence and deliberate indifference. A reasonably prudent man may well have deemed it necessary to call Dr. Amy in the light of Sibley's worsening condition. To be deliberately indifferent, however, the deputies would have had to have chosen not to call Dr. Amy with the expectation that some harm would result to Sibley.").

John Doe #6 is a closer call, but Plaintiffs still fall short.  Plaintiffs pled that John Doe #6 "met with . . . Claiborne and removed him from mental health observation, and the required restrictions thereof . . . [d]espite all of the knowledge of the Sheriff's Office and its medical staff

of . . . Claiborne's mental health crisis and symptoms." (*Id.* ¶ 20.)   While John Doe #6's mistake

may have been grossly negligent, it must be seen in the context of Fifth Circuit caselaw on detainee

and inmate suicide.

The Fifth Circuit "has previously observed that " '[s]uicide is inherently difficult for

anyone to predict, particularly in the depressing prison setting.' " *Est. of Bonilla*, 982 F.3d at 306

(quoting *Domino*, 239 F.3d at 756)  In *Estate of Bonilla*, the appellate court summarized prior case

law on this issue:

> In *Flores v. County of Hardeman*, the court determined that the
> sheriff did not act with deliberate indifference when he took off of
> suicide watch an inmate who later committed suicide, despite the
> fact that the deceased had just been arrested after a one-hour standoff
> with police and "was not acting like himself." [124 F.3d 736, 738–
> 39 (5th Cir. 1997)]. Similarly, in *Sibley v. Lemaire*, the plaintiff
> offered evidence that jail personnel had "observed [Sibley] holding
> his Bible upside down while appearing to read from it, cleaning the
> walls of his cell with toilet paper, lying next to his toilet and staring
> into it . . . . [and] kicking the door to his cell." 184 F.3d 481, 484
> (5th Cir. 1999). Sibley was having a psychotic episode and
> eventually blinded himself by attempting to remove his own eyes.
> Nonetheless, the court concluded that "[a]lthough Sibley's actions
> seem to have become increasingly erratic, nothing he did so clearly
> indicated an intent to harm himself that the deputies caring for him
> could have only concluded that he posed a serious risk of harm to
> himself." *Id.* at 489.

*Id.*  "The common thread is a reluctance to hold that generalized evidence of an inmate's mental

illness invariably indicates a substantial risk of self-harm." *Id.*

In addition to these cases, in *Young*, the Fifth Circuit recently found no error in dismissing

deliberate indifference claims against medical defendants. 760 F. App'x at 256–57.  Plaintiff

prisoner, who was "suicidal due to his mother's terminal illness," alleged that he advised a social

worker that he was suicidal, yet she "repeatedly downgrad[ed] him from extreme to standard

suicide watch, which allowed him to harm himself by banging his head on a steel bed frame and

the wall and by jumping from the toilet to the bed, thereby exacerbating a previous shoulder injury." *Id.* at 253. Plaintiff claimed that a doctor met with him only briefly by videoconference before "concluding that [he] did not need treatment and was competent to participate in a . . . disciplinary hearing arising from his attempts at self-harm." *Id.*

Despite this, the Fifth Circuit concluded that, "[a]t most, [plaintiff's] complaint alleged that [the social worker] and [doctor] acted with gross negligence in treating his mental health problems, which is insufficient to establish deliberate indifference." *Id.* at 256–57 (citing *Doe v. United States*, 831 F.3d 309, 320 (5th Cir. 2016)). The *Young* court explained that "[s]uicide is inherently difficult . . . to predict, particularly in the depressing prison setting" and that "an incorrect diagnosis regarding the genuineness of a suicide threat does not amount to deliberate indifference." *Id.* at 257 (citing *Domino*, 239 F.3d at 754–56). With respect to the doctor, "merely expressing a disagreement with a diagnostic measure[] . . . 'does not state a claim for . . . indifference to medical needs.' " *Id.* (citing *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)).

The same reasoning applies here. As alleged, John Doe #6 made a grave mistake that cost Claiborne his life, but the Court cannot say that his gross negligence amounted to deliberate indifference.

