## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**SHAHEEDRA JORDAN, ET AL.**

                **CIVIL ACTION**

**VERSUS**

                **NO. 21-48-JWD-SDJ**

**SID J. GAUTREAUX III, ET AL.**

## RULING AND ORDER ON  SHERIFF DEFENDANTS' SECOND MOTION TO DISMISS

This matter comes before the Court on one of three motions pending in this case. Specifically, Sheriff Sid J. Gautreaux, III, in his capacity as Sheriff of East Baton Rouge Parish ("Sheriff Gautreaux"); Lieutenant Colonel Dennis Grimes, Warden of the East Baton Rouge Parish Prison ("Warden Grimes"); and certain individuals associated with the East Baton Rouge Parish Sheriff's Office ("EBRSO")[1] (collectively, "Sheriff Defendants") have filed this *Motion to Dismiss* (Doc. 56) ("*Sheriff MTD2*") seeking dismissal of all federal claims asserted by Plaintiffs, Shaheedra Jordan, Sahara Claiborne, and Leiaja Claiborne ("Plaintiffs").  Plaintiffs oppose the motion, (Doc. 66),[2] and Sheriff Defendants have filed a reply, (Doc. 67).  Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.  For the following reasons, *Sheriff MTD2* is granted, and all § 1983 claims against Sheriff Defendants are dismissed with prejudice.

---

[1] The individuals associated with the EBRPSO named as defendants include: Corporal Jacob Page, Deputy Kenyaki Domino, Corporal Damien King, Corporal Michael Britt, Corporal Justin Minor, Deputy Rodney Johnson, Deputy Joe Coleman, Sergeant Jermaine Cruz, Lieutenant Grant, and Captain Leader.

[2] Plaintiffs' opposition responds to the instant motion and a motion filed by the City of Baton Rouge/Parish of Baton Rouge. (Doc. 61.) However, this ruling addresses only the *Sheriff MTD2*.

I.       **Relevant Factual and Procedural Background**

  A.  **Introduction**

This case involves the tragic suicide of Shaheed Claiborne, a mentally ill pretrial detainee at East Baton Rouge Parish Prison ("EBRPP").  Claiborne's heirs bring this suit against (1) Sheriff Defendants; (2) (a) CorrectHealth East Baton Rouge, LLC ("CorrectHealth"), (b) two of its upper level officers,[3] and (c) a handful of its healthcare providers allegedly involved in Claiborne's death;[4] and (3) the Parish of East Baton Rouge (the "Parish"). All Defendants have moved to dismiss, (Docs. 55, 56, 61), but this ruling focuses only on *Sheriff MTD2*.

On March 25, 2022, this Court issued a *Ruling and Order* on Sheriff Defendants' original motion to dismiss. *Jordan v. Gautreaux*, 593 F. Supp. 3d 330 (M.D. La. 2022) (deGravelles, J.), Doc. 45. In that decision, the Court granted the motion in part, dismissed all of Plaintiffs' Section 1983 claims against Sheriff Defendants without prejudice, but denied the motion as to Plaintiffs' state law claims. *Id.* at 373–74.  The Court also gave Plaintiffs leave to amend to cure the deficiencies contained in their prior complaint. *Id.* at 374.

More relevant to this motion, the Court found that, with respect to the § 1983 claims against Gautreaux, Grimes, and Leader, "each of these claims—for conditions of confinement, under *Monell*, and for supervisory liability—fail for lack of causation. That is, Plaintiffs have failed to demonstrate a direct causal link between the conduct of or condition caused by any Sheriff Defendant and the harm Claiborne suffered." *Id*. at 362.[5]  The details of these rulings will be addressed in more detail below.

---

[3] These upper level officials include Carlo Musso, MD, CorrectHealth's President and Managing Member, and Jean Llovet, its director of clinical services.

[4] The CorrectHealth providers named as defendants include Nurse Brumfield, Nurse Foy, Nurse Chapman, and John Doe #6.

[5] The Court also found that "the supervisory liability claims fail for the additional reason that Plaintiffs have not specifically identified the deficiencies in training or supervision." *Jordan*, 593 F. Supp. 3d at 362.

In the instant motion, Sheriff Defendants seek dismissal of the § 1983 claims against them in the *Second Amended Complaint* ("*SAC*"), Doc 48.  These include (1) Count 1, a "§ 1983 violation based on establishment of a system in which prisoners with serious mental health issues are denied access to appropriate medical care," against Gautreaux in his official capacity, (*SAC* ¶¶ 100–02, Doc. 48 (cleaned up)), which this Court previously construed to be a conditions-of-confinement claim, *Jordan*, 593 F. Supp. 3d at 362; (2) Count 2, a "§ 1983 violation based on failure to supervise other defendants to ensure inmates received appropriate care for serious medical needs," against Gautreaux and Grimes, *inter alia* (*SAC* ¶¶ 103–07, Doc. 48 (cleaned up)); and (3) Count 4, a "*Monell* violation of § 1983 based on establishment of policies patterns or practices pursuant to which prisoners with serious mental health conditions are denied access to appropriate medical care," against Gautreaux and others in their official capacity, (*id.* ¶¶ 112–16 (cleaned up)), which this Court interpreted to be a *Monell* claim based on episodic acts or omissions, *Jordan*, 593 F. Supp. 3d at 362.

### B.  Events Leading Up to Claiborne's Suicide

On Saturday, January 18, 2020, Claiborne was arrested by the Baton Rouge Police Department ("BRPD") after trying to kick and ram his way into a drug and alcohol recovery center, after getting into an altercation with bystanders outside that center, and after crashing his car into an electric pole. (*SAC* ¶¶ 9–14, Doc. 48.)  BRPD advised a corporal at EBRPP that Claiborne had "mental health issues," and Claiborne was placed in a one-man cell until he could be assessed by mental health staff. (*Id.* ¶¶ 15–17.)

Corporal Page and Deputy Baker gave Claiborne a "yellow smock rather than a cloth jumpsuit, per his mental health observation status" because of "the risk of suicide known to the Sheriff and its medical staff of inmates suffering mental health issues.  The choice of the smock

was because of the known risk of suicide Mr. Claiborne potentially presented." (*Id.* ¶ 19.) "Page brought Claiborne to N01—the special needs housing unit—to Cell #3." (*Id.* ¶ 20.)

However, despite these deputies' knowledge of "Claiborne's mental health crisis and symptoms, on Sunday, January 19, 2020—one day after his arrest—a member of the medical staff, John Doe #6, met with Mr. Claiborne and removed him from mental health observation, and the required restrictions thereof." (*Id.* ¶ 21.) Claiborne was given a cloth jumpsuit to replace the yellow smock, and this cloth jumpsuit was the same kind not originally given to Claiborne because of "his acute mental health issues, which were known to the Sheriff's Office and its medical staff—including the risk of Mr. Claiborne committing suicide." (*Id.* ¶ 22.)

"On Monday, January 20, 2020 at 1:35 [a.m.], according to video surveillance, a smock or clothing garment was taken from an inmate, possibly Mr. Claiborne." (*Id.* ¶ 23.) At 1:43 a.m., Deputy Domino made rounds and, according to video surveillance, spoke to an inmate near the first few cells. (*Id.* ¶ 24.) "Motion-detection triggered video surveillance of N01 displayed 'no activations' from 2:22-3:14 [a.m.], a period of 52 minutes." (*Id.* ¶ 25.) "At 3:14 [a.m.], Deputy Domino began rounds, and knowing Mr. Claiborne was in Cell #3, Deputy Domino walked directly and immediately to Cell #3 where he found Mr. Claiborne hanging from his cell bars by his recently-issued cloth jumpsuit." (*Id.* ¶ 26.) Domino called for help, and other deputies arrived. (*Id.* ¶ 27.) They tried at first to untie the jumpsuit, but they eventually got a knife to cut him down. (*Id.*) "At or around 3:18 [a.m.], Mr. Claiborne was taken down and officers began administering CPR." (*Id.* ¶ 28.)

Nurses arrived to help administer CPR, and only seven minutes later, at 3:21 a.m., was EMS notified. (*Id.* ¶¶ 28–30.) Another nurse came around the same time with oxygen. (*Id.* ¶ 31.)

Around 3:44 a.m., EMS arrived.  (*Id.* ¶ 32.)  They left six to ten minutes later, having decided that Claiborne was dead. (*Id.*)

### C.  Claiborne's Mental Condition

Plaintiffs allege:

> According to the investigation and subsequent report by Detective Auzenne, Mr. Claiborne had been displaying odd behavior in the hours prior to his death:
>
> a) The inmate in Cell #1 heard Mr. Claiborne talking out loud to God;
>
> b) The inmate in Cell #2 heard Mr. Claiborne singing church music and songs;
>
> c) The inmate in Cell #5 heard Mr. Claiborne singing and talking to himself, and heard him repeatedly state that "[Mr. Claiborne] was going to kill himself." Using reflection in the windows near his cell, the inmate in Cell #5 stated that he "observed [Mr. Claiborne] climb to the upper bars of his cell[,]" then later saw Mr. Claiborne "hanging from the bars[,]" and called for help. It appears that no one ever came, and that all the other inmates were asleep at the time.
>
> * * *
>
> Additionally, Deputy Domino's report states that from 5:00 [p.m.]–3:14 [a.m.], Mr. Claiborne had been exhibiting "bizarre" behavior such as speaking loudly, using unknown jargon, racking gates, spitting on the floor, talking about his deceased mother, and singing spiritual songs.