In sum, Plaintiffs have no underlying constitutional violation against any CorrectHealth Employee. Thus, they can have no episodic acts or omissions claim or claim for deliberate indifference, and these claims will be dismissed.[2]

---

[2] The Court notes in closing that CorrectHealth is correct that Plaintiffs fail to substantively oppose dismissal of their claims against CorrectHealth in its individual capacity. Consequently, in addition to the above reasons, such claims are waived. *See JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (finding that claims could be deemed waived for failure to timely oppose); *see also JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (stating that, "[t]o avoid waiver, a party must identify relevant legal standards and 'any relevant Fifth Circuit cases' " and holding that, because appellant "fail[ed] to do either with regard to its underlying claims, ... those claims [were] inadequately briefed and therefore waived." (citing *United States v. Skilling*, 554 F.3d 529, 568 n.63 (5th Cir. 2009) and *United States v. Scroggins*, 599 F.3d 433, 446–47 (5th

### 3. Failure-to-Train-or-Supervise Claim

To state a claim for a claim against a municipality for failure to train, "a plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Valle*, 613 F.3d at 544 (citation omitted). "All failure to act claims, such as . . . failure to train [or] supervise . . . involve the same basic elements: inadequacy, deliberate indifference, and causation." *Skinner v. Ard*, 519 F. Supp. 3d 301, 314 (M.D. La. 2021) (deGravelles, J.) (citation omitted).

Here, Plaintiffs' failure to train and supervise claims fall short on the first and third elements. As to the third, if a plaintiff fails to state a viable claim against individual officials for deliberate indifference, then he has also failed to satisfy the causation element of a Section 1983 claim against a superior for failure to train and supervise. *See Martinez v. City of N. Richland Hills*, 846 F. App'x 238, 244–45 (5th Cir. 2021) (citing *Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006) ("[i]t is facially evident that [the test for supervisory liability] test cannot be met if there is no underlying constitutional violation."). As the Court has already established, Plaintiffs have not adequately alleged an underlying constitutional violation by any CorrectHealth Employee, so their claims for failure to supervise and train must necessarily be dismissed.

---

Cir. 2010) (noting that it is "not enough to merely mention or allude to a legal theory")); *United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation ... is a failure to brief and constitutes waiver.")); *United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015) ("This failure to develop the relevant argument effectively represents a waiver of the point." (citing *United States v. Dominguez–Chavez*, 300 F. App'x 312, 313 (5th Cir. 2008) ("Dominguez has failed to adequately raise or develop his due process and equal protection arguments in his appellate brief, and, thus, they are waived."); *El–Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.")))

As to the first prong of these claims, "[i]n resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Valle*, 613 F.3d at 544*.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)).

Relatedly, "municipalities must provide custodial officials with minimal training to detect obvious medical needs of detainees with *known, demonstrable*, and serious medical disorders, but a failure to train custodial officials in screening procedures to detect *latent* suicidal tendencies does not rise to the level of a constitutional violation." *Whitt*, 529 F.3d at 284 (cleaned up, emphasis in original). "In the absence of manifest signs of suicidal tendencies, a city may not be held liable for a detainee's suicide in a § 1983 suit based on a failure to train." *Id.* (cleaned up).

Here, Plaintiffs do not allege beyond conclusions how CorrectHealth's training or supervision was deficient.  Plaintiffs allege that CorrectHealth, Musso, and Llovet "failed to adequately staff and train employees responsible for providing constitutionally adequate medical and mental health care at EBRPP." (*FAC* ¶ 41, Doc. 9.)  Because of *de facto* policies and practices allowed by these defendants (among others), "EBRPP employees are not trained and/or supervised to address and refer prisoners' serious mental health care needs to CorrectHealth . . ., including those exhibited by [ ] Claiborne resulting in deliberate indifference to prisoners' serious mental healthcare needs." (*Id.*)  Count 2 also lays out the failure to train and supervise claims against CorrectHealth, Musso, and Llovet:

> [These defendants], in their individual and official capacities, failed to supervise their subordinates, namely Defendants Brumfield, Foy, Chapman, and John Doe #6, to ensure that these subordinates did not ignore prisoners' obvious signs of medical and/or mental health

distress, and/or fail to properly monitor prisoners show signs of mental health crisis. They also failed to ensure that their subordinates provided reasonable and sufficient treatment for prisoners' mental health conditions and properly monitored prisoners who were being treated. The plaintiffs were directly harmed by this failure to supervise because it caused the death of Mr. Claiborne, who received patently insufficient treatment for his serious mental health needs from the specified defendants.

(*Id.* ¶ 53.)

Here, while Plaintiffs articulate *what* they wanted the training programs to accomplish—to "ensure" that certain things would not happen—Plaintiffs do not describe *how* CorrectHealth's current training and supervision procedures failed to accomplish those aims or how they are otherwise defective.   Further, as CorrectHealth argues, Plaintiffs do not articulate beyond conclusions how CorrectHealth fails to provide "minimal training to detect obvious medical needs of detainees with *known, demonstrable*, and serious medical disorders." *Whitt*, 529 F.3d at 284. Thus, because Plaintiffs failed to satisfy the adequacy prong, their failure to train and supervise claims fail. *See Skinner*, 519 F. Supp. 3d at 316 (finding, where plaintiffs alleged that sheriff "maintained, enforced, tolerated, permitted, and applied policies, practices, or customs and usages of (including but not limited to) subjecting citizens to unreasonable seizures by failing to adequately train, supervise, and equip employees to properly handle dog/animal encounters without the use of lethal force as evidenced," that such allegations were insufficient to state viable claims because plaintiffs did "not allege *how* [the] Sheriff did any of this or how the training program was otherwise defective.").