(*SAC* ¶¶ 33–34, Doc. 48 (first through fourth alterations in original).)

Plaintiffs later continue, "Just prior to his suicide, records reveal that Mr. Claiborne was showing signs of bizarre behavior, including speaking loudly, using unknown jargon, racking the gates to his cell, spiting on the floor, speaking about his deceased mother, and singing spiritual songs." (*Id.* ¶ 55.)

They further plead:

While incarcerated, the EBRPP staff failed or refused to provide Mr. Claiborne with his prescribed psychiatric medication or otherwise provide him with treatment for his psychiatric illness, i.e. bipolar disorder, even though he was exhibiting behavior that clearly demonstrated his need for such medication and treatment. That need was demonstrated by the fact that:

a) Mr. Claiborne was arrested on January 18, 2020 for attempting to gain entry to a drug and alcohol recovery center before it opened. Records indicate that Mr. Claiborne was kicking and ramming [with his body] the door in an effort to get inside; he was acting erratically and getting into physical altercations with bystanders outside of the drug and alcohol recovery center; after not being able to get inside, Mr. Claiborne used/drove his vehicle to crash into the drug and alcohol recovery center in an effort to get inside; and he was observed to have red dilated eyes.

b) After Mr. Claiborne was arrested, Baton Rouge Police Department Captain Sandridge called Corporal Page to tell him that Mr. Claiborne was en route to EBRPP and that "they [presumably EBRPP staff] were to be on high alert."

c) Captain Sandridge further advised Corporal Page that Mr. Claiborne was very strong and had "mental health issues."

d) Additionally, while Mr. Claiborne was in the booking intake room, Warden Grimes called Corporal Page to tell Corporal Page that Mr. Claiborne "was to be placed in a one man cell until he was assess[ed] by mental health staff."

(*Id.* ¶ 56 (first alteration in original).)

Plaintiffs also provide screenshots of Claiborne's January 18, 2020, EBRPP intake receiving form completed by Nurse Brumfield. (*Id.* ¶ 57.) Critically, though this document reflects a history of Bipolar disorder, the intake form also states that Claiborne answered "No" to the questions of "Do you have current thoughts or plans to harm yourself?", "Does the patient exhibit any signs that suggest the risk of suicide or self-injurious behavior?", and "Past and Recent Suicide Attempts/ Ideations (include when and how)." (*Id.*) Further, the form also shows that Claiborne

"HAS BIPOLAR MEDS, DOESN'T TAKE THEM" and "DOESN'T KNOW NAME OF PSYCH MEDS." (*Id.*)

Plaintiffs complain about this form.  They say it does not reflect what was asked of Claiborne or what "signs" or "evidence" Nurse Brumfield supposedly looked for. (*Id.* ¶ 58.) Further, Plaintiffs maintain that the nurse's responses reflect a lack of training and qualifications with respect to "properly and adequately assess[ing] (and treat[ing]) Mr. Claiborne's mental health, psychiatric illness, and his risk of suicide." (*Id.* ¶ 59.)  Plaintiffs claim the responses are "inconsistent with one another" and that the assessment "is difficult to comprehend considering the nature of Mr. Claiborne's arrest," his bipolar disorder, failure to take prescribed medicine, and "mental health issues." (*Id.*) "It appears that the only reason Nurse Brumfield even recommended putting Mr. Claiborne on Mental Health Observation was because Warden Grimes said that Mr. Claiborne needed to be assessed by mental health staff." (*Id.* ¶ 59.)

Plaintiffs also paste screenshots of Claiborne's EBRPP Mental Health Intake Form from January 19, 2020, from around 12:00 p.m. (*Id.* ¶ 60.)  Cheryl Morris completed this document. (*Id.*)  It states that Claiborne had no suicide attempts or self-injurious behavior history. (*Id.*)  The document also states that Claiborne was diagnosed with Bipolar Disorder in 2017 after his mother's death and that "he is currently prescribed trazodone, [which he] states he takes [ ] on an as needed basis for sleep." (*Id.*)  His mood was "Agitated," but he was not "suicidal/homicidal"; indeed, Morris specifically wrote, "IM short in response.  Easily agitated. Stated he was not suicidal at the time of arrest, however was agitated due to arrest. Did not appear to be RIS." (*Id.*) Plaintiff makes complaints about this form substantially similar to those made about Nurse Brumfield's with regard to a lack of training, qualifications, and consistency. (*See id.* ¶ 61.)

Plaintiffs further allege:

7

Other suicide risk factors for Mr. Claiborne included being put in a jail cell with no other cell mate and with little to no monitoring, previous inadequate treatment of Mr. Claiborne's bipolar disorder, and Mr. Claiborne's poor medication adherence. Notwithstanding all of the foregoing suicide risk factors present for Mr. Claiborne—and which CorrectHealth and Ms. Morris clearly disregarded—CorrectHealth and Ms. Morris decided that Mr. Claiborne was fine and could be taken off of Mental Health Observation *less than 24 hours after he was put on mental health observation*. CorrectHealth's and Ms. Morris's actions evidence a total disregard and lack of care for Mr. Claiborne's mental health and well-being, and directly caused and/or led to Mr. Claiborne committing suicide less than 24 hours after being taken off of Mental Health Observation.

(*Id.* ¶ 63.)

### D. Sheriff Defendants' Failures, Along with the Failures of Others

Plaintiffs claim that, "[d]espite the obvious indications that Mr. Claiborne was suffering an emotional breakdown and was in acute mental distress," and "[d]espite his observably bizarre behavior for several hours prior to his death," the various Sheriff Defendants at EBRPP took certain actions that led to Claiborne's death, including (1) "fail[ing] to take the necessary actions to ensure [his] safety;" (2) "failing to physically walk the halls between 2:22 [a.m.] and 3:14 [a.m.] – close to an hour—to monitor Mr. Claiborne's cell even though they had knowledge of his acute emotional distress; (3) failing to respond to the calls for help by the inmate in Cell #5; (4) fail[ing] to monitor prisoner living areas, including the isolation cells in Unit II's N01," which, by its design, allows for monitoring of suicidal prisoners "without having to physically make monitoring rounds, i.e. walk the hallway in front of the cell;" (5) as to Page, "failing to place Mr. Claiborne in Cell #1 or #2," which "enabled Mr. Claiborne to hang himself;" and (6) "failing to provide Mr. Claiborne sufficient access to qualified medical and mental health care (*SAC* ¶¶ 36–39, Doc. 48.)

Plaintiffs further plead:

> Despite the obvious indications that Mr. Claiborne was suffering an emotional breakdown and was in acute mental health distress following the tragic death of his beloved mother just days before his arrest, an EBRPP staff member removed him from mental health observation less than 24 hours after his arrival and provided him with the cloth jumpsuit that he used mere hours later to hang himself.

> Despite his observably bizarre behavior for several hours prior to his death, Defendants Page, Domino, King, Britt, Minor, Johnson, Coleman, Cruz, Grant, Leader, and John Does #1-#5, failed to take the necessary actions to ensure Mr. Claiborne's safety. Defendants Page, Domino, King, Britt, Minor, Johnson, Coleman, Cruz, Grant, Leader, and John Does #1-#5, by failing to physically walk the halls between 2:22[ a.m.] and 3:14[ a.m.] – close to an hour— to monitor Mr. Claiborne's cell even though they had knowledge of his acute emotional distress, and by failing to respond to the calls for help by the inmate in Cell #5, permitted Mr. Claiborne to hang himself.

(*Id.* ¶¶ 36–37.)

> Plaintiffs continue later:

> EBRPP, CorrectHealth, Sheriff Gautreaux, Warden Grimes, and their employees failed to properly assess Mr. Claiborne as a suicide risk, or even a potential risk, in spite of the fact that Mr. Claiborne presented at the jail informing them of his bipolar mental illness and psychiatric medications.

> . . . Given the information provided/obtained from Mr. Claiborne's intake forms, CorrectHealth and EBRPP officials were aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] to Mr. Claiborne if his mental health disorders were not treated or if he did not receive the treatment he needed (*i.e.*, ensuring that Mr. Claiborne had access to and was taking his psychiatric medication; keeping Mr. Claiborne on Mental Health Observation; and properly monitoring his mental health for longer than 36 hours after being booked into EBRPP as an inmate with known "mental health issues" who had just been arrested for attempting to gain entry into a drug and alcohol recovery center and who had not been taking his psychiatric medication).

(*Id.* ¶¶ 64–65.)

Plaintiffs later make a number of complaints about other alleged failures and how they lead to Claiborne's death. (*Id.* ¶¶ 66–67, 71.)  Plaintiffs again allege that "[p]rison officials and

CorrectHealth staff" lacked training to "recognize how Mr. Claiborne's bipolar disorder/mental illness would affect his ability to communicate his medical needs (or medical history) or meaningfully participate in his medical treatment and risk assessment." (*Id.* ¶ 68.)  Plaintiffs also say that "EBRPP and CorrectHealth were not adequately staffed or equipped to identify, accommodate and treat Mr. Claiborne's bipolar disorder, nor did EBRPP and CorrectHealth have proper procedures, arrangements and/or capacity to transport prisoners to a facility that was adequately staffed and equipped to treat mental illness." (*Id.* ¶ 69.)