### 4. Conditions-of-Confinement Claim

Preliminarily, CorrectHealth argues that Plaintiffs' claim is more appropriately analyzed as one for episodic acts or omissions rather than conditions of confinement.  Thus, this court must decide "whether the alleged unconstitutional conduct is a 'condition of confinement' or [an]

'episodic act or omission.' When the alleged constitutional violation is a particular act or omission by an individual that points to a derivative policy or custom of the municipality, [courts] apply the deliberate indifference standard." *Gibbs v Grimmette*, 254 F.3d 545, 549 n.2 (5th Cir. 2001) (internal citation omitted)).

Conversely, "[conditions-of-confinement]   claims are challenges to the 'general conditions, practices, rules, or restrictions of pretrial confinement.' " *Sanchez v. Young Cnty., Tex. (Sanchez II)*, 956 F.3d 785, 791 (5th Cir.) (quoting *Hare*, 74 F.3d at 644), *cert. denied,* 141 S. Ct. 901 (2020). "The issue is whether the conditions 'amount to punishment.' " *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

"To prevail on a conditions-of-confinement claim, a plaintiff must show a condition—a 'rule,' a 'restriction,' an 'identifiable intended condition or practice,' or 'sufficiently extended or pervasive' 'acts or omissions' of jail officials—that is not reasonably related to a legitimate government objective and that caused the constitutional violation." *Id.* (quoting *Duvall v. Dallas Cty.*, 631 F.3d 203, 207 (5th Cir. 2011) (quoting *Hare*, 74 F.3d at 645))). Thus, for purposes of such a claim, a plaintiff need not show deliberate indifference on the part of the municipality. *See Duvall,* 631 F.3d at 207. However, the standards for a *Monell* claim and for a conditions of confinement claim are similar and frequently overlap. *See id.* at 208.

Critically, a plaintiff may pursue conditions of confinement claims and episodic acts claims provided both are properly pled. *See Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 n.1 (5th Cir. 2009) ("Further, the district judge is no more required to classify a § 1983 lawsuit than any other case in which multiple theories are pled in the alternative. In the present case, . . . a fact issue existed only on the conditions of confinement claim."); *cf. Cleveland v. Gautreaux*, No. 15-744, 2018 WL 3966269, at *20 (M.D. La. Aug. 17, 2018) (deGravelles, J.) ("It was no obstacle to the

conditions-of-confinement claims in *Shepherd* that the plaintiff also pled episodic-acts-or-omissions claims based on the same events, and this Court would certainly be permitted to analyze Plaintiffs' allegations under both standards and let the theory with evidentiary support proceed." (citing *Shepherd*, 591 F.3d at 452 n.1, 453 n.2)), *rev'd on other grounds sub nom. Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019).  Thus, the key question is whether Plaintiffs adequately pled such a claim.

Here, the Court finds that Plaintiffs have adequately alleged unlawful and extensive conditions caused by CorrectHealth that were not reasonably related to legitimate governmental objectives. Specifically, Plaintiffs alleged that there were conditions which "deprive prisoners with serious medical conditions, namely, serious mental health disorders, of treatment for those disorders." (*FAC* ¶ 59, Doc. 9.)  Plaintiffs extensively detail the conditions of EBRPP, particularly at the time of a Metro Council meeting in August 2015 (*id.* ¶¶ 44(b), (m)), along with statements about the conditions of the jail from public figures like Grimes, Gautreaux, and others, (*id.* ¶¶ 44(i), (n), & (o).)  Plaintiffs describe the HMA report and state that CorrectHealth did not adequately respond to that report by, for instance, "failing to increase staffing levels for health care workers at the jail." (*Id.* ¶¶ 44(p), (q).)  All of these conditions reflect serious and systematic deficiencies in the provision of care that lacked a reasonable relationship to legitimate governmental objectives.