Plaintiffs also say there is a "pattern in the lack of monitoring of Mr. Claiborne, as well as other mentally ill inmates, due to the layout of EBRPP and the cells (including N-01 where Mr. Claiborne was housed and committed suicide) being out of sightlines for EBRPP officials to adequately monitor inmates." (*Id.* ¶ 70.)  Plaintiffs make a number of complaints about Claiborne "[b]eing housed in a solitary confinement cell (*i.e.*, no cell-mate) with barred doors," and the design of the jail. (*Id.* ¶¶ 72–74.)

They also make further complaints about CorrectHealth's provision of medical services and the use of CorrectHealth. (*Id.* ¶¶ 75–79.)  Plaintiffs then assert:

> EBRPP and the Sheriff cannot argue that they were not on notice that mental health facilities and services at EBRPP were dramatically below acceptable standards or that those facilities and services did not pose a serious risk of permanent harm or even death to mentally ill inmates, because it is the Sheriff, Warden Grimes and the head of the Parish who were making those arguments publicly to the Council. . . .

> EBRPP, CorrectHealth, Sheriff Gautreaux, Warden Grimes, and their employees had a duty to protect inmates such as Mr. Claiborne in EBRPP from the known threat of harm, including harm from known medical and mental health conditions and harm from suicide by providing medical and mental health care commensurate with accepted community standards of care, and by providing comprehensive suicide prevention policies and practices consistent with contemporary correctional practices across the United States.

10

(*Id.* ¶¶ 80–81.)  Plaintiffs claim that these defendants knew that a failure to fulfill their duty would result in harm to inmates and that these defendants did in fact fail in their duty, both generally and specifically with respect to Claiborne. (*Id.* ¶ 82.)  Plaintiffs also maintain that "EBRPP's mental-health system was still inadequately funded, understaffed, and marred by a complete lack of training with respect to assessing and treating inmates with mental health disorders" like Claiborne at the time of his death. (*Id.* ¶ 83.)

Plaintiffs then assert that Sheriff Gautreaux was deliberately indifference:

> Given the numerous prior instances of similar suicides by inmates at EBRPP and other prisons run by CorrectHealth (as alleged herein) and the extensive reports, findings, and admissions by EBRPP, Sheriff Gautreaux, Warden Grimes, and the Parish of East Baton Rouge regarding EBRPP's inmate mental health assessment and treatment deficiencies (as alleged herein), EBRPP, CorrectHealth, Sheriff Gautreaux, Warden Grimes, and the Parish of East Baton Rouge all had actual and/or constructive knowledge of the deficient policies and customs with respect to assessing, treating, and housing inmates with mental health problems, and those deficiencies directly caused or led to the failure to properly and adequately treat mentally ill inmates and were the moving force behind the suicide of inmates with mental health problems such as Mr. Claiborne.

> . . . BRPP, CorrectHealth, Sheriff Gautreaux, Warden Grimes, and the Parish of East Baton Rouge failed to ensure that Mr. Claiborne received necessary psychiatric care while detained, despite having knowledge of the needs and requirements of the incarcerated mentally ill.

> . . . EBRPP, CorrectHealth, Sheriff Gautreaux, Warden Grimes, and the Parish of East Baton Rouge's decisions to continue accepting mentally ill inmates—all while knowing that EBRPP's facilities, policies, and abilities were inadequate and presented a danger to mentally ill inmates at EBRPP, but nevertheless choose to leave those inadequate facilities, policies, and abilities undisturbed—effectively assented to the harms suffered by Mr. Claiborne and reflects deliberate indifference to the risk that a violation of Mr. Claiborne's constitutional rights to sufficient medical care while a pre-trial detainee would occur.

. . . Further, the lack of adequate health care, understaffing, and conditions of EBRPP show that Sheriff Gautreaux and Warden Grimes' deliberate indifference was highly likely to lead to inadequate monitoring, and the specific injuries (death by suicide) suffered by Mr. Claiborne.

(*Id.* ¶¶ 85–88.)

Plaintiffs also circle back to re-urge the lack of training:

Likewise, Sheriff Gautreaux and Warden Grimes (in their individual capacities) also failed to supervise their employees to properly screen prisoners with serious mental health conditions (such as Mr. Claiborne), provide and ensure access to psychiatric medication, identify suicidal inmates, and institute proper quality-control measures to alleviate the chronic shortcomings revealed in the HMA report. These failures to supervise were the product of EBRPP's deficient policies, procedures, and facilities for incarcerating and treating mentally ill inmates, and ultimately resulted in Mr. Claiborne's suicide less than 48 hours after being booked into EBRPP.

. . . Sheriff Gautreaux and Warden Grimes also failed to train their employees on how to recognize serious mental illnesses in inmates and on how to adequately assess mentally ill inmates to determine whether said inmate is a suicide risk.

An adequately trained and supervised (with respect to assessing inmate mental health and suicide risk) EBRPP/CorrectHealth official would have recognized that Mr. Claiborne was a suicide risk, or at least a potential risk, and at a minimum, would not have taken Mr. Claiborne off of Mental Health Observation less than 48 hours after being evaluated and booked into prison.

(*Id.* ¶¶ 95–97.)

## II.    Rule 12(b)(6) Standard

"Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (alterations in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]; *Twombly*, 55[0] U.S. at 556 [ ]. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556 [ ].

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502 (5th

Cir. 2014) (citing *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc)). The Court "need not, however, accept the plaintiff's legal conclusions as true." *Id.* at 502–03 (citing *Iqbal*, 556 U.S. at 678). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503 (cleaned up).

### III.   Count 1: § 1983 Conditions of Confinement Claim

#### A.   Parties' Arguments

##### 1. Sheriff Defendants' Original Memorandum (Doc. 56-1)

Sheriff Defendants begin their argument by recapping the law on conditions-of-confinement claims, by emphasizing that Plaintiffs repeat their allegations as to Count 1, and by then summarizing the Court's prior ruling on these claims. (Doc. 56-1 at 6–9.)  Sheriff Defendants next urge that "Plaintiffs make the same factual allegations discussed by this Court in its Ruling on Plaintiffs' conditions-of-confinement claims in their Second Amended Complaint." (*Id.* at 9.) Again, a medical provider (likely nurse Cheryl Morris) "removed Claiborne from Mental Health Observation," so, "as this Court noted, there was no reason to monitor more than they already did." (*Id.*)

Plaintiffs also object to the failure to monitor Claiborne's "increasingly bizarre behavior," but "[t]his Court held that Fifth Circuit authority 'amply demonstrate, Claiborne's behavior, while strange, was not so strange as to put any Sheriff Defendant deputies on notice that Claiborne was a high risk of suicide.' " (*Id.* (quoting *Jordan v. Gautreaux*, 593 F. Supp. 3d 330, 364 (M.D. La. 2022) (deGravelles, J.)).)  Plaintiffs fail to allege additional facts concerning the bizarre behavior in the *Second Amended Complaint*, so the same result as before is warranted. (*Id.* at 9–10.)

Sheriff Defendants then argue that "Plaintiffs add conclusory paragraphs presumably in support of a conditions-of-confinement claim against Sheriff Gautreaux." (*Id.* at 10.)  The Court should disregard such allegations, say Sheriff Defendants, because on a motion to dismiss the Court need not accept legal conclusions. (*Id.*)  Further, the allegations about understaffing and inhumane conditions concern medical and mental health care staff, and that is the responsibility of CorrectHealth, not Sheriff Gautreaux. (*Id.*)  Likewise, other allegations made about unlawful conditions are outside of the Sheriff's responsibility, such as the provision of medical and mental health care to inmates (which is CorrectHealth's job) or the design and layout of the jail (which is the Parish's). (*Id.* at 11.)

In sum, Sheriff Defendant's maintain Plaintiffs have failed to add new facts to the *Second Amended Complaint* to support their conditions-of-confinement claims. (*Id.* at 12.) As a result, these claims should be dismissed with prejudice. (*Id.*)

### 2. Plaintiffs' Opposition (Doc. 66)

Plaintiffs respond by relying on *Colbert v. City of Baton Rouge/Parish of East Baton Rouge*, No. 17-28, 2018 WL 344966 (M.D. La. Jan. 9, 2018) (Jackson, C.J.). (Doc. 66 at 5.) Plaintiffs say that, in *Colbert*, the Court concluded that plaintiffs adequately alleged a § 1983 *Monell* claim against Sheriff Gautreux for " 'extended' and 'pervasive' misconduct of EBRPP staff, and the establishment of a system of policies, patterns, or practices where the decedent inmate, Colbert, was denied access to appropriate medical care." (*Id.* (quoting *Colbert*, 2018 WL 344966, at *8).)  Plaintiffs then summarize the findings in *Colbert* and argue that the allegations in this case track that one. (*Id.* at 5–7.)

Plaintiffs next urge that Sheriff Gautreaux and Warden Grimes are the final policymakers with respect to EBRPP. (*Id.* at 8.)  Following this, Plaintiffs quote from their *Second Amended*

*Complaint* allegations about lack of funding and oversight by the Parish. (*Id.* (quoting *SAC* ¶ 43, Doc. 48).)