CorrectHealth's most serious argument is that the conditions set forth in the *FAC* occurred or existed before CorrectHealth took over health care in the prison in 2017 and well before Clairborne's death in January 2020, but CorrectHealth ignores two key allegations in the *FAC*. First, Plaintiffs describe June 2019 statements by Dr. Homer Venters, "who spent several years overseeing the medical program in New York City's notorious Rikers Island jail and later became

one of its biggest critics"; who, after touring EBRPP and after "not[ing] its practice of keeping suicidal inmates and others experiencing severe mental illness in solitary confinement at least 23 hours per day," said that the cells were "the most dangerous units I have observed in an American jail or prison"; and who pointed out "numerous suicide risks including the open bars, more than one of which had cloth ties affixed to bars at the time of our tour." (*Id.* ¶ 44(w).)  CorrectHealth also overlooks representations by a different expert who inspected the jail in connection with a different case related to Covid-19 and who said that EBRPP is the "worst jail he had ever seen in his 16-year career and as bad as a jail that was 100 years old." (*Id.* ¶ 44(cc)).  Such allegations are critical because, construing the *FAC* in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, the Court can reasonably infer that the same conditions described since 2012 were still present in the jail at the time of the 2020 Covid-19 pandemic, up to the present day. At the very least,  the *FAC* contains enough factual matter, taken as true, to raise a reasonable hope or expectation that discovery will reveal relevant evidence of each element of this claim. *See Lormand*, 565 F.3d at 257.

CorrectHealth also objects to the lack of sufficiently similar prior incidents and points to the fact that there is only one other suicide described in the operative complaint.  But, "specific examples of other instances of detainees who suffered [decedent's] fate . . . are not required to meet the 'condition or practice' element." *Montano v. Orange Cnty., Tex.,* 842 F.3d 865, 876 (5th Cir. 2016).

For instance, in *Sanchez II*, the Fifth Circuit recently found that the district court erred in finding that there was insufficient evidence of an "unofficial custom or practice—much less pervasive acts—of failing to monitor detainees." 956 F.3d at 792.  *Sanchez II* based this decision in part on public reports about the conditions of the jail, ratification of those conditions, evidence

of "dishonesty and an apparent cover-up," and the consistent testimony of jail employees. *See id.* at 792–93.

Here, the Court could easily reach the same result about the conditions of EBRPP.  The HMA report; the fact that those conditions remained unchanged until 2020 (and were thus ratified); CorrectHealth's "refus[al] to release" required "investigations" and "mortality review[s]" into the "circumstances surrounding [inmate] death[s]," (*FAC* ¶¶ 44(aa), Doc. 9);[3] and the consistent public statements of Gautreaux, Grimes, and others connected with the jail all support the conclusion that there were de facto policies, even if there was only one other incidence of a suicide.

CorrectHealth also attacks causation, arguing that there was no direct link between the alleged deficiencies and the harm that befell Claiborne.  But the Fifth Circuit has emphasized that it does "not require a plaintiff to show that a policy or practice was the *exclusive* cause of the constitutional deprivation." *Sanchez II*, 956 F.3d at 795 (cleaned up).  "Courts may consider how individual policies or practices interact with one another within the larger system." *Id.* (cleaned up).  "This is because confinement conditions may be constitutionally inadequate if, when viewed in combination, they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Id.* (cleaned up).

Thus, in *Shepherd*, the Fifth Circuit found that plaintiff adequately demonstrated a conditions of confinement case and explained:

> Shepherd's claim, by contrast, does not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates with chronic illness. His original complaint contains the full theory of the case: The jail's evaluation, monitoring, and treatment of inmates with chronic illness was, at the time of Shepherd's stroke, grossly inadequate due to poor or non-existent procedures and understaffing of guards and medical personnel, and

---

[3] Thus, while CorrectHealth may be correct that statistics of death may be misleading and of limited utility, the Court is certainly entitled to draw reasonable inferences from alleged manipulation of mortality reviews in accordance with *Sanchez II*.

>these deficiencies caused his injury. Shepherd relied on evidence
>showing that the inadequate treatment he received in a series of
>interactions with the jail's medical system inevitably led to his
>suffering a stroke. To demonstrate the existence of an unlawful
>condition, he presented extensive independent evidence on the jail's
>treatment of inmates with chronic illness. This evidence included a
>comprehensive evaluative report commissioned by the County, the
>DOJ report, affidavits from employees of the jail and its medical
>contractor attesting to the accuracy and applicability of the reports,
>and a plethora of additional documentary evidence. From this
>evidence, the court could reasonably infer a *de facto* jail policy of
>failing properly to treat inmates with chronic illness.

*Shepherd*, 591 F.3d at 453.[4]  Likewise, the *FAC* has sufficiently alleged facts from which the

inference can be drawn that poor evaluation, monitoring, and staffing all contributed to Claiborne

constitutionally inadequate care and that these deficiencies directly led to his death.