Plaintiffs then cite the next paragraph of the operative complaint to say that "Plaintiffs also alleged facts showing the deficient conditions of EBRPP and other inmate suicides and instances of inmates not receiving proper mental health care, treatment, or medication." (*Id.* (citing *SAC* ¶ 44, Doc. 48).) Those allegations establish that that the Sheriff, Warden Grimes, and the Parish knew "of the possibility of inmates such as Mr. Claiborne committing suicide in isolated housing with jail cell bars." (*Id.* at 8–9.) Again, this suit is similar to *Colbert* and warrants the same result. (*Id.*)

### 3. Sheriff Defendants' Reply (Doc. 67)

In reply, Sheriff Defendants again recap the Court's prior ruling on this issue. They then say:

> As Sheriff Defendants asserted in their Memorandum, Plaintiffs did not add any additional facts to cure the deficiencies noted by this Court related to their conditions-of-confinement claim against Sheriff Gautreaux. Instead of addressing the Sheriff Defendants' arguments, Plaintiffs again merely cite to the holding in the *Colbert* decision. Plaintiffs do not explain how the holding in *Colbert* applies to the allegations in this case. As noted above, *Colbert* did not involve a suicide and was decided prior to the Fifth Circuit's decision in *Estate of Bonilla*.

(Doc. 67 at 6.)

Sheriff Defendants again re-urge that the Court correctly determined that CorrectHealth has the responsibility of providing medical care and that "Plaintiffs continue to allege in their Second Amended Complaint that Parish contracted with CorrectHealth to provide medical care to individuals housed at the EBRPP." (*Id.* at 7.) Further, Sheriff Defendants note that, in *Colbert*, Plaintiffs had incorrectly alleged that Prison Medical Services (the provider of healthcare to

EBRPP) had contracted with the EBRPSO and the Parish for medical services.  (*Id.*) Thus, unlike in *Colbert*, the failure to provide medical care should not be attributable to Sheriff Gautreaux. (*Id.*) Additionally, here, Plaintiffs allege, that poor sightlines are the responsibility of the Parish, as is funding and issues with the physical design and manner of operation of the prison. (*Id.* at 7–8.)

Sheriff Defendants then assert:

> As this Court pointed out, the only alleged condition attributable to Sheriff Gautreaux in this case was the alleged failure to adequately monitor. Plaintiff continues to complain about the failure to monitor given Claiborne's increasingly bizarre behavior. However, Plaintiff has not alleged facts to show a direct causal link between the alleged failure to monitor and Claiborne's suicide because as this Court noted, "the deputies had no reason to monitor more than they already did, as the medical provider had removed restrictions and as Claiborne's odd behavior did not, by itself, mean he was suicidal." Plaintiffs did not add any additional allegations regarding Claiborne's behavior at the EBRPP.

(*Id.* at 8.)

### B.  Applicable Law and Prior Ruling

The Court previously dismissed Plaintiffs' conditions-of-confinement claims for lack of causation. *Jordan v. Gautreaux*, 593 F. Supp. 3d 330, 362–65 (M.D. La. 2022) (deGravelles, J.). In doing so, the Court provided a detailed summary of the law governing these claims. *Id.* at 356– 59. The Court will briefly summarize that standard here:

> "Municipalities can be held liable for violating a person's constitutional rights under § 1983." *Sanchez v. Young* [*Cnty.*, *Tex.*] *(Sanchez II)*, 956 F.3d 785, 791 (5th Cir.), *cert. denied*, 141 S. Ct. 901 (2020) (citing [*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978)]. "For pretrial detainees, such rights include the right to medical care, [*Sanchez v. Young* [*Cnty.*, *Tex.*] *(Sanchez I)*, 866 F.3d 274, 279 (5th Cir. 2017)], and the right to be protected from known suicidal tendencies, *Flores v.* [*Cnty.*] *of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997)." *Id.* "These procedural and substantive due-process rights stem from the Fourteenth Amendment." *Id.* (citing *Hare v. City of Corinth*, 74

F.3d 633, 639 (5th Cir. 1996) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520 [ ] (1979))).

"This circuit characterizes such § 1983 violations of a pretrial detainee's rights as either episodic-acts-or-omissions claims or conditions-of-confinement claims." *Id.* (citing *Hare*, 74 F.3d at 644). "For both claims, a plaintiff has two burdens: to show (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *Id.* (citing *Monell*, 436 U.S. at 694 [ ]).

*Jordan*, 593 F. Supp. 3d at 356.  This Court continued:

"[Conditions-of-confinement] claims are challenges to the 'general conditions, practices, rules, or restrictions of pretrial confinement.' " [*Sanchez II*, 956 F.3d at 791]. (quoting *Hare*, 74 F.3d at 644). "The issue is whether the conditions 'amount to punishment.' " *Id.* (quoting *Bell*, 441 U.S. at 535 [ ]).

"To prevail on a conditions-of-confinement claim, a plaintiff must show a condition—a 'rule,' a 'restriction,' an 'identifiable intended condition or practice,' or 'sufficiently extended or pervasive' 'acts or omissions' of jail officials—that is not reasonably related to a legitimate government objective and that caused the constitutional violation." *Sanchez II*, 956 F.3d at 791 (quoting *Duvall v. [Dall. Cnty.*], 631 F.3d 203, 207 (5th Cir. 2011) (quoting *Hare*, 74 F.3d at 645)). Thus, for purposes of such a claim, a plaintiff need not show deliberate indifference on the part of the municipality. *See Duvall*, 631 F.3d at 207 . . . . However, the standards for a *Monell* claim and for a conditions of confinement claim are similar and frequently overlap. *See Duvall*, 631 F.3d at 208[.] . . .

Finally, again, "Plaintiffs must meet a heightened standard of causation in order to hold a municipality liable under § 1983." [*Valle v. City of Hous.*, 613 F.3d 536, 542 (5th Cir. 2010)] (citation omitted). Plaintiffs must show that the municipal policy was "the 'moving force' that caused the specific constitutional violation." *Id.* (citation omitted). "A direct causal connection must exist between the policy and the alleged constitutional deprivation. This connection must be more than a mere 'but for' coupling between cause and effect." *Estate of Bonilla by & through Bonilla v. Orange [Cnty., Tex.*], 982 F.3d 298, 312 (5th Cir. 2020) (cleaned up).

However, the Fifth Circuit has emphasized that it does "not require a plaintiff to show that a policy or practice was the *exclusive* cause

of the constitutional deprivation." *Sanchez II*, 956 F.3d at 795 (cleaned up). "Courts may consider how individual policies or practices interact with one another within the larger system." *Id.* (cleaned up). "This is because confinement conditions may be constitutionally inadequate if, when viewed in combination, they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Id.* (cleaned up).

*Jordan*, 593 F. Supp. 3d at 357–59.

The Court also focused (albeit in a different section) on the difficulty prison officials have in detecting suicidal tendencies. The Court will quote this portion of the ruling at length, as it is critical to this claim:

> The Fifth Circuit "has previously observed that '[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting.' " *Est. of Bonilla*, 982 F.3d at 306 (quoting [*Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 5th Cir. 2001)]. In *Estate of Bonilla*, the appellate court summarized prior case law on this issue:
>
> > In *Flores v. County of Hardeman*, the court determined that the sheriff did not act with deliberate indifference when he took off of suicide watch an inmate who later committed suicide, despite the fact that the deceased had just been arrested after a one-hour standoff with police and "was not acting like himself." 124 F.3d at 738–39. Similarly, in *Sibley v. Lemaire*, the plaintiff offered evidence that jail personnel had "observed [Sibley] holding his Bible upside down while appearing to read from it, cleaning the walls of his cell with toilet paper, lying next to his toilet and staring into it . . . [and] kicking the door to his cell." 184 F.3d 481, 484 (5th Cir. 1999). Sibley was having a psychotic episode and eventually blinded himself by attempting to remove his own eyes. Nonetheless, the court concluded that "[a]lthough Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself." *Id.* at 489.

[*Est. of Bonilla*, 782 F.3d at 306]. "The common thread is a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." *Id.*

Thus, in *Estate of Bonilla*, the Fifth Circuit found that the district court correctly granted summary judgment on the episodic acts or omissions claim, remarking that the plaintiffs' position not only "lack[ed] support in the case law" but also "lack[ed] logical force, given the varied, individualized nature of mental illness." *Id.* The appellate court explained that the decedent in *Bonilla* "presented with fewer warning signs than either Flores or Sibley." *Id.* "The circumstances of her arrest, booking and detention did not raise questions concerning her mental stability or capacity for self-harm. She had no history of suicidal tendencies. The evidence indicates that Bonilla did not request medical help, and her behavior in detention was unremarkable prior to her suicide." *Id.* The Fifth Circuit concluded that the "evidence did not give rise to reasonable inferences that the individual defendants were aware of Bonilla's suicidal tendency, much less that they disregarded the risk." *Id.* at 306.

*Sibley* was cited with approval by *Estate of Bonilla* and serves as an even stronger example of the high bar for these claims. In *Sibley*, the plaintiff "underwent a psychotic episode while being detained in an isolation cell." 184 F.3d at 483. He was placed in that cell following "erratic behavior," and he "could only be observed by looking through a slot in the door." *Id.* at 484.