For all these reasons, the Court finds that Plaintiffs have stated a viable conditions-of-

confinement claim against CorrectHealth.  Consequently, the motion to dismiss this claim will be

denied.

### 5. Punitive Damages

The Court will also deny without prejudice CorrectHealth's motion to dismiss the punitive

damage claim.  CorrectHealth points to *Moore v. LaSalle Corr., Inc*, 429 F. Supp. 3d 285 (W.D.

La. 2019), which held that punitive damages could not be awarded against a private company

working under contract with a local political subdivision to provide correction services.  After

noting that the Fifth Circuit has not yet addressed the issue, *Moore* provided an extensive analysis

of *City of Newport v. Fact Concerts, Inc*., 453 U.S. 247 (1981), which established that, under

Section 1983, punitive damages could not be awarded against a public body because (1) "punitive

damages allowed against a municipality would serve to harm innocent taxpayers who would likely

---

[4] This quote from *Shepherd* makes clear that, contrary to CorrectHealth's argument, understaffing can be part of a
conditions-of-confinement claim.

bear the brunt of any damages which would be paid out of the public *fisc*," *Moore* 429 F. Supp. 3d at 288 (citing *City of Newport*, 453 U.S. at 263); (2) "punitive damages typically seek, 'to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct," *id.* (citing *City of Newport* at 266–267), but "this purpose breaks down when punitive damages are sought against an entity rather than an individual," *id.* and (3) "the deterrent purpose of § 1983 would not be advanced by assessing punitive damages against a municipality, where that purpose could be satisfied fully by assessing those damages against the individuals who may have committed the constitutional violations at issue", *id.* at 288–89. The *Moore* court found that, "[t]he Court's reasoning in *City of Newport* easily extends to a private entity which has assumed a traditionally governmental role or function via contract with a governmental entity." *Id.* at 289. *Moore* then looked at a number of other district court cases in the Fifth Circuit and found:

> In each of these contexts, a private prison management company was treated exactly as a municipality. Each of those courts took § 1983 law as applied to municipalities and applied it to private prison management companies like LaSalle. Where, as here, the courts of a circuit have applied every other aspect of § 1983 law regarding municipalities to entities like LaSalle, it follows that the law on a *res nova* issue, such as punitive damages here, will be applied in the same way.

*Id.* at 291. After reviewing policy considerations, *Moore* concluded that the private company "[could not] be cast for punitive damages.' " *Id.* at 292.

Some cases in this circuit have adopted *Moore's* position. *See Carter v. Gautreaux*, No. 19-105, 2021 WL 2785332, at *6 (M.D. La. July 2, 2021) (describing *Moore* as a "correct statement of the law" but noting that Plaintiff did "not offer any response to CorrectHealth's argument," so the failure to oppose was deemed a waiver); *Mixon v. Pohlmann*, No. 20-1216, 2021 WL 6072501, at *18 (E.D. La. Dec. 23, 2021) (finding "the reasoning in *Moore* persuasive" and

holding that "punitive damages are not available against a private entity such as [CorrectHealth St. Bernard, LLC] performing the traditional governmental function of operating the medical facilities of a prison").

However, the Court finds most persuasive Judge Lemmon's opinion in *Woodward v. Lopinto*, No. 18-4236, 2021 WL 1969446 (E.D. La. May 17, 2021).  After briefly summarizing the *Moore* ruling, Judge Lemmon explained, "In contrast, multiple courts around the country have held that private prison contractors are not immune from punitive damages." *Id.* at *10 (citing *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951 (7th Cir. 2018); *Sanders v. Glanz*, 138 F. Supp. 3d 1248 (N.D. Okla. 2015); *Lawes v. Las Vegas Metro. Police Dept.*, No. 12-1523, 2013 WL 3433150 (D. Nev. 2013). *See also, Campbell v. Pa. Sch. Bds. Ass'n*, No. 18-892, 2018 WL 3092292 (E.D. Pa. 2018) (holding that punitive damages could be claimed against the Pennsylvania School Board Association as a "private entity held to be a state actor for purposes of a claim under § 1983.")).  The *Woodward* court also quoted commentary that has reached a similar conclusion. *Id.* (quoting JOHN KIRCHER & CHRISTINE WISEMAN, PUNITIVE DAMAGES: LAW AND PRAC. § 15:23 (2d ed. 2020) ("municipal immunity from punitive damages does not extend to private organizations that contract with the municipality to perform a function previously performed by the municipality. The policy reasons behind prohibiting recovery of punitive damages against municipalities are not applicable to private parties merely because of their contract relationship with the municipality.").  Judge Lemmon ended by saying:

> Moore presents the precise question the court is confronted with in this motion, which is unresolved in this circuit, and currently before the Fifth Circuit Court of Appeals. It has been docketed and briefing is underway. The trial of the instant matter is set for August 2, 2021. Accordingly, the court pretermits consideration of this issue until after the appellate court has issued its decision.