On the day after he was arrested, he was examined by the parish coroner, who found that the plaintiff should be transferred to a mental health center. *Id.* However, because there were no available beds, the coroner put the plaintiff on a waiting list. *Id.*

The following day, a deputy notified the correctional center nurse that the plaintiff needed to see a doctor. *Id.* A different doctor concluded that the plaintiff should be transferred but, given the lack of beds, plaintiff was again put on a waiting list. *Id.* That doctor (Dr. Amy) completed a Physician's Emergency Commitment form, which said that plaintiff "could be having delusions" and was not violent on the exam but did get arrested for battery. *Id.* The appellate court continued:

> In dictated notes from his visit, Dr. Amy further noted: "I was called to see patient at the jail for grossly bizarre behavior. On arrival, patient was pacing around his cell reading an upside down Bible

with photographs lined up on the bed like he was holding services. Patient had a very bizarre affect." In a handwritten note at the bottom of the copy of Dr. Amy's typewritten, dictated notes, he wrote in hand: "He is on the list at Acadiana Mental Health & *really* needs to go there."

Dr. Amy left with instructions that he should be called if necessary. Sibley concedes that, up to that point, "[a]lthough [his] conduct was strange and indecorous, there was no suggestion of any potentially self-harming behavior prior to or during Dr. Amy's visit."

*Id.* Thus, as explained above:

Throughout this time period, Sibley's behavior was erratic—he was observed holding his Bible upside down while appearing to read from it, cleaning the walls of his cell with toilet paper, and lying next to his toilet and staring into it. On Sunday, November 26, Sibley was found kicking the door to his cell.

*Id.*

On the day of the incident, "a deputy discovered that Sibley had urinated on himself and his mattress, thrown his food around, and thrown his Bible and family pictures into the toilet." *Id.* Sibley "was removed to another cell while his cell was cleaned. He was offered a shower but declined one because he apparently believed the devil would come up through the drain." *Id.* "A deputy testified that he checked on him at 9:15 p.m. and observed him sitting on his bed chanting[,]" and, fifteen minutes later, the same deputy saw Sibley plucking out his eyes with his fingers. *Id.* at 484–85.

The Fifth Circuit found no error in the district court's granting of summary judgment on the deliberate indifference claims. *Id.* at 489–90. The key issue was whether the deputies "were either aware or should have been aware of an unjustifiably high risk that Sibley would hurt himself and failed to act." *Id.* at 489. While the deputies may have been negligent, their conduct did not amount to deliberate indifference:

Although Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he

> posed a serious risk of harm to himself. The record
> does clearly establish that Sibley's actions in
> blinding himself are highly unusual and
> unpredictable, even for someone suffering a
> psychotic episode.

> *Id.* at 489–90. Thus, the Fifth Circuit found no error in the district
> court's conclusion that the guards did not act with deliberate
> indifference and were entitled to qualified immunity. *Id.* at 490.

*Jordan*, 593 F. Supp. 3d at 359–61.

Again, this Court dismissed the conditions-of-confinement claim against Sheriff Defendants in the last ruling and focused on the third element: that the " 'condition or practice . . . caused the violation of detainee's constitutional rights.' " *Id.* at 362–63 (quoting *Est. of Bonilla*, 982 F.3d at 308–09). The Court emphasized again that "[a] direct causal connection must exist between the policy and the alleged constitutional deprivation. This connection must be more than a mere 'but for' coupling between cause and effect." *Id.* at 358 (quoting *Est. of Bonilla*, 982 F.3d at 312).

The Court found that Plaintiffs failed to satisfy this third element. *Id.* at 364. Elaborating, the Court rejected Plaintiff's objection that Sheriff Defendants failed to provide decedent with sufficient access to qualified medical and mental health care because:

> as Sheriff Defendants point out, "[t]he general statutory scheme is
> that the parish is responsible for the expenses of establishing,
> maintaining and operating a jail and for all expenses of feeding,
> clothing, and providing medical treatment to prisoners. The sheriff
> has the duty of operating a jail and seeing to it that prisoners are
> properly cared for, fed, and clothed." [*Boudreaux v. St. Mary Par.
> Council*, No. 07-0614, 2009 WL 1787678, at *4 (W.D. La. June 18,
> 2009)]. Thus, any inadequacy concerning the contract with
> CorrectHealth, which appears to be the primary basis of Count 1,
> would fall on the Parish, not Sheriff Defendants. Indeed, Plaintiffs
> concede this point, stating that, "[w]hile Defendant Gautreaux is not
> responsible for the medical care that individuals housed at EBRPP
> receive, he is certainly responsible for his deputies' role in that
> care." (Doc. 24 at 23.)

*Jordan*, 593 F. Supp. 3d at 363.

This Court went on to recognize, "Ultimately, the alleged failure to provide medical care and access to medical care boil down to one single allegedly unlawful condition attributable to Gautreaux: the failure to properly monitor. But even this is insufficient to impose liability, as the *FAC* fails to demonstrate how this policy caused Claiborne harm." *Id.* Elaborating:

> Though Plaintiffs pled that Corporal Page was told to be on "high alert" and that Claiborne had "mental health issues[,]" (*FAC* ¶ 14, Doc. 9), Page responded appropriately by placing Claiborne in a one-man cell "*until he received a mental health assessment*" and by "relay[ing] this information to Nurse Brumfield, who put Mr. Claiborne on mental health observation shortly thereafter[,]" (*id.* ¶ 16 (emphasis added)). Page and Deputy Baker also gave Claiborne a "smock rather than a cloth jumpsuit, *per his mental health observation status.*" (*Id.* ¶ 18 (emphasis added).) Thus, by Plaintiffs' own allegations, the cloth jumpsuit and precautions were dependent on Claiborne's mental health assessment and status. (*See id.* ¶¶ 16, 18.)
>
> Even more critically, Plaintiffs allege that "a member of the medical staff, John Doe #6, met with . . . Claiborne and removed him from mental health observation, *and the required restrictions thereof.*" (*Id.* ¶ 20 (emphasis added).) Thus, Plaintiffs plainly allege that a healthcare provider removed any restrictions. "When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention." *Smith v. Harris* [*Cnty.*]*, Tex.*, 956 F.3d 311, 319 (5th Cir. 2020) (quoting *Miranda v.* [*Cnty.*] *of Lake*, 900 F.3d 335, 343 (7th Cir. 2018)); *cf. id.* ("While hindsight tells us that Hawkins's medical treatment proved inadequate, non-medical employees at the jail had no reason to believe, much less actual knowledge, that Hawkins needed additional accommodations following his discharge.").
>
> Further, Plaintiffs complain about the failure to monitor given Claiborne's increasingly bizarre behavior. (*See FAC* ¶¶ 17, 33, Doc. 9.) But, as the Fifth Circuit authority cited above amply demonstrate, Claiborne's behavior, while strange, was not so strange as to put any Sheriff Defendant deputies on notice that Claiborne was a high risk of suicide. *See* [*Est.*] *of Bonilla*, 982 F.3d at 306; *Sibley*, 184 F.3d at 489; *see also, infra.*

Thus, as a matter of fact and law, Plaintiffs' complaints of systematic deficiencies, individually or in combination, fail. Even construing the *FAC* in a light most favorable to Plaintiffs, the deputies had no reason to monitor more than they already did, as the medical provider had removed restrictions and as Claiborne's odd behavior did not, by itself, mean he was suicidal. Phrased another way, there was simply no direct causal link between the numerous deficiencies with EBRPP detailed in the complaint, (*FAC* ¶ 44, Doc. 9), and Claiborne's death. Consequently, the conditions-of-confinement claim fails. *See* [*Est.*] *of Bonilla*, 982 F.3d at 311 (finding plaintiffs failed to satisfy the causation requirement of their conditions-of-confinement claim because "there [were] crucial gaps between the Defendants' failure to provide Xanax and Bonilla's decision to take her own life" such that "[a] jury would have to resort to impermissible speculation to conclude that there was a 'direct causal link' between the alleged constitutional violation— Defendants' failure to distribute Xanax to Bonilla during her 10-hour stay—and her death."); [*Martinez v. City of N. Richard Hills*, 846 F. App'x 238, 247 (5th Cir. 2021)] ("Martinez's complaint does not . . . plead any facts that would permit the conclusion that the unidentified custom or policy was the 'moving force' behind the detention officers' alleged misconduct.").

*Jordan*, 593 F. Supp. 3d at 363–65.

## C. Analysis

Having carefully considered the matter, the Court will grant Sheriff Defendants' motion on this claim. The Court agrees with Sheriff Defendants that Plaintiffs have failed to add any additional allegations to make their claim viable. That is to say, the conditions-of-confinement claims in the *Second Amended Complaint* still fails for lack of causation.

Plaintiff's entire argument against dismissal centers on *Colbert v. City of Baton Rouge/Par. of E. Baton Rouge*, No. 17-28, 2018 WL 344966 (M.D. La. Jan. 9, 2018), but the Court finds this case distinguishable, both factually and legally. As to the former, the *Colbert* court denied a motion to dismiss a conditions-of-confinement claim against Gautreaux, finding:

With respect to the conditions of confinement claims against Sheriff Gautreaux and Warden Grimes, the analysis is similar to that of the EBR. Plaintiffs allege a series of unresolved, systemic deficiencies

24

sufficient for the Court to infer the existence of a *de facto* policy of failing to adequately monitor, supervise, and protect prisoners; provide adequate medical and mental health care; and to treat pretrial detainees who are diagnosed with mental illnesses. Plaintiffs further aver that Defendants were deliberately indifferent because they failed to appropriately address these deficiencies despite having knowledge of them. (Doc. 40 at ¶¶ 80–82).