*Id.*

37

This Court will take the same approach as *Woodward*. *Moore* remains pending in the Fifth Circuit, and it is set for oral argument on the week of April 4, 2022. (*See Moore v. LaSalle Mgmt.*, No. 20-30739, Doc. 159.)  Even if this Court is more persuaded by the cases and authority from outside this circuit (and it is), there is simply no reason to make a definitive ruling at this time before the Fifth Circuit has an opportunity to resolve the issue.  Accordingly, CorrectHealth's motion to dismiss the punitive damage claim will be denied without prejudice, and it can renew the motion, if necessary, following a decision in *Moore*.

## IV.    State Law Claims Against CorrectHealth

CorrectHealth argues that, under the Louisiana Medical Malpractice Act ("LMMA"), Plaintiffs must present their claims of negligence and intentional conduct to a medical review panel before filing suit. (Doc. 25-1 at 18.)  Since there is no indication Plaintiffs have exhausted this requirement, Counts 5 and 6 must be dismissed as premature. (*Id.*)

Plaintiffs respond that CorrectHealth's argument about the MMA is "frivolous" because "§ 1983 claims based on allegedly intention[al] or deliberate indifferent conduct are not subject to this requirement." (Doc. 37 at 27.)  Here, Plaintiffs did not bring a malpractice claim, and those are the only ones to which the medical review panel are subject. (*Id.*)

Having carefully considered the matter, the Court will grant the motion.  Preliminarily, Plaintiffs only assert derivative state law claims against CorrectHealth—that is, respondeat superior (Count 6), loss of consortium (Count 7), wrongful death (Count 8), and a survival action (Count 9), (*see FAC* ¶¶ 64–68, Doc. 9.)  However, Plaintiffs do make claims against CorrectHealth Employees, specifically for intentional and negligent acts (Count 5), (*id.* ¶ 63), and for failure to protect (Count 12), (*id.* ¶ 73).

Thus, both sides are correct in some way; CorrectHealth is right that Plaintiffs plead acts of negligence, and Plaintiffs accurately say they assert claims of intentional misconduct.

The negligence claims are easily subject to dismissal.  The LMMA provides in relevant part that "[n]o action against a health care provider covered by this [Act], or his insurer, may be commenced in any court before the claimant's proposed complaint has been presented to a medical review panel established pursuant to this Section." La. Rev. Stat. Ann. § 40:1231.8(B)(1)(a)(i). "Premature medical malpractice suits are subject to dismissal." *Adams v. Foti*, No. 02-1059, 2004 WL 241859, at *4 (E.D. La. Feb. 5, 2004)

Plaintiffs do not seriously dispute that they have failed to do to exhaust their administrative remedies before bringing their negligence claims.  Thus, the Court will dismiss these claims as premature. *See Castellanos v. Jefferson Par. Corr. Ctr.*, No. 07-7796, 2008 WL 3975606, at *5 (E.D. La. Aug. 22, 2008) ("Accordingly, the Court finds that it is appropriate to dismiss the state law claims [for state law medical malpractice *and* negligence] as premature because plaintiff failed to exhaust his state statutory remedies as required by Louisiana law." (citing *Parish v. Lee*, No. 02-2655, 2004 WL 877103, at *13 (E.D. La. Apr. 22, 2004)).

Plaintiffs are correct that they need not exhaust remedies for intentional conduct.  *See Zavala v. City of Baton Rouge/Par. of E. Baton Rouge*, No. 17-656, 2018 WL 4517461, at *21 (M.D. La. Sept. 20, 2018) (deGravelles, J.) ("Of course, for the same reason the [LMMA] does not foreclose any of Zavala's surviving § 1983 claims, it also does not doom any state-law claims based on allegedly intentional or deliberately indifferent conduct." (citing *Bailey v. E.B.R. Par. Prison*, No. 12-224, 2015 WL 545706, at *3 (M.D. La. Feb. 9, 2015) ("[I]nasmuch as the [LMMA] defines malpractice as an 'unintentional tort or breach of contract,' and inasmuch as a claim for the violation of constitutional civil rights, in contrast, involves intentional wrongdoing on the part

of a state official, or an analogous state of mind described as 'deliberate indifference,' the [LMMA] has no application to [plaintiff's] claim of intentional, willful and malicious wrongdoing." (citations omitted))).