Additionally, the Complaint plausibly states that Sheriff Gautreaux and Warden Grimes' alleged *de facto* policies are not reasonably related to a legitimate government objective, such as to treat the mentally ill to avoid exacerbation of the condition. Lastly, Plaintiffs properly allege a constitutional injury caused to Colbert that is sufficient to support a condition of confinement claim. It is alleged that while Colbert was in the care and custody of Defendants, he became suicidal, began hearing voices, became anxious and was unable to sleep, had his arm broken without receiving medical attention for approximately five days, and was ultimately murdered by his cellmate as a result of Defendants' failure to provide adequate mental health care, failure to properly monitor the cells, and the lack of sightlines in the prison. (Doc. 40 at ¶¶ 40). As a result, the Defendants' motion regarding conditions of confinement is DENIED.

*Colbert*, 2018 WL 344966, at *10.

But the risk to the inmate (and thus the need for enhanced monitoring) were much more apparent in *Colbert* than in the instant case; there, the court explained:

On December 6, 2015, Plaintiffs claim that while Colbert was housed in Unit II's M01 cellblock, an EBRPP deputy observed Colbert put his arm into the cell and "then [he] started screaming and struggling to pull his arm out of the cell." [Doc. 40 at] ¶ 28). Allegedly, an x-ray two days later revealed that Colbert's forearm was broken, and three days later, on December 11, 2015, Colbert was transported to the hospital. (*Id*. at ¶ 28). The hospital purportedly required Colbert to follow up with the physician within 2–3 weeks, but no follow up appointment was made and Colbert "never saw the [physician] again." (*Id*. at ¶ 30). Plaintiffs assert that Colbert was not transported to any "scheduled medical call outs" within EBRPP that occurred on December 14 and 28, 2015, and January 4, 6, and 11, 2016. (*Id*. at ¶ 31).

On January 23, 2017, Colbert allegedly expressed to an EBRPP deputy that he wanted to kill himself, prompting the deputy to bring

> Colbert to PMS staff. (*Id*. at ¶ 33). Plaintiffs claim that when
> Defendant PMS staff spoke with Colbert, he "stared" and did not
> respond, prompting PMS to strip Colbert of his clothes, handcuff
> and shackle him, and place him in a paper gown, at which point
> Colbert purportedly "threw himself to the floor and bloodied his
> mouth" causing him to be "placed on lockdown." (*Id*. at ¶ 33).

*Id.* at *2. A few days later, Colbert was taken off of suicide watch and placed in a two-man cell.

*Id.* Then, several weeks later, Colbert was killed by another inmate. *Id.*

Thus, even putting aside the fact that *Colbert* did not involve a suicide, the deficient

conditions there lasted substantially longer, and the problems were much more readily apparent to

EBRSO deputies, than in the instant case. Thus, as a matter of fact, conditions attributable to

Gautreaux directly caused the harm to Colbert in a way that simply wasn't the case in Claiborne's

death.

Equally important, *Colbert* is distinguishable legally. As Sheriff Defendants argue,

*Colbert* predated *Estate of Bonilla*'s admonition that "[s]uicide is inherently difficult for anyone

to predict, particularly in the depressing prison setting;" its analysis of Fifth Circuit caselaw; and

its ultimate conclusion that "[t]he common thread [in that caselaw] is a reluctance to hold that

generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-

harm." *Est. of Bonilla*, 982 F.3d at 306 (first alteration in original) (first quoting *Domino*, 239 F.3d

at 756).

Further, to be clear, and to clarify the Court's prior ruling, "the Sheriff of a parish has some

obligation to provide medical treatment for those detained in a parish jail." *Cleveland v.*

*Gautreaux*, No. 15-744, 2018 WL 3966269, at *19 (M.D. La. Aug. 17, 2018) (deGravelles, J.),

*rev'd sub nom. Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019) (citing *Landry v. E. Baton Rouge*

*Par. Sheriff's Off.*, 2014-0733 (La. App. 1 Cir. 3/9/15), *writ granted*, 2015-681 (La. 6/30/15), 168

So.3d 378; *Oladipupo v. Austin*, 104 F. Supp. 2d 643, 653 (W.D. La. 2000) ("Sheriff Belt may be

sued in his official capacity because under Louisiana law, administration of a parish jail, including the obligations to provide medical care for, feed and clothe the prisoners, is the province of the Sheriff of the parish.")). And the Court acknowledged this in the prior ruling in quoting Plaintiffs that, "[w]hile Defendant Gautreaux is not responsible for the medical care that individuals housed at EBRPP receive, he is certainly responsible for his deputies' role in that care." (Doc. 24 at 23.)

But the Fifth Circuit has also recently stated (again, after *Colbert*), "When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention." *Smith*, 956 F.3d at 319 (quoting *Miranda*, 900 F.3d at 343); *cf. id.* ("While hindsight tells us that Hawkins's medical treatment proved inadequate, non-medical employees at the jail had no reason to believe, much less actual knowledge, that Hawkins needed additional accommodations following his discharge."). So, under the facts as alleged in this case, any systematic deficiencies in the provision of medical care or monitoring are simply not attributable to Sheriff Gautreaux.

In sum:

> Even construing the *[Second Amended Complaint]* in a light most favorable to Plaintiffs, the deputies had no reason to monitor more than they already did, as the medical provider had removed restrictions and as Claiborne's odd behavior did not, by itself, mean he was suicidal. Phrased another way, there was simply no direct causal link between the numerous deficiencies with EBRPP detailed in the complaint, [(*Sec. Am. Compl.* ¶¶ 36–39, 70–72 85–88, 95–97, Doc. 48)], and Claiborne's death. Consequently, the conditions-of-confinement claim fails. *See* [*Est.*] *of Bonilla*, 982 F.3d at 311 (finding plaintiffs failed to satisfy the causation requirement of their conditions-of-confinement claim because "there [were] crucial gaps between the Defendants' failure to provide Xanax and Bonilla's decision to take her own life" such that "[a] jury would have to resort to impermissible speculation to conclude that there was a 'direct causal link' between the alleged constitutional violation—Defendants' failure to distribute Xanax to Bonilla during her 10-hour stay—and her death."); *Martinez*, 846 F. App'x at 247 ("Martinez's complaint does not . . . plead any facts that would

permit the conclusion that the unidentified custom or policy was the 'moving force' behind the detention officers' alleged misconduct.").

*Id.*

### IV.    **Count 4: *Monell* Claim of Episodic Acts or Omissions**

#### A.    **Parties' Argument**

Sheriff Defendants assert that the Court previously dismissed Plaintiffs' *Monell* claim for lack of an underlying constitutional violation. (Doc. 56-1 at 14.)  According to Sheriff Defendants, the Court found that Corporal Page's decision to place Claiborne in Cell #3 was "insulated by John Doe #6's removing of Claiborne's mental health restrictions." (*Id.* at 15.)  Sheriff Defendants then say that, likewise, Page acted correctly by putting Claiborne in a one-man cell until he received a mental health assessment and then by relaying the information to Nurse Brumfield, who conducted the assessment. (*Id.*)  Similarly, the Court found nothing wrong with giving Claiborne a cloth jumpsuit, says Sheriff Defendants, because the precautions were dependent on decedent's assessment and status. (*Id.* at 15–16.)  The allegations in the new complaint remain the same. (*Id.* at 16.)  Of the other deputies, only Deputy Domino allegedly made rounds and observed the strange behavior, with the other deputies arriving shortly thereafter. (*Id.*)  Again, the Court concluded that Claiborne's behavior was not so strange as to alert Domino that he was suicidal under Fifth Circuit precedent. (*Id.* at 17.)  Sheriff Defendants assert that, since Plaintiffs have not cured these deficiencies, the Court should dismiss the claims with prejudice. (*Id.*)  Sheriff Defendants close by urging that Plaintiffs fail to allege a policy or practice related to the treatment of inmates with mental health disorders. (*Id.* at 18.)

Plaintiffs' response on the *Monell* claim is identical to its response to the conditions-of-confinement claims. (Doc. 66 at 5–9.)  The Court need not repeat those arguments here.

In reply, Sheriff Defendants reiterate that the basis for the Court's prior ruling was that there was no underlying constitutional violation, and the heart of their argument is that Plaintiffs allege no additional facts to cure those deficiencies. (Doc. 67 at 4.)  Rather, Plaintiffs instead only rely on *Colbert*. (*Id.* at 4–5)  Defendants assert:

> Plaintiffs do not explain how the decision in *Colbert* addresses the Sheriff Defendants' argument that Plaintiffs have failed to amend their complaint to allege an underlying constitutional violation by a Sheriff deputy in this case. In fact, the *Colbert* case is easily distinguishable from this case. *Colbert* did not involve a suicide. Rather, the plaintiffs in Colbert alleged that *Colbert* was murdered by his cellmate. In fact, the Court in *Colbert* did not even address whether there was an underlying constitutional violation by a sheriff deputy. Further, Colbert was decided prior to the Fifth Circuit's decision in *Estate of Bonilla v. Orange Cty.*, 982 F. 3d 298 at 311 (5th Cir. 2020), relied on by this Court in its ruling dismissing Plaintiffs' Section 1983 *Monell* and conditions-of-confinement claims.