However, the problem for Plaintiffs is that this Court has already determined that they have no viable claims against CorrectHealth, its Supervisors, or its Employees for deliberate indifference. Consequently, the Court agrees with CorrectHealth that Plaintiffs' claim for respondeat superior against it must be dismissed.

## V.    Section 1983 Claims Against CorrectHealth Supervisors

### A.  Parties' Arguments

#### 1. Musso and Llovet's Original Memorandum (Doc. 26-1)

Musso and Llovet first seek dismissal of the official capacity claims against them on the grounds that they are duplicative of the official capacity claim against CorrectHealth. (Doc. 26-1 at 3–4.) Such claims are redundant and must be dismissed. (*Id.* at 4.)

CorrectHealth Supervisors next argue that the individual capacity claims against them should be dismissed for two reasons. (*Id.* at 4.) First, there are no allegations that they were personally involved in the constitutional violations. (*Id.*) Thus, to be subject to liability, they must implement unconstitutional policies that were the moving force of constitutional violations. (*Id.*) Since there is no personal involvement here, Plaintiffs must allege that they had actual or constructive notice that a particular omission in training caused rights to be violated yet chose to retain the program. (*Id.* at 5.) Here, Plaintiffs do not allege knowledge beyond mere conclusions and unwarranted speculation that they were aware of what took place at all Metro Council meetings. (*Id.* at 5–6.)

Second, Plaintiffs improperly lump all Defendants (including CorrectHealth Supervisors) together without differentiating who is responsible for what conduct or how each is individually deliberately indifferent. (*Id.* at 6–7.)  This is improper, but, to the extent the Court can look past this, Musso and Llovet adopt all arguments made on behalf of CorrectHealth. (*Id.* at 7.)

CorrectHealth Supervisors then close by arguing that they should not be subject to punitive damages. (*Id.* at 8.)  These defendants argue that there are no facts to support the argument that they showed evil motive or intent or acted with reckless or callous indifference to the federally protected rights of others. (*Id.*)

### 2. Plaintiffs' Opposition (Doc. 37)

In addition to the arguments made that were summarized above, Plaintiffs maintain that the CorrectHealth Supervisors acted as final policy makers when they put Claiborne in Cell # 3. (Doc. 37 at 19–20.)   As supervisors, they implemented unconstitutional policies that causal resulted in injuries. (*Id.* at 20.)  Llovet attended Metro Council meetings, and both he and Musso were aware of the systematic deficiencies at the prison. (*Id.*)

As to the failure to train claims, Plaintiffs highlight the numerous problems with the jail and state that Musso and Llovet "were part of CorrectHealth's management and supervisors at that time." (*Id.* at 25–26.)   These defendants "oversaw a mental health system and trained and supervised mental health staff that failed to address Mr. Claiborne's serious mental health needs." (*Id.* at 25–26.)  CorrectHealth Supervisors allowed these *de facto* policies to happen. (*Id.* at 26.) Given the patterns alleged, Musso and Llovet must have known. (*Id.*)

### 3. CorrectHealth Supervisor's Reply (Doc. 39)

Musso and Llovet begin by arguing that Plaintiffs have failed to oppose (1) that the official capacity claims against them are redundant, and (2) that they were not personally involved in any

of what befell Claiborne. (Doc. 39 at 1–2.)  Thus, these claims should be dismissed as waived. (*Id.*)  The remainder of the reply is largely the same for these Defendants as for CorrectHealth. (*See id.* at 2–17.)

### B.  Law and Analysis

Plaintiffs assert three counts against Musso and Llovet under § 1983: (a) failure to train and supervise in their individual and official capacities (Count 2); (b) deliberate indifference to appropriate mental health care in their individual capacities (Count 3); and (c) a *Monell* claim for denying access to appropriate medical care (Count 4). (*FAC* ¶¶ 53–61, Doc. 9.) Having carefully considered the matter, the Court will dismiss each of these claims.

As to the official capacity claims (Counts 2 and 4), courts in this circuit have held that, when the same official capacity claims are brought against an entity and its municipal officials, the claims against the officials are dismissed as redundant and duplicative. *See Zavala*, 2018 WL 4517461, at *14 ("Nevertheless, Zavala's claim in Count One names Dr. Bridges as a defendant only in his official capacity. . . . As that claim is also asserted against the City/Parish and CorrectHealth, it is duplicative and should therefore be dismissed." (citing *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) (district court correctly dismissed claims against municipal officers which "duplicate[d] claims against the respective governmental entities themselves"); *Broussard v. Lafayette City-Par. Consol. Gov't*, 45 F. Supp. 3d 553, 571 (W.D. La. 2014) ("When ... the government entity itself is a defendant in the litigation, claims against specific individuals in their official capacities are redundant, and for that reason, courts in this circuit have found it is appropriate to dismiss them."))).  Thus, Counts 2 and 4 can be dismissed on this ground alone.