(*Id.* at 5.)  Consequently, Plaintiffs' *Monell* claim should be dismissed. (*Id.*)

## B.  Applicable Law and Prior Ruling

The Court previously gave an extensive overview of the law governing *Monell* liability. *See Jordan v. Gautreaux*, 593 F. Supp. 3d 330, 353–56 (M.D. La. 2022) (deGravelles, J.).  The Court will repeat here only those portions of the ruling essential for the instant analysis:

> "To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.' " [*Valle*, 613 F.3d at 541] (quoting *Monell*, 436 U.S. at 691 [ ]). The Plaintiff must allege "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Id.* at 541–42 (cleaned up). . . .
>
> "The Supreme Court has explained that a municipality cannot be liable '[i]f a person has suffered no constitutional injury at the hands of the individual police officer.' " *Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 [ ] (1986)). Thus, official capacity "claims fail

> without an underlying constitutional violation." *Whitley v. Hanna*, 726 F.3d 631, 648–49 (5th Cir. 2013) (citing *Bustos*, 599 F.3d at 467 ("Because [plaintiff] has alleged no constitutional injury attributable to the Officers, [plaintiff] has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights.")).

*See Jordan*, 593 F. Supp. 3d at 353, 356.

The Court also provided a lengthy overview of the standard governing episodic acts or omissions claims. *Id.* at 359–61. The Court stated in part:

> "An episodic acts or omissions claim arises where 'the complained-of harm is a particular act or omission of one or more officials.' " [*Est.*] *of Bonilla*, 982 F.3d at 304 (quoting *Flores*, 124 F.3d at 738). "More specifically, the Fourteenth Amendment protects pretrial detainees' right to medical care and to 'protection from known suicidal tendencies.' " *Id.* at 304–05 (quoting *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (citing *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019)); *Hare*, 74 F.3d at 639). "A government official violates a Fourteenth Amendment right when the official acts with deliberate indifference to a detainee's serious medical needs." *Id.* at 305 (citing *Baldwin*, 964 F.3d at 326). "Deliberate indifference is an extremely high standard to meet." *Id.* (quoting *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).
>
> To sufficiently demonstrate deliberate indifference, Plaintiffs must allege "that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' that the defendants actually 'dr[e]w the inference,' and that the defendants 'disregard[ed] that risk by failing to take reasonable measures to abate it.' " *Id.* (quoting *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 [ ] (1994)); *Hyatt*, 843 F.3d at 179 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006))).

*See Jordan*, 593 F. Supp. 3d at 359.

The Court also discussed the law governing detection of suicides in the Fifth Circuit. *Id.*

That law was quoted extensively above. To briefly summarize:

The Fifth Circuit "has previously observed that '[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting.' " *Est. of Bonilla*, 982 F.3d at 306 (quoting *Domino*, 239 F.3d at 756)[.] In [*Estate*] *of Bonilla*, the appellate court summarized prior case law on this issue:

> In *Flores v. County of Hardeman*, the court determined that the sheriff did not act with deliberate indifference when he took off of suicide watch an inmate who later committed suicide, despite the fact that the deceased had just been arrested after a one-hour standoff with police and "was not acting like himself." 124 F.3d at 738–39. Similarly, in *Sibley v. Lemaire*, the plaintiff offered evidence that jail personnel had "observed [Sibley] holding his Bible upside down while appearing to read from it, cleaning the walls of his cell with toilet paper, lying next to his toilet and staring into it . . . [and] kicking the door to his cell." 184 F.3d 481, 484 (5th Cir. 1999). Sibley was having a psychotic episode and eventually blinded himself by attempting to remove his own eyes. Nonetheless, the court concluded that "[a]lthough Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself." *Id.* at 489.

> *Id.* "The common thread is a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." *Id.*

*See Jordan*, 593 F. Supp. 3d at 359. The Court went on to find that there was no underlying constitutional violation:

> As to Corporal Page, the Court has already addressed any claim against him. His decision to place Claiborne in Cell #3 is insulated by John Doe #6's removal of Claiborne's mental health restrictions. *Cf. Smith*, 956 F.3d at 319. That is, Page is not deliberately indifferent to a risk of serious harm when a medical provider told him there was no such risk. *Cf. id.*

> As to the other deputies, Deputy Domino is the only Sheriff Defendant who is alleged to have made rounds by Claiborne's cell on the day of the incident. (*FAC* ¶¶ 24–27, Doc. 9.) Some of the

deputies—King, Britt, Minor, and Johnson—"arrived shortly [after]" Domino "called for assistance," (*id.* ¶ 27), and others—Coleman, Cruz, and Grant—are simply alleged to have been at the prison and "fail[ed] to physically walk the halls . . . to monitor [ ] Claiborne's cell," (*id.* ¶ 37). This is critical because "[d]eliberate indifference . . . cannot be shown through the actions of the cumulative group. Instead, each named member of that group must be shown to have acted, independently, with deliberate indifference." *Martinez*, 846 F. App'x at 243 (internal citation omitted).

Thus, as alleged, Deputy Domino is the only deputy who observed Claiborne's strange behavior on the night of the incident, (*see FAC* ¶ 33, Doc. 9), and he is the only deputy who is even remotely alleged to have knowledge of a substantial risk of harm. *See Martinez*, 846 F. App'x at 244 (finding that, because plaintiff "assert[ed] no specific, substantive allegations against [certain] defendants . . . other than that they were working at the Jail at some point during [plaintiff's] incarceration[,]" such "allegations [were] not sufficient to state a claim for deliberate indifference because they fail to show these Defendants acted or failed to act with the required mental state.").

As to Deputy Domino, Claiborne's behavior is on par with Sibley's, yet the Fifth Circuit found in *Sibley* that "[a]lthough Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself." 184 F.3d at 489. Likewise, nothing Claiborne did rose to the level that Deputy Domnio "could have only concluded that he posed a serious risk of harm to himself," and Domino cannot be said to have known of an "unjustifiably high risk that [Claiborne] would hurt himself and [yet] failed to act." *Id.* at 489. This conclusion is particularly warranted given the Fifth Circuit's recent statement that there is a "common thread" in the case law reflecting "a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." [*Est.*] *of Bonilla*, 982 F.3d at 306.

Plaintiffs argue that an inmate overheard Claiborne say he would kill himself, (*FAC* ¶¶ 33, Doc. 9), and Plaintiffs maintain that the inference can be made that Domino and the others heard this. However, no such allegation is made in the *FAC*, and, in any event, such an inference would collapse deliberate indifference into a negligence standard and impose liability on Sheriff Defendants based on what Plaintiffs say the deputies *should* have heard rather

than what they in fact heard. *See* [*Est.*] *of Bonilla*, 982 F.3d at 305 ("Even if an officer responds without the due care a reasonable person would use—such that the officer is only negligent—there will be no liability." (cleaned up)); *Sibley*, 184 F.3d at 489 n.7 ("We note here the difference between negligence and deliberate indifference. A reasonably prudent man may well have deemed it necessary to call Dr. Amy in the light of Sibley's worsening condition. To be deliberately indifferent, however, the deputies would have had to have chosen not to call Dr. Amy with the expectation that some harm would result to Sibley."). Without even an allegation that Domino and the others "actually drew the inference" that Claiborne would kill himself, Plaintiffs' claims fail. *See Martinez*, 846 F. App'x at 244 (affirming dismissal of claims against certain defendants because "there [were] no allegations to support that they actually drew the inference that their acts or omissions could *cause* [plaintiff] serious harm and that they acted or failed to act with the intent to harm [plaintiff].").

In sum, because Plaintiffs have failed to allege an underlying constitutional violation against any Sheriff Defendant, Plaintiffs have failed to adequately allege a *Monell* claim against them. Consequently, these claims will be dismissed.

*See Jordan*, 593 F. Supp. 3d at 365–66.

### C. Analysis

Having carefully considered the matter, the Court will grant the motion for two reasons.

First, the Court agrees with Sheriff Defendants that Plaintiffs have largely fail to respond to the

heart of their argument: i.e., that Plaintiffs did not allege an underlying constitutional violation.

On this ground alone, the *Monell* claims can be dismissed as waived. *See JMCB, LLC v. Bd. of*

*Com. & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (finding that claims

could be deemed waived for failure to timely oppose); *see also JTB Tools & Oilfield Servs., L.L.C.*

*v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (stating that, "[t]o avoid waiver, a party must

identify relevant legal standards and 'any relevant Fifth Circuit cases' " and holding that, because

appellant "fail[ed] to do either with regard to its underlying claims, . . . those claims [were]

inadequately briefed and therefore waived." (citing, *inter alia*, *United States v. Skilling*, 554 F.3d

529, 568 n.63 (5th Cir. 2009);*United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010)

(noting that it is "not enough to merely mention or allude to a legal theory"))); *United States v.*

*Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (defendant's failure to offer any "arguments or

explanation . . . is a failure to brief and constitutes waiver.")); *United States ex rel. Wuestenhoefer*

*v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015) ("This failure to develop the relevant

argument effectively represents a waiver of the point." (citing *United States v. Dominguez–*

*Chavez*, 300 F. App'x 312, 313 (5th Cir. 2008) ("Dominguez has failed to adequately raise or

develop his due process and equal protection arguments in his appellate brief, and, thus, they are

waived."); *El–Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving

the court to put flesh on its bones."))); *Jordan v. Gautreaux*, No. 21-48, 2022 WL 897549, at *15

n.2 (M.D. La. Mar. 25, 2022) (deGravelles, J.) (finding that certain claims against CorrectHealth

could also be dismissed as waived because "Plaintiffs fail[ed] to substantively oppose dismissal

of" them (citing all of the above authorities on waiver)).