Even putting this aside, the official capacity claims in Counts 2 and 4, along with the individual capacity claims in Counts 2 and 3, can be dismissed for an additional reason. As to the individual capacity claims, " '[a] supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury.' " *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). Here, there is clearly no personal participation by CorrectHealth Supervisors, so Plaintiffs must rely on the latter theory.

This is important for several related reasons. First, the legal standards for imposing supervisor liability are essentially the same for individual and official capacity claims. *See Roberts*, 397 F. 3d at 293 (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452–54 and nn. 7–8 (5th Cir. 1994) (en banc)). Second, if a plaintiff fails to state a viable claim against individual officials for deliberate indifference, then he has also failed to satisfy the causation element of a Section 1983 claim against a superior for failure to train and supervise. *See Martinez*, 846 F. App'x at 244–45 (citing *Rios*, 444 F.3d at 425). And third, official capacity "claims fail without an underlying constitutional violation." *Whitley*, 726 F.3d at 648–49 (citing *Bustos*, 599 F.3d at 467).

In sum, all claims against the CorrectHealth Supervisors—for failure to supervise and train, for implementing unconstitutional policies, and under *Monell*—fail for lack of an underlying constitutional violation. Because this Court has already determined that no CorrectHealth Employee committed an underlying constitutional violation, the causation element for each of these claims fails. Accordingly, all § 1983 claims against Musso and Llovet, including the ones for punitive damages, will be dismissed.

## VI.    State Law Claims Against CorrectHealth Supervisors

The parties' arguments on the state law claims against Musso and Llovet largely parallel those with respect to CorrectHealth.  The Court agrees that the analysis is the same.  For the reasons given above, the state law negligence claims against Llovet and Musso are dismissed for failure to exhaust, and the state law intentional torts are dismissed for failure to state viable claims.

## VII.    Leave to Amend

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955). The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

One leading treatise has further explained:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading

> appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Here, though Plaintiffs previously amended their complaint, they did not do so in response to a ruling by this Court assessing the sufficiency of his claims. Thus, "the Court will act in accordance with the 'wise judicial practice' and general rule and grant Plaintiff's request." *Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 519 (M.D. La. 2021) (deGravelles, J.) (citing *JMCB*, 336 F. Supp. 3d at 641–42; *Fetty v. La. State Bd. of Priv. Sec. Exam'rs*, —— F. Supp. 3d ——, No. 18-517, 2020 WL 520026, at *15 (M.D. La. Jan. 31, 2020) (deGravelles, J.) ("because Plaintiffs did not amend their complaint in response to a ruling by this Court, and because of the above 'wise judicial practice,' the Court will grant Plaintiffs one final opportunity to amend their complaint to state viable claims against the Board Members." (citing *JMCB, supra*)); *Murphy v. Bos. Sci. Corp.*, No. 18-31, 2018 WL 6046178, at *1 (M.D. La. Nov. 19, 2018) (deGravelles, J.) (reaching same result) (citing, inter alia, *JMCB, supra*).

The Court makes notes that it passed on a number of issues in reaching this decision. In amending the *FAC*, Plaintiffs should correct any other deficiencies they may find appropriate in light of CorrectHealth, Musso, and Llovet's motions. If they fail to do so, and any CorrectHealth Defendant ultimately proves successful on a subsequent motion to dismiss, the Court will be less inclined to grant leave to amend, given the notice Plaintiffs had of these potential issues and the opportunity to cure.

## VIII.  Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss Plaintiffs' Complaint against CHEBR* (Doc. 25) filed by Defendant CorrectHealth East Baton Rouge, LLC ("CorrectHealth") is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted in that all claims by Plaintiffs against CorrectHealth are **DISMISSED WITHOUT PREJUDICE**, except Plaintiffs' § 1983 claim that Claiborne was subjected to unlawful conditions of confinement.  In that sole respect, CorrectHealth's motion is denied.

**IT IS FURTHER ORDERED** that the *Motion to Dismiss Plaintiffs' Complaint Against Musso and Llovet* (Doc. 26) filed by Defendants Dr. Carlo Musso and Jean Llovet is **GRANTED**, and all claims by Plaintiffs against these defendants are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs shall have twenty-eight (28) days from this order in which to amend the operative complaint to cure the deficiencies detailed in this ruling. Failure to do so will result in the dismissal of the above claims with prejudice.

Signed in Baton Rouge, Louisiana, on <u>March 25, 2022</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**