Second, even assuming there was no waiver, the Court would dismiss Plaintiffs' *Monell*

claims.  Putting aside Plaintiffs' conclusory allegations, (*see, e.g.*, *SAC* ¶¶ 19–21, Doc. 48), the

same issues identified in the prior ruling remain.  First, again, John Doe #6's removing of

restrictions from Claiborne insulate the deputies in their decision to give him a cloth jumpsuit. (*Id.*

¶¶ 21–22.)

Second, Deputy Domino remains the only deputy for whom it was remotely possible to

prevent the harm, (*id.* ¶¶ 23–26), but ultimately Claiborne's bizarre behavior, (*see id.* ¶¶ 33–34,

55–56), was not so bizarre under *Sibley* and *Estate of Bonilla* as to put Domino and the other deputies on notice that Claiborne was suicidal.

Plaintiffs add additional allegations on this issue, (*id.* ¶¶ 55–61), but they do not help save their claims.  Some of these allegations, (*id.* ¶¶ 55–56), are largely argumentative and repetitive rather than providing additional facts warranting relief.  Moreover, some of the allegations even undercut Plaintiffs' position; Plaintiffs provide screenshots of intake and assessment forms, and these documents reflect that Claiborne (1) indicated that he did not have current plans to hurt himself; (2) did not exhibit signs of suicide; (3) did not have any past or recent attempts at suicide; and (4) either (a) did not know his mental health medication, (b) did not take them, or (c) took them only as needed. (*Id.* ¶ 57, 60.)  Plaintiffs complain these intake forms reflect a lack of training, qualifications, and consistency, (*id.* ¶¶ 59, 61), but these again are more argumentative than factual and do not ultimately show an underlying constitutional violation by any EBRSO deputy.

Plaintiffs also continue to allege that an inmate heard Claiborne say he would kill himself, (*id.* ¶¶ 33–34), but Plaintiffs still fail to allege that Domino or any other deputy actually heard Claiborne say that.  This is critical, for, as *Sibley* explained:

> We note here the difference between negligence and deliberate indifference. A reasonably prudent man may well have deemed it necessary to call [a doctor] in the light of [the inmate's] worsening condition. To be deliberately indifferent, however, the deputies would have had to have chosen not to call [the doctor] with the expectation that some harm would result to [the inmate].

*Sibley*, 184 F.3d at 489 n.7.  Likewise, though a reasonably prudent deputy would have heard Claiborne's threats of suicide—which this Court held with respect to Plaintiffs' negligence claims, *Jordan*, 593 F. Supp. 3d at 368–69—the Court cannot find, based on the allegations of the *Second Amended Complaint*, that Domino and the deputies actually heard Claiborne's threats yet chose not to act.

For all these reasons, the Court finds that Plaintiffs have failed to cure the deficiencies of the prior complaint with respect to the *Monell* claims. That is, Plaintiffs still fail to allege any underlying constitutional violation by any deputy, so Plaintiffs' *Monell* claims must be dismissed.

## V.   Count 2: Failure to Supervise/Train Claim

Sheriff Defendants urge that the Court previously dismissed Plaintiffs' failure to train and supervise claims because (1) there was no underlying constitutional violation by any Sheriff's deputy, and (2) Plaintiffs failed to allege the specific problems with training and supervision. (Doc. 56-1 at 20–21.) These defendants then quote the new allegations touching on this claim and argue that they do not justify recovery against Sheriff Defendants. (*Id.* at 21–23.) Further, official capacity claims against Captain Leader fail because Leader is not an official policymaker. (*Id.* at 23.) Finally, any individual capacity claims fail because Gautreaux, Grimes, and Leader are entitled to qualified immunity. (*Id.*)

In their opposition, Plaintiffs make passing references to inadequate supervision with respect to their conditions-of-confinement and *Monell* claims. (*See* Doc. 66 at 6, 8.) However, Plaintiffs do not specifically discuss the separate failure to supervise and train claims against Sheriff Gautreaux, Grimes, and Leader. (*See* Doc. 66.)

In reply, Sheriff Defendants assert:

> Plaintiffs have failed to address the Sheriff Defendants' arguments related to their Section 1983 failure to supervise/train claims in their Opposition. In fact, Plaintiffs do not even mention their Section 1983 supervisory liability claims in their Opposition, other than to state that this Court dismissed these claims against Sheriff Gautreaux, Warden Grimes and Captain Leader.

(Doc. 67 at 3.) Sheriff Defendants urge that Plaintiffs have waived any opposition to the dismissal of these claims and that, consequently, they should be dismissed with prejudice. (*Id.* at 3–4.)

In short, the Court will grant the motion, for some of the reasons highlighted by Sheriff Defendants.  First, Plaintiffs have failed to oppose dismissal of this claim, and, on that ground alone, the motion could be granted. *See Jordan*, 2022 WL 897549, at *15 (collecting above authorities on waiver).

Second, as explained in the prior ruling, "there is no underlying constitutional violation by any individual Sheriff's deputy, so any supervisor claim against Gautreaux, Grimes, and Leader must necessarily fail." *Jordan*, 593 F. Supp. 2d at 366 (citing *Martinez*, 846 F. App'x at 244–45 (citing *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 425 (5th Cir. 2006))); *Lively v. Theriot*, No. 6:13-2756, 2015 WL 3952159, at *9 (W.D. La. June 29, 2015) (finding that summary judgment was proper because "plaintiffs have failed to demonstrate that the Sheriff's subordinate Deputies violated Davis' Constitutional rights[,]" so "a direct causal connection between the Sheriff's alleged inadequate training, supervision or discipline and a constitutional deprivation [was] lacking.").  On this additional ground, any failure to train or supervise claim fails.

## VI.    Leave to Amend

Sheriff Defendants close by arguing that Plaintiffs were already given one opportunity to amend their pleading to address the deficiencies of their claims, yet they failed to do so.  (Doc. 67 at 8.)  Thus, their claims should be dismissed with prejudice. (*Id.*)

Federal Rules of Civil Procedure 15(a) "requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (cleaned up). However, "[l]eave to amend is in no way automatic, but the district court must possess a 'substantial reason' to deny a party's request for leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (quoting *Jones*, 427 F.3d at 994 (citation and internal quotation marks

omitted)). The Fifth Circuit further described the district courts' discretion on a motion to amend as follows:

> The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment." [*Jones*, 427 F.3d at 994] (citation omitted). "In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal." *Mayeaux v. La. Health Serv. and Indent. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citation omitted). However, when the justification for the denial is "readily apparent," a failure to explain "is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." *Id.* (citation and internal quotation marks omitted).

*Id.*

In addition, the Fifth Circuit has made clear that "[d]enying a motion to amend is not an abuse of discretion if allowing an amendment would be futile." *Id.* (citing *Briggs v. Mississippi*, 331 F.3d 499, 508 (5th Cir. 2003)). An amendment would be deemed futile "if it would fail to survive a Rule 12(b)(6) motion." *Id.* (citing *Briggs*, 331 F.3d at 508).

Having carefully considered the matter, the Court will deny leave to amend. First, as stated above, "repeated failures to cure deficiencies by amendments previously allowed" is a factor to consider when granting or denying leave to amend, as is undue delay. *Id.* (citation omitted). Here, Plaintiffs had the benefit of the Court's ruling on Sheriff Defendants' original motion to dismiss, yet they failed to cure the deficiencies of the *First Amended Complaint*. (*See* Doc. 45.)  Second, even putting this aside, further amendment would be futile; Plaintiffs have shown, through their failure to properly amend, that they simply lack viable claims and have no further allegations to make, particularly with respect to Claiborne's mental condition or an underlying constitutional

violation by any Sheriff deputy.  Consequently, Plaintiffs will be denied leave to amend, and their § 1983 claims will be dismissed with prejudice. *See Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 679 (M.D. La. 2019) (deGravelles, J.) (denying leave to amend when plaintiff should have had notice of issue from court's ruling on original motion to dismiss and when further amendment would be futile); *Skinner v. Ard*, 519 F. Supp. 3d 301, 321–22 (M.D. La. 2021) (deGravelles, J.) (same); *Martin v. Roy*, No. 20-339, 2022 WL 894599, at *13–14 (M.D. La. Mar. 25, 2022) (deGravelles, J.) (same).

## VII.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss* (Doc. 56) filed by Sheriff Sid Gautreaux, Lieutenant Colonel Dennis Grimes, Corporal Jacob Page, Deputy Kenyaki Domino, Corporal Damien King, Corporal Michael Britt, Corporal Justin Minor, Deputy Rodney Johnson, Deputy Joe Coleman, Sergeant Jermaine Cruz, Lieutenant Grant, and Captain Leader is **GRANTED**, and all § 1983 claims by Plaintiffs against Sheriff Defendants are **DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on <u>February 2, 2023</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**