# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**SHAHEEDRA JORDAN, ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 21-48-JWD-SDJ**

**SID J. GAUTREAUX III, ET AL.**

## RULING AND ORDER ON CORRECTHEALTH DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT (DOC. 55)

This matter comes before the Court on the *Motion to Dismiss the Second Amended Complaint* (Doc. 55) ("*CorrectHealth MTD2*") filed by defendants CorrectHealth East Baton Rouge, LLC ("CorrectHealth"); Dr. Carlo Musso; and Jean Llovet (collectively, "CorrectHealth Defendants"). Plaintiffs, Shaheedra Jordan, Sahara Claiborne, and Leiaja Claiborne ("Plaintiffs") oppose the motion, (Doc. 65), and CorrectHealth Defendants have filed a reply, (Doc. 69). Oral argument is not necessary. The Court has carefully considered the law, the facts in the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, the *CorrectHealth MTD2* is granted. Plaintiffs have failed to demonstrate that any of CorrectHealth's employees were deliberately indifferent. Consequently, all claims by Plaintiffs against CorrectHealth Defendants (other than for unlawful conditions of confinement) will be dismissed with prejudice.

## I.    Relevant Factual and Procedural Background

### A.  Introduction

This case involves the tragic suicide of Shaheed Claiborne, a mentally ill pretrial detainee at East Baton Rouge Parish Prison ("EBRPP"). Claiborne's heirs brought this suit against (1) (a) Sheriff Sid J. Gautreaux, III, in his capacity as Sheriff of East Baton Rouge Parish ("Sheriff

Gautreaux"); (b) Lieutenant Colonel Dennis Grimes, Warden of the East Baton Rouge Parish

Prison ("Warden Grimes"); and (c) certain individuals associated with the East Baton Rouge Parish

Sheriff's Office ("EBRSO")[1] (collectively, "Sheriff Defendants"); (2) (a) CorrectHealth; (b) Carlo

Musso, MD, CorrectHealth's President and Managing Member, and Jean Llovet, its director of

clinical services (collectively, "CorrectHealth Supervisors"); and (c) Nurse Brumfield, Nurse Foy,

Nurse Chapman, and John Doe #6 (believed to be Cheryl Morris) (collectively, "CorrectHealth

Employees"), who are a handful of CorrectHealth's healthcare providers allegedly involved in

Claiborne's death; and (3) the Parish of East Baton Rouge (the "Parish").

All three Defendants initially moved to dismiss this case, (Docs. 13, 15, 25), and the Court

issued two extensive rulings addressing those motions: *Jordan v. Gautreaux* (*Jordan I*), 593 F.

Supp. 3d 330 (M.D. La. 2022), Doc. 45, and *Jordan v. Gautreaux* (*Jordan II*), No. 21-48, 2022

WL 897549 (M.D. La. Mar. 25, 2022), Doc. 46.  *Jordan I* dealt with Sheriff Defendants' and the

Parish's motions to dismiss, and *Jordan II* dealt with CorrectHealth Defendants' motions.

In *Jordan I*, all claims by Plaintiffs against Sheriff Defendants under § 1983 were

dismissed, but the state law claims survived. *Jordan I*, 593 F. Supp. 3d at 373–74.  Further, the

Parish's motion to dismiss was denied in full. *Id.* at 374.

*Jordan II* is more relevant to the instant motion.  There, the Court granted the CorrectHealth

Supervisors' motion in full and granted in part and denied in part CorrectHealth's motion. *Jordan

II*, 2022 WL 897549, at *24.  Specifically, as to the claims against CorrectHealth under § 1983,

the Court found:

> [M]ost of Plaintiffs' claims will be dismissed. Any *Monell* claim for
> episodic acts and omissions falls for a lack of an underlying
> constitutional violation. The failure to train and supervise claims

---

[1] The individuals associated with the EBRPSO named as defendants include: Corporal Jacob Page, Deputy Kenyaki Domino, Corporal Damien King, Corporal Michael Britt, Corporal Justin Minor, Deputy Rodney Johnson, Deputy Joe Coleman, Sergeant Jermaine Cruz, Lieutenant Grant, and Captain Leader

> fails for this reason too and because Plaintiffs have not specificized how the training or supervision was defective. However, the conditions of confinement claim will survive, as the *FAC* contains enough factual matter, taken as true, to raise a reasonable hope or expectation that discovery will reveal relevant evidence supporting each element of the claim.

*Id.* at *12.  Additionally,  "all claims against the CorrectHealth Supervisors—for failure to supervise and train, for implementing unconstitutional policies, and under *Monell*—fail[ed] for lack of an underlying constitutional violation." *Id.* at *23.  Likewise, the state law claims against CorrectHealth were dismissed: (1) negligence, for failure to exhaust under the Louisiana Medical Malpractice Act ("LMMA"), and (2) intentional conduct, for failure to state a viable claim. *Id.* at *20–21.  The state law claims against the CorrectHealth Supervisors were also dismissed for the same reasons. *Id.* at *23.  Ultimately, Plaintiffs were given leave to amend to cure these deficiencies. *Id.* at *23–24.  The details of this ruling will be discussed in greater detail below.

Following the rulings in *Jordan I* and *II*, on April 29, 2022, Plaintiffs filed the *Second Amended Complaint* ("*SAC*"), (Doc. 48).  Relevant here, the *SAC* asserts the following counts against the CorrectHealth Defendants: (a) Count 1, conditions of confinement;[2] (b) Count 2, failure to supervise other defendants to ensure inmates receive proper medical needs against CorrectHealth Defendants (among others); (c) Count 3, deliberate indifference to Claiborne's right to mental healthcare against CorrectHealth Defendants and the CorrectHealth Employees; (d) Count 4, a *Monell* claim against CorrectHealth for unlawful policies with respect to denying access to appropriate medical care; (e) Count 6, *respondeat superior* against CorrectHealth, *inter alia*, and (f) Count 7, loss of consortium against all defendants. (*Id*. ¶¶ 100–120.)

---

[2] As with the *First Amended Complaint* ("*FAC*"), Count 1 only lists in its title Gautreaux and the Parish as defendants. However, the actual paragraphs of this count speak to Defendants generally. (*See SAC* ¶¶ 100–02, Doc. 48.) Consequently, as with the last ruling, the Court broadly interprets this as a condition of confinement claim against CorrectHealth as well.  Since the *CorrectHealth MTD2* does not seek dismissal of Count 1, it remains pending.

In response to the *SAC*, each of the above defendants filed motions to dismiss, (Docs. 55, 56, and 61). The Court granted the Sheriff Defendants' motion in full, dismissing all § 1983 claims against them. *See Jordan v. Gautreaux* (*Jordan III*), No. 21-48, 2023 WL 1491213, at *1 (M.D. La. Feb. 2, 2023), Doc. 70. The Court also denied the Parish's motion in full. *Jordan v. Gautreaux* (*Jordan IV*), No. 21-48, 2023 WL 1484929, at *1 (M.D. La. Feb. 2, 2023), Doc. 71.

CorrectHealth Defendants now move for dismissal of most of the claims against them. (Doc. 55.) They argue that Counts 2, 3, and 4 could be dismissed for lack of an underlying constitutional violation, as the *SAC* has not been changed in such a way as to make a difference from the last ruling. (Doc. 55-1 at 7–9.)[3] They close by seeking dismissal of the state law claims. (*Id.* at 20–21.)

### B. Events Leading Up to Claiborne's Suicide

On Saturday, January 18, 2020, Claiborne was arrested by the Baton Rouge Police Department ("BRPD") after trying to kick and ram his way into a drug and alcohol recovery center, after getting into an altercation with bystanders outside that center, and after crashing his car into an electric pole. (*SAC* ¶¶ 9–14, Doc. 48.) BRPD advised a corporal at EBRPP that Claiborne had "mental health issues" and that the corporal should be on "high alert," and Claiborne was placed in a one-man cell until he could be assessed by mental health staff. (*Id.* ¶¶ 15–17.)

Corporal Page and Deputy Baker gave Claiborne a "yellow smock rather than a cloth jumpsuit, per his mental health observation status" because of "the risk of suicide known to the Sheriff and its medical staff of inmates suffering mental health issues. The choice of the smock

---

[3] CorrectHealth Defendants also argue that Counts 2, 3, and 4 should be dismissed on various other grounds. (*See* Doc. 55-1 at 9–20.) However, given the Court's finding that there is no underlying constitutional violation, no discussion of these other issues is necessary.

4

was because of the known risk of suicide Mr. Claiborne potentially presented." (*Id.* ¶ 19.)  Page brought Claiborne to N01—the special needs housing unit—to Cell #3. (*Id.* ¶ 20.)

However, despite these deputies' knowledge of Claiborne's "mental health crisis and symptoms, on Sunday, January 19, 2020—one day after his arrest—a member of the medical staff, John Doe #6, met with Mr. Claiborne and removed him from mental health observation, and the required restrictions thereof." (*Id.* ¶ 21.)  John Doe #6 (believed to be nurse Cheryl Morris) gave Claiborne a cloth jumpsuit to replace the yellow smock, and this cloth jumpsuit was the same kind not originally given to Claiborne because of "his acute mental health issues, which were known to the Sheriff's office and its medical staff—including the risk of Mr. Claiborne committing suicide." (*Id.* ¶ 22.)

"On Monday, January 20, 2020 at 1:35 [a.m.], according to video surveillance, a smock or clothing garment was taken from an inmate, possibly Mr. Claiborne." (*Id.* ¶ 23.)  At 1:43 a.m., Deputy Domino made rounds and, according to video surveillance, spoke to an inmate near the first few cells. (*Id.* ¶ 23.)  "Motion-detection triggered video surveillance of N01 displayed 'no activations' from 2:22–3:14 [a.m.], a period of 52 minutes." (*Id.* ¶ 25.)  "At 3:14 [a.m.], Deputy Domino began rounds, and knowing Mr. Claiborne was in Cell #3, Deputy Domino walked directly and immediately to Cell #3 where he found Mr. Claiborne hanging from his cell bars by his recently-issued cloth jumpsuit." (*Id.* ¶ 26.)  Domino called for help, and other deputies arrived. (*Id.* ¶ 27.)  They tried at first to untie the jumpsuit, but they eventually got a knife to cut him down. (*Id.*)  "At or around 3:18 [a.m.], Mr. Claiborne was taken down and officers began administering CPR." (*Id.* ¶ 28.)

Nurses Foy and Chapman arrived to help administer CPR, and only seven minutes later, at 3:21 a.m., was EMS notified. (*Id.* ¶¶ 28–30.)  Nurse Brumfield came around the same time with oxygen. (*Id.* ¶ 31.)

Around 3:44 a.m., EMS arrived.  (*Id.* ¶ 32.)  They left six to ten minutes later, having decided that Claiborne was dead. (*Id.*)

### C.  Claiborne's Mental Condition

Plaintiffs allege:

> According to the investigation and subsequent report by Detective Auzenne, Mr. Claiborne had been displaying odd behavior in the hours prior to his death:
>
> a) The inmate in Cell #1 heard Mr. Claiborne talking out loud to God;
>
> b) The inmate in Cell #2 heard Mr. Claiborne singing church music and songs;
>
> c) The inmate in Cell #5 heard Mr. Claiborne singing and talking to himself, and heard him repeatedly state that "[Mr. Claiborne] was going to kill himself." Using reflection in the windows near his cell, the inmate in Cell #5 stated that he "observed [Mr. Claiborne] climb to the upper bars of his cell[,]" then later saw Mr. Claiborne "hanging from the bars[,]" and called for help. It appears that no one ever came, and that all the other inmates were asleep at the time.
>
> * * *
>
> Additionally, Deputy Domino's report states that from 5:00 [p.m.]–3:14 [a.m.], Mr. Claiborne had been exhibiting "bizarre" behavior such as speaking loudly, using unknown jargon, racking gates, spitting on the floor, talking about his deceased mother, and singing spiritual songs.

(*SAC* ¶¶ 33–34, Doc. 48.)

Plaintiffs later continue, "Just prior to his suicide, records reveal that Mr. Claiborne was showing signs of bizarre behavior, including speaking loudly, using unknown jargon, racking the

gates to his cell, spiting on the floor, speaking about his deceased mother, and singing spiritual

songs." (*Id.* ¶ 55.)

They further plead:

> While incarcerated, the EBRPP staff failed or refused to provide Mr.
> Claiborne with his prescribed psychiatric medication or otherwise
> provide him with treatment for his psychiatric illness, i.e. bipolar
> disorder, even though he was exhibiting behavior that clearly
> demonstrated his need for such medication and treatment. That need
> was demonstrated by the fact that:
>
> a) Mr. Claiborne was arrested on January 18, 2020 for attempting to
> gain entry to a drug and alcohol recovery center before it opened.
> Records indicate that Mr. Claiborne was kicking and ramming [with
> his body] the door in an effort to get inside; he was acting erratically
> and getting into physical altercations with bystanders outside of the
> drug and alcohol recovery center; after not being able to get inside,
> Mr. Claiborne used/drove his vehicle to crash into the drug and
> alcohol recovery center in an effort to get inside; and he was
> observed to have red dilated eyes.
>
> b) After Mr. Claiborne was arrested, Baton Rouge Police
> Department Captain Sandridge called Corporal Page to tell him that
> Mr. Claiborne was en route to EBRPP and that "they [presumably
> EBRPP staff] were to be on high alert."
>
> c) Captain Sandridge further advised Corporal Page that Mr.
> Claiborne was very strong and had "mental health issues."
>
> d) Additionally, while Mr. Claiborne was in the booking intake
> room, Warden Grimes called Corporal Page to tell Corporal Page
> that Mr. Claiborne "was to be placed in a one man cell until he was
> assess[ed] by mental health staff."

(*Id.* ¶ 56.)

Plaintiffs also provide screenshots of Claiborne's January 18, 2020, EBRPP intake

receiving form completed by Nurse Brumfield. (*Id.* ¶ 57.) Critically, though this document reflects

a history of Bipolar disorder, the record also states that Claiborne answered "No" to the questions

of "Do you have current thoughts or plans to harm yourself?", "Does the patient exhibit any signs

that suggest the risk of suicide or self-injurious behavior?", and "Past and Recent Suicide Attempts/ Ideations (include when and how)". (*Id.*) Further, the form also shows that Claiborne "HAS BIPOLAR MEDS, DOESN'T TAKE THEM" and "DOESN'T KNOW NAME OF PSYCH MEDS." (*Id.*)

Plaintiffs complain about this form. They say it does not reflect what was asked of Claiborne or what "signs" or "evidence" Nurse Brumfield supposedly looked for. (*Id.* ¶ 58.) Further, Plaintiffs maintain that the nurse's responses reflect a lack of training and qualifications with respect to "properly and adequately assess[ing] (and treat[ing]) Mr. Claiborne's mental health, psychiatric illness, and his risk of suicide." (*Id.* ¶ 59.) Plaintiffs claim the responses are "inconsistent with one another" and that the assessment "is difficult to comprehend considering the nature of Mr. Claiborne's arrest," his bipolar disorder, failure to take prescribed medicine, and "mental health issues." (*Id.*) "It appears that the only reason Nurse Brumfield even recommended putting Mr. Claiborne on Mental Health Observation was because Warden Grimes said that Mr. Claiborne needed to be assessed by mental health staff." (*Id.*)

Plaintiffs also paste screenshots of Claiborne's EBRPP Mental Health Intake Form from Claiborne's January 19, 2020, 12:00 p.m., visit with Cheryl Morris. (*Id.* ¶ 60.) CorrectHealth Defendants attach the entirety of this record, (Doc. 55-2 at 18–20), and, as will be explained below, it can be considered for the instant motion.

Cheryl Morris completed the form. (*See id.*) The document states that Claiborne was diagnosed with Bipolar Disorder in 2017 after his mother's death and that he was abused as a child, but it also provides that he had no current provider or inpatient hospitalizations and that "he is currently prescribed trazodone, [which he] states he takes [ ] on an as needed basis for sleep." (*Id.* at 18.) The record also states that Claiborne expressed no suicide attempts or self-injurious

behavior history. (*Id.*)  Claiborne's orientation was "O x 4," (*id.*), which CorrectHealth represents means, "oriented to person, place, time, and situation," (Doc. 55-1 at 6).   Further, Claiborne's appearance was "[w]ell groomed, well nourished, [and] appropriate," and his "level of engagement" was "cooperative." (Doc. 55-2 at 19)  His thought process was "relevant / coherent / [and] logical," and there was "No Problem" with his "thought content." (*Id.*)  His speech, tones, and eye contact were all normal. (*Id.*)  Further, his mood was "Agitated," but he was not "Suicidal / Homicidal"; indeed, Morris specifically wrote, "IM short in response.  Easily agitated. Stated he was not suicidal at the time of arrest, however was agitated due to arrest. Did not appear to be RIS," (*id.* at 19), and CorrectHealth represents that "RIS" means "responsive to internal stimuli," (Doc. 55-1 at 6).  No risk factors were identified, and on the question of "Provider Orders / Referrals," Morris wrote, "Psychiatry (IM to follow up on as needed. )." (*Id.*)

Plaintiff makes complaints about this form which are substantially similar to those made about Nurse Brumfield's with regard to a lack of training, qualifications, and consistency. (*See SAC* ¶ 61, Doc. 48.)  Specifically, Plaintiffs plead:

> Similarly, Mr. Claiborne's EBRPP Mental Health Intake Form completed by Cheryl Morris shows that she is likewise untrained and/or unqualified to properly and adequately assess (and treat) Mr. Claiborne's mental health, psychiatric illness, and his risk for suicide. Many of the responses provided by Ms. Morris are inconsistent with one another, and Ms. Morris's assessment regarding Mr. Claiborne's mental health and suicide risk—and Ms. Morris's decision to take Mr. Claiborne off of Mental Health Observation—is difficult to comprehend considering the nature of Mr. Claiborne's arrest; considering the fact that Mr. Claiborne "had mental health issues;" considering Mr. Claiborne's drug use; considering Mr. Claiborne's agitated state; considering that Mr. Claiborne told Ms. Morris that he was bipolar and was not taking his prescribed medicine for his bipolar disorder; considering that Mr. Claiborne told Ms. Morris that he was a victim of abuse as a child; and considering that Mr. Claiborne told Ms. Morris that he is prescribed and takes Trazodone—which is an antidepressant and sedative prescribed to treat depression . . . .

> Additionally, for Ms. Morris to conclude in her assessment that Mr. Claiborne was not "homicidal" just one day after Mr. Claiborne was arrested in part for screaming to two individuals inside the drug and alcohol recovery center that he was going to kill both of them once he got inside and assaulted and battered other individuals outside of the center is evidence of CorrectHealth's failure to train Ms. Morris to identify inmate risk factors and CorrectHealth's/EBRPP's inability to properly assess mentally ill inmate risk factors.

(*Id.* ¶¶ 61–62.)

Plaintiffs further allege:

> Other suicide risk factors for Mr. Claiborne included being put in a jail cell with no other cell mate and with little to no monitoring, previous inadequate treatment of Mr. Claiborne's bipolar disorder, and Mr. Claiborne's poor medication adherence. Notwithstanding all of the foregoing suicide risk factors present for Mr. Claiborne—and which CorrectHealth and Ms. Morris clearly disregarded—CorrectHealth and Ms. Morris decided that Mr. Claiborne was fine and could be taken off of Mental Health Observation less than 24 hours after he was put on mental health observation. CorrectHealth's and Ms. Morris's actions evidence a total disregard and lack of care for Mr. Claiborne's mental health and well-being, and directly caused and/or led to Mr. Claiborne committing suicide less than 24 hours after being taken off of Mental Health Observation. . . .

(*Id.* ¶ 63.)

### D. Failures by CorrectHealth Defendants and Employees

Plaintiffs charge the CorrectHealth Supervisors and Employees with the following wrongful conduct:

> Defendants Brumfield, Foy, and Chapman, as the result of *de facto* policies and practices permitted by defendants . . . CorrectHealth . . . , Musso, and Llovet failed to provide Mr. Claiborne sufficient medical and mental health care prior to, and resulting in, his death. . . .
>
> Defendants CorrectHealth . . . , Musso, and Llovet failed to adequately staff and train employees responsible for providing constitutionally adequate medical and mental health care at EBRPP. As a result of *de facto* policies and practices permitted by

> Defendants CorrectHealth . . . , Musso[ ] [and] Llovet . . . are not trained and/or supervised to address and refer prisoners' serious mental health care needs to CorrectHealth . . . , including those exhibited by Mr. Claiborne, resulting in deliberate indifference to prisoners' serious mental health care needs. . . .

> Defendant John Doe #6, as the result of *de facto* policies and practices permitted by defendants . . . CorrectHealth . . . , Musso, and Llovet failed to provide appropriate care when he/she removed Mr. Claiborne from mental health observation, less than 24 hours after he was brought in, even though several staff members had knowledge of his dangerous and fragile mental state and/or had witnessed bizarre and alarming behavior by Mr. Claiborne.

(*SAC* ¶¶ 40–42, Doc. 48.)  Plaintiffs continue:

> John Doe #6 (believed to be nurse Cheryl Morris) was deliberately indifferent to Mr. Claiborne's serious medical needs in light of her knowledge that Mr. Claiborne had reported to be an unmedicated, bipolar pretrial detainee that had "mental health issues" whose mother had just passed away. However, John Doe #6 and CorrectHealth refused to treat Mr. Claiborne and ignored his bipolar disorder, and did not even attempt to verify Mr. Claiborne's self-reported bipolar diagnoses or prescription medications.

(*Id.* ¶ 89.)

Plaintiffs later claim:

> Given the information provided/obtained from Mr. Claiborne's intake forms, CorrectHealth and EBRPP officials were aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] to Mr. Claiborne if his mental health disorders were not treated or if he did not receive the treatment he needed (i.e., ensuring that Mr. Claiborne had access to and was taking his psychiatric medication; keeping Mr. Claiborne on Mental Health Observation; and properly monitoring his mental health for longer than 36 hours after being booked into EBRPP as an inmate with known "mental health issues" who had just been arrested for attempting to gain entry into a drug and alcohol recovery center and who had not been taking his psychiatric medication). . . .

> CorrectHealth failed to properly and adequately respond to the numerous suicide risk factors provided by Mr. Claiborne in his intake forms, and such failures ultimately doomed Mr. Claiborne's life. For example, based on Mr. Claiborne's EBRPP intake records,

> EBRPP and CorrectHealth and its staff made no attempt to obtain Mr. Claiborne's medical records, or have Mr. Claiborne sign a release for his medical records, or confirm Mr. Claiborne's bipolar diagnosis, or confirm his psychiatric medication prescriptions, or even make sure that Mr. Claiborne had access to and took his psychiatric medications. . . .
>
> Had CorrectHealth done the foregoing, it likely would have enabled CorrectHealth to properly and adequately assess and treat Mr. Claiborne's mental health and properly classify him as a suicide risk, or at a minimum, keep him on Mental Health Observation.

(*Id.* ¶¶ 65–67.)

Plaintiffs then assert that CorrectHealth staff like Cheryl Morris were inadequately trained and that "CorrectHealth's evaluation, identification, monitoring, and treatment of inmates with mental illness, such as bipolar disorder, was grossly inadequate." (*Id.* ¶¶ 68–69.)  CorrectHealth also suffered from inadequate staffing, treatment, procedures, and monitoring (*Id.* ¶ 69–70.) Further, "Mr. Claiborne's suicide was directly influenced by CorrectHealth's failure to appropriately assess his psychiatric illness, adequately treat his psychiatric illness, failure to request his prior mental health treatment records and medication records to improve delivery of effective care; and, failure to provide or conduct any mental health follow-up." (*Id.* ¶ 71.) Elsewhere, Plaintiffs complain of a failure to train and supervise by the CorrectHealth Supervisors. (*Id.* ¶¶ 93–94.)

## II.     Rule 12(b)(6) Standard

In *Erickson v. Pardus*, 551 U.S. 89, 93 (2007), the Supreme Court explained:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' "

*Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Interpreting Rule 8(a) and *Twombly*, the Fifth Circuit explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556) (emphasis added).

Later, in *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787 (5th Cir. 2011), the Fifth Circuit explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."

*Id.* at 796 (internal citations omitted).

Finally, in *Thompson v. City of Waco, Texas*, 764 F.3d 500 (5th Cir. 2014), the Fifth Circuit recently summarized the Rule 12(b)(6) standard as thus:

> We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff. We need not, however, accept the plaintiff's legal conclusions as true. To survive dismissal, a plaintiff must plead enough facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Our task, then, is to determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id.* at 502–03 (internal citations and quotations omitted).

13

Additionally, the general rule regarding what may be considered in deciding a Rule 12(b)(6) motion is well known.

> In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201.

*Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam) (quoting *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019)). However, there is an exception to this rule: a court may consider documents attached to a motion to dismiss "where the complaint refers to the documents and they are central to the claim." *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)). *See also Harris v. Lovett*, No. 18-857, 2019 WL 4640319, at *1 (E.D. La. Sept. 24, 2019) (Barbier, J.) ("As Plaintiff's pleadings refer to his medical records and he brings a claim of medical indifference against Belmudes, his medical records are properly considered here.").

## III.    Discussion

### A.    Counts 2, 3, and 4: Constitutional Claims Dependent on an Underlying Constitutional Violation

#### *1. Parties' Arguments*

CorrectHealth Defendants open by contending that Counts 2, 3, and 4 can each be dismissed for lack of an underlying constitutional violation. (Doc. 55-1 at 7.) No new allegations have been made with respect to Nurses Foy, Chapman, and Brumfield. (*Id.*) Further, though the *SAC* adds certain allegations against Morris, those allegations are insufficient under Fifth Circuit precedent, particularly given Claiborne's medical records. (*Id.* at 8–9.) Morris did not ignore known or obvious symptoms of a suicide risk; while her conduct may have been negligent, it does

14

not, as the Court previously held, "come remotely close to satisfying this 'extremely high standard' of deliberate indifference." (*Id.* at 9 (quoting Doc. 46 at 25).)

Plaintiffs respond that they state a claim through deliberate indifference and the existence of policies and practices that led to a constitutional violation. (Doc. 65 at 5.)  Plaintiffs pound the facts, specifically what CorrectHealth staff knew about Plaintiff's condition and medical history and their alleged failures despite this knowledge. (*Id.* (citing *SAC* ¶¶ 15, 17, 19, 57, 59, 60–61, 65–66, 71, 89, Doc. 48).)  "In short, Plaintiffs allege that Mr. Claiborne received no psychiatric treatment (other than his initial mental health observation) and received none of his prescribed medication for his bipolar disorder or depression during his incarceration." (*Id.* at 6.)  Plaintiffs then rely on *Phoenix on behalf of SW v. Lafourche Parish Government*, No. 19-13004, 2021 WL 184909 (E.D. La. Jan. 19, 2021), and *Guillot v. Lopinto*, No. 20-1604, 2021 WL 5386260 (E.D. La. Nov. 18, 2021), in support of their positions.

In reply, CorrectHealth Defendants assert that there is still no underlying constitutional violation. (Doc. 69 at 5.) First, Plaintiffs' cases conflict with the Fifth Circuit's decision in *Estate of Bonilla by & through Bonilla v. Orange County, Texas*, 982 F.3d 298, 306 (5th Cir. 2020), and is instead closer to *McCasland v. Upshur County, Texas*, No. 18-401, 2021 WL 4172933, at *7 (E.D. Tex. Aug. 3, 2021). (Doc. 69 at 6–7.)  In sum:

> Plaintiffs are effectively contending that without a prescription verification within the first two days of booking, there must be a constitutional violation/deliberate indifference where an inmate reports a history of bipolar disorder and medications, has no acute findings on medical and/mental health examinations, and was being monitored via mental health observation. This is contrary to Fifth Circuit precedent and further confirms that Plaintiffs merely disagree with the treatment provided, which does "not give rise to a § 1983 claim."

(*Id.* at 7.)

Further, Plaintiff's cases are distinguishable. (*Id.*)  In *Phoneix*, the inmate had "actually expressed suicidal ideations" and feelings of depression and was incarcerated for 23 days, and, here, Claiborne was incarcerated for two days and had expressed no such ideations or symptoms of depression. (*Id.* at 8.)  Similarly, in *Guillot*, the inmate was housed for 11 days, had reported being hospitalized and taking medication for depression such that the nurse knew of the mental distress but failed to act. (*Id.* at 9.)  Here, however, Morris was not aware of the mental distress. (*Id.*)  In any event, says CorrectHealth Defendants, *Guillot* conflicts with *Bonilla*. (*Id.*)

### 2. Prior Rulings and Applicable Law

In *Jordan II*, the Court addressed CorrectHealth's liability for Claiborne's death.  As to the claim for deliberate indifference, the Court held:

> "The test to determine liability for a private prison-management corporation under § 1983 is more or less identical to the test employed to determine municipal or local government liability." *Woodward v. Lopinto*, No. 18-4236, 2021 WL 1969446, at *5 (E.D. La. May 17, 2021) (quoting *Alfred v. Corr. Corp. of Am.*, No. 08-0643, 2009 WL 789649, at *2, n.1 (W.D. La. Mar. 24, 2009)) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "Municipalities face § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . ." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (quoting *Monell*, 436 U.S. at 694).
>
> That is, "[a] municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.' " *Valle v. City of Hous.*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)). "To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.' " *Id.* (quoting *Monell*, 436 U.S. at 691). The Plaintiff must allege "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Id.* at 541–42 (cleaned up).

Critically, as to the last prong, "[t]he Supreme Court has explained that a municipality cannot be liable '[i]f a person has suffered no constitutional injury at the hands of the individual police officer.' " *Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (quoting *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)). Thus, official capacity "claims fail without an underlying constitutional violation." *Whitley v. Hanna*, 726 F.3d 631, 648–49 (5th Cir. 2013) (citing *Bustos*, 599 F.3d at 467 ("Because [plaintiff] has alleged no constitutional injury attributable to the Officers, [plaintiff] has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights.")).

Here, Plaintiffs fail to state a viable claim against any CorrectHealth Employee. "[A] § 1983 cause of action asserting . . . a lack of proper inmate medical care requires 'deliberate indifference' to the prisoner's 'serious medical needs.' " *Young* [*v. McCain*, 760 F. App'x 251, 256 (5th Cir. 2019)] (quoting *Estelle v. Gamble*, 429 U.S. 97, 101–05 (1976) (internal quotation marks and citations omitted)); *see also Hare v. City of Corinth, Miss.*, 74 F.3d 633, 647–48 (5th Cir. 1996) (recognizing that deliberate indifference standard applies to episodic acts or omissions claims for convicted prisoners and pretrial detainees). To sufficiently demonstrate deliberate indifference, Plaintiffs must allege "that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' that the defendants actually 'dr[e]w the inference,' and that the defendants 'disregard[ed] that risk by failing to take reasonable measures to abate it.' " *Est. of Bonilla by & through Bonilla v. Orange Cnty., Texas*, 982 F.3d 298, 305 (5th Cir. 2020) (quoting *Hyatt v. Thomas*, 843 F.3d at 177 (5th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994))); *See also Hyatt*, 843 F.3d at 179 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).

"The 'extremely high standard' of deliberate indifference requires that prison officials 'refused to treat [the prisoner], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Young*, 760 F. App'x at 256 (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (internal quotation marks and citations omitted)). "Allegations of unsuccessful medical treatment, negligence, neglect, medical malpractice, or a mistaken judgment do not amount to deliberate indifference to serious medical needs." *Id.* (citing *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991)). " '[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment.'

" *Id.* (quoting *Domino*, 239 F.3d at 756 (internal quotation marks and citation omitted)).

Here, Plaintiffs do not come remotely close to satisfying this "extremely high standard" for most of the CorrectHealth staff. Nurse Brumfield "medically processed" Claiborne, after which time Claiborne was given the yellow smock. (*FAC* ¶¶ 16, 18, Doc. 9.) There is little by way of negligence alleged here. Nurses Foy, Chapman, and Brumfield merely responded to the deputies' distress call after Claiborne was discovered hanging in his cell. (*Id.* ¶¶ 29–32.) While they waited "at least a full seven minutes after Claiborne was found hanging" to notify EMS, (*id.* ¶ 30), such conduct, as alleged, is, at worst, negligent or grossly negligent; it does not reflect deliberate indifference. *See Sibley v. Lemaire*, 184 F.3d 481, 489 n.7 (5th Cir. 1999) ("We note here the difference between negligence and deliberate indifference. A reasonably prudent man may well have deemed it necessary to call Dr. Amy in the light of Sibley's worsening condition. To be deliberately indifferent, however, the deputies would have had to have chosen not to call Dr. Amy with the expectation that some harm would result to Sibley.").

John Doe #6 is a closer call, but Plaintiffs still fall short. Plaintiffs pled that John Doe #6 "met with . . . Claiborne and removed him from mental health observation, and the required restrictions thereof . . . [d]espite all of the knowledge of the Sheriff's Office and its medical staff of . . . Claiborne's mental health crisis and symptoms." (*Id.* ¶ 20.) While John Doe #6's mistake may have been grossly negligent, it must be seen in the context of Fifth Circuit caselaw on detainee and inmate suicide.

The Fifth Circuit "has previously observed that " '[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting.' " *Est. of Bonilla*, 982 F.3d at 306 (quoting *Domino*, 239 F.3d at 756) In *Estate of Bonilla*, the appellate court summarized prior case law on this issue:

> In *Flores v. County of Hardeman*, the court determined that the sheriff did not act with deliberate indifference when he took off of suicide watch an inmate who later committed suicide, despite the fact that the deceased had just been arrested after a one-hour standoff with police and "was not acting like himself." [124 F.3d 736, 738–39 (5th Cir. 1997)]. Similarly, in *Sibley v. Lemaire*, the plaintiff offered evidence that jail personnel had "observed [Sibley] holding his Bible upside down while appearing to

read from it, cleaning the walls of his cell with toilet paper, lying next to his toilet and staring into it . . . [and] kicking the door to his cell." 184 F.3d 481, 484 (5th Cir. 1999). Sibley was having a psychotic episode and eventually blinded himself by attempting to remove his own eyes. Nonetheless, the court concluded that "[a]lthough Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself." *Id.* at 489.

*Id.* "The common thread is a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." *Id.*

In addition to these cases, in *Young*, the Fifth Circuit recently found no error in dismissing deliberate indifference claims against medical defendants. 760 F. App'x at 256–57. Plaintiff prisoner, who was "suicidal due to his mother's terminal illness," alleged that he advised a social worker that he was suicidal, yet she "repeatedly downgrad[ed] him from extreme to standard suicide watch, which allowed him to harm himself by banging his head on a steel bed frame and the wall and by jumping from the toilet to the bed, thereby exacerbating a previous shoulder injury." *Id.* at 253. Plaintiff claimed that a doctor met with him only briefly by videoconference before "concluding that [he] did not need treatment and was competent to participate in a . . . disciplinary hearing arising from his attempts at self-harm." *Id.*

Despite this, the Fifth Circuit concluded that, "[a]t most, [plaintiff's] complaint alleged that [the social worker] and [doctor] acted with gross negligence in treating his mental health problems, which is insufficient to establish deliberate indifference." *Id.* at 256–57 (citing *Doe v. United States*, 831 F.3d 309, 320 (5th Cir. 2016)). The *Young* court explained that "[s]uicide is inherently difficult . . . to predict, particularly in the depressing prison setting" and that "an incorrect diagnosis regarding the genuineness of a suicide threat does not amount to deliberate indifference." *Id.* at 257 (citing *Domino*, 239 F.3d at 754–56). With respect to the doctor, "merely expressing a disagreement with a diagnostic measure[ ] . . . 'does not state a claim for . . . indifference to medical needs.' " *Id.* (citing *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)).

> The same reasoning applies here. As alleged, John Doe #6 made a grave mistake that cost Claiborne his life, but the Court cannot say that his gross negligence amounted to deliberate indifference.
>
> In sum, Plaintiffs have no underlying constitutional violation against any CorrectHealth Employee. Thus, they can have no episodic acts or omissions claim or claim for deliberate indifference, and these claims will be dismissed.

*Jordan II*, 2022 WL 897549, at *12–15. For similar reasons (lack of an underlying constitutional violation), the Court dismissed Plaintiffs' failure to train and supervised claims[4] and the claims against Llovet and Musso.[5]

---

[4] Specifically, the Court explained:

> Here, Plaintiffs' failure to train and supervise claims fall short on the first and third elements. As to the third, if a plaintiff fails to state a viable claim against individual officials for deliberate indifference, then he has also failed to satisfy the causation element of a Section 1983 claim against a superior for failure to train and supervise. *See Martinez v. City of N. Richland Hills*, 846 F. App'x 238, 244–45 (5th Cir. 2021) (citing *Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006)) ("[i]t is facially evident that [the test for supervisory liability] test cannot be met if there is no underlying constitutional violation."). As the Court has already established, Plaintiffs have not adequately alleged an underlying constitutional violation by any CorrectHealth Employee, so their claims for failure to supervise and train must necessarily be dismissed.

*Jordan II*, 2022 WL 897549, at *15.

[5] The Court specifically stated:

> First, the legal standards for imposing supervisor liability are essentially the same for individual and official capacity claims. *See Roberts*, 397 F.3d at 293 (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452–54 and nn. 7–8 (5th Cir. 1994) (en banc)). Second, if a plaintiff fails to state a viable claim against individual officials for deliberate indifference, then he has also failed to satisfy the causation element of a Section 1983 claim against a superior for failure to train and supervise. *See Martinez*, 846 F. App'x at 244–45 (citing *Rios*, 444 F.3d at 425). And third, official capacity "claims fail without an underlying constitutional violation." *Whitley*, 726 F.3d at 648–49 (citing *Bustos*, 599 F.3d at 467).
>
> In sum, all claims against the CorrectHealth Supervisors—for failure to supervise and train, for implementing unconstitutional policies, and under *Monell*—fail for lack of an underlying constitutional violation. Because this Court has already determined that no CorrectHealth Employee committed an underlying constitutional violation, the causation element for each of these claims fails. Accordingly, all § 1983 claims against Musso and Llovet, including the ones for punitive damages, will be dismissed.

*Jordan II*, 2022 WL 897549, at *23.

### *3. Analysis*

Having carefully considered the matter, the Court finds that the instant motion must be granted.  In short, Plaintiffs have failed to cure the deficiencies of the prior complaint.

As in the previous ruling, "Plaintiffs do not come remotely close to satisfying this 'extremely high standard' for most of the CorrectHealth [Employees]." *Jordan II*, 2022 WL 897549, at *14. Nurses Foy and Chapman are alleged to have administered CPR to Claiborne and to have delayed seven minutes before notifying EMS. (*SAC* ¶¶ 28–30, Doc. 48.)  Little has changed from the *FAC* for these CorrectHealth Employees.  Again, while this conduct may have been negligent or grossly negligent, that is insufficient to state a viable claim. *See Young*, 760 F. App'x at 256 ("Allegations of unsuccessful medical treatment, negligence, neglect, medical malpractice, or a mistaken judgment do not amount to deliberate indifference to serious medical needs."); *see also Phoenix on behalf of S.W. v. Lafourche Par. Gov't,* No. 19-13004, 2021 WL 184909, at *7 (E.D. La. Jan. 19, 2021) (dismissing claims against certain defendants because, "in the amended complaint, [plaintiff] . . . includes claims against [these defendants], but the deficiencies previously identified have not been amended[,]" and "[n]one of the new allegations mention these defendants.").

Likewise, Nurse Brumfield merely completed the intake receiving form, portions of which are referenced in (in fact, copied into) the *SAC*, (*id.* ¶¶ 57–59), so this document can be considered in deciding the instant motion, *see Harris*, 2019 WL 4640319, at *1.   While this record shows that Claiborne had a history of bipolar, it also demonstrates that (1) Claiborne denied having "current thoughts or plans to harm [him]self;" (2) he exhibited no "signs that suggest[ed] the risk of suicide or self-injurious behavior;" and (3) he provided no "Past and Recent Suicide Attempts / Ideations." (*Id.* ¶ 57.)  Critically, the form also shows that Claiborne "HAS BIPOLAR MEDS, *DOESN'T*

21

*TAKE THEM*" and "*DOESN'T KNOW NAME OF PSYCH MEDS.*" (*Id.* (emphasis added).) Nothing in this document shows that Brumfield was "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed," much less that Brumfield in fact drew the inference. *Est. of Bonilla*, 982 F.3d at 305. This is particularly true in light of the Fifth Circuit's admonition that " '[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting.' " *Id.* at 306.

John Doe #6 (Cheryl Morris) remains the heart of this motion, but the Court again finds that Plaintiffs' claims against Morris are insufficient. To summarize the relevant allegations, Morris met with Claiborne at 12:00 p.m. on January 19, 2020 (one day after his arrest) and made the fateful and terrible decision to remove him from mental health observation and the required restrictions thereof. (*SAC* ¶¶ 21, 60, Doc. 48.) This was done despite the fact that Claiborne was previously placed in a one-man cell, with BRPD advising that Claiborne had "mental health issues" and that the corporal should be on "high alert." (*SAC* ¶¶ 15–17, Doc. 48.) Claiborne was also given a "yellow smock rather than a cloth jumpsuit, per his mental health observation status" because of "the risk of suicide known to the Sheriff and its medical staff of inmates suffering mental health issues. The choice of the smock was because of the known risk of suicide Mr. Claiborne potentially presented."(*Id.* ¶ 19.) Further, Plaintiffs complain that CorrectHealth and its employees "made no attempt to obtain Mr. Claiborne's medical records, or have Mr. Claiborne sign a release for his medical records, or confirm Mr. Claiborne's bipolar diagnosis, or confirm his psychiatric medication prescriptions, or even make sure that Mr. Claiborne had access to and took his psychiatric medications." (*Id.* ¶ 66.) Finally:

> [Morris] was deliberately indifferent to Mr. Claiborne's serious medical needs in light of her knowledge that Mr. Claiborne had reported to be an unmedicated, bipolar pretrial detainee that had "mental health issues" whose mother had just passed away.

> However, John Doe #6 and CorrectHealth refused to treat Mr.
> Claiborne and ignored his bipolar disorder, and did not even attempt
> to verify Mr. Claiborne's self-reported bipolar diagnoses or
> prescription medications.

(*Id.* ¶ 89.)

But the Court finds that the medical records as a whole paint a different picture. Again,

Morris completed the EBRPP Mental Health Intake Form. (Doc. 55-2 at 18.)  As Plaintiffs point

out, the document shows that Claiborne was diagnosed with Bipolar Disorder in 2017 following

his mother's death, that he was abused as a child, and that he was "Agitated." (*Id.* at 18–19.)  But,

the record also contains a number of facts that mitigate Morris' tragic mistake, including: (1) that

Claiborne expressed no suicide attempts or self-injurious behavior history; (2) that, despite his

diagnosis, he had no current provider or inpatient hospitalizations; (3) that Claiborne appeared

"[w]ell groomed, well nourished, [and] appropriate," and his "level of engagement" was

"cooperative;" (4) that his thought process was "relevant / coherent / [and] logical," and there was

"No Problem" with his "thought content;" (5) that his speech, tones, and eye contact were all

normal; (6) that, though he was agitated because of the arrest, he was "not suicidal at the time of

[the] arrest;" and (7) that he was not "Suicidal / Homicidal." (*Id.*)[6]  Even construing the facts in a

light most favorable to Plaintiffs and drawing reasonable inferences in their favor, the Court cannot

say, when looking at all the information available to Morris and the record as a whole, that

Plaintiffs have adequately alleged that Morris "engaged in . . . conduct that would clearly evince a

wanton disregard for any serious medical needs." *Young*, 760 F. App'x at 256 (citations omitted);

---

[6] The Court also notes two other mitigating factors.  Claiborne's orientation was "O x 4," (*id.*), which CorrectHealth Defendants represent means, "oriented to person, place, time, and situation," (Doc. 55-1 at 6).  Further, Claiborne "[d]id not appear to be RIS," (*id.* at 19), and these defendants represent that "RIS" means "responsive to internal stimuli," (Doc. 55-1 at 6.)  While these points would be important to the Court's analysis, the Court ultimately cannot consider them because they represent facts beyond the pleadings and considered documents.

*Sibley*, 184 F.3d at 489 n.7 ("To be deliberately indifferent, however, the deputies would have had to have chosen not to call Dr. Amy with the expectation that some harm would result to Sibley.").

Plaintiffs also complain about Morris' failure to provide prescriptions, but this too falls short. To be sure, a defendant can be liable under § 1983 if he refuses to treat an inmate or ignores her complaints, but "[a] prisoner's disagreement with medical treatment, and even medical malpractice, does not constitute deliberate indifference absent exceptional circumstances." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 729 (5th Cir. 2020); *see also Young*, 760 F. App'x at 256. Here, the medical records are inconclusive about Claiborne's need to take his prescription. Specifically, the initial medical records said that Plaintiff "HAS BIPOLAR MEDS, *DOESN'T TAKE THEM*" and "*DOESN'T KNOW NAME OF PSYCH MEDS*." (*SAC* ¶ 57, Doc. 48 (emphasis added).) Further, to Morris, Claiborne said "he is currently prescribed trazodone, [which *he*] *states he takes [ ] on an as needed basis for sleep*[.]" (*Id.* ¶ 60 (emphasis added).) Thus, this is not a case where Morris denied Claiborne medication which she knew he absolutely needed. And considering the fact that Claiborne committed suicide a mere two days after arriving at the prison *and less than twenty-four hours* after being seen by Morris, the Court cannot conclude that Morris was deliberately indifferent to Claiborne's medical needs in failing to provide this medication or verify his prescription before his unfortunate death. *See Est. of Bonilla*, 982 F.3d at 302–03 (finding no deliberate indifference when detainee hung herself nine hours after being brought to jail, even though no prescribed medications were given, and even though prescriptions were not verified before the staff departed for the day); *Kirby v. Johnson*, 243 F. App'x 877, 879 (5th Cir. 2007) (rejecting inmate's claim that he was "denied adequate medical treatment . . . because his psychiatric medications were discontinued abruptly without sufficient examination" of himself or his records because these "allegations constitute[d] disagreement with [the provider's] treatment

24

of [the inmate's] medical condition, or at most, negligence or medical malpractice, all of which are insufficient to establish a claim of deliberate indifference.").

Again, "the Fourteenth Amendment protects pretrial detainees' right to medical care and to protection from known suicidal tendencies." *Est. of Bonilla*, 982 F.3d at 304. "The 'extremely high standard' of deliberate indifference requires that prison officials 'refused to treat [the prisoner], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Young*, 760 F. App'x at 256. Medical malpractice or mere negligence is not enough. *Id.* Considering the facts summarized above as a whole, the Court simply cannot conclude that Morris was aware of facts from which the inference could be drawn that Claiborne was suicidal and in need of serious medical treatment at the time she evaluated him and that Morris actually drew the inference.

Fifth Circuit case law confirms this. Again, in *Young*, the plaintiff had actually advised the social worker that he was suicidal, yet, despite this, she "repeatedly downgrad[ed] him from extreme to standard suicide watch, which allowed him to harm himself by banging his head on a steel bed frame and the wall and by jumping from the toilet to the bed, thereby exacerbating a previous shoulder injury." 760 F. App'x at 253. Despite this, the Court still found no deliberate indifference. *Id.* at 256–57.

Likewise, in *Sibley*, jail personnel "observed [Sibley] holding his Bible upside down while appearing to read from it, cleaning the walls of his cell with toilet paper, lying next to his toilet and staring into it . . . [and] kicking the door to his cell," *Est. of Bonilla*, 982 F.3d at 306 (quoting *Sibley*, 184 F.3d at 484). "Sibley was having a psychotic episode and eventually blinded himself by attempting to remove his own eyes." *Id.* Despite all of that, the Fifth Circuit concluded, "nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have

only concluded that he posed a serious risk of harm to himself." *Id.* (quoting *Sibley*, 184 F.3d at 489). The Fifth Circuit further said:

> We note here the difference between negligence and deliberate indifference. A reasonably prudent man may well have deemed it necessary to call Dr. Amy in the light of Sibley's worsening condition. To be deliberately indifferent, however, the deputies would have had to have chosen not to call Dr. Amy with the expectation that some harm would result to Sibley."

*Sibley*, 184 F.3d at 489 n.7.

Likewise, in *Estate of Bonilla*, the Fifth Circuit affirmed a finding of no deliberate indifference after a pretrial detainee hung herself in a jail cell nine hours after arriving. 982 F.3d at 302–03. The appellate court reached this result even though (1) the decedent was "agitated" when she arrived at the jail and again later, though her mood improved later, 982 F.3d at 302–03; (2) the decedent also indicated that she was bi-polar and took a number of medications, *id.* at 302–03; (3) decedent had indicated that she "had previously sought mental health treatment at a state facility," *id.*; (4) the providers had not verified decedent's prescription before departing for the day, and "[n]o one at the jail distributed any medications to Bonilla," *id.*, and (5) decedent "had no history of suicidal tendencies" and "did not request medical help," *id.* at 306.

To be clear, *Estate of Bonilla* is not perfectly in line with this case,[7] but, ultimately, these are distinctions without a difference. First, *Estate of Bonilla* itself stated that "Bonilla presented with fewer warning signs than either Flores or Sibley," yet there was still no finding of deliberate indifference. *Id.* Second, despite the differences, *Estate of Bonilla* remains similar in key respects, including the short time span in which decedent was housed, her agitation upon arriving, her

---

[7] There, the "circumstances of her arrest, booking and detention did not raise questions concerning her mental stability or capacity for self-harm," *Estate of Bonilla*, 982 F.3d at 306, whereas, here, the circumstances of arrest and detention raise questions of mental stability, though not self-harm (at least under *Sibley* and *Estate of Bonilla*). Further, decedent's "behavior in detention was unremarkable prior to her suicide," *id.*, whereas, here, Claiborne's behavior was remarkable.

medical condition and alleged failure to provide and verify medications, and her lack of any history of suicidal tendencies or request for help.  All of these facts highlighted by the Fifth Circuit show why the same result is warranted here.  And third, in at least one way, *Estate of Bonilla* presents an even stronger case for deliberate indifference, as Bonilla had previously sought mental health treatment in a state facility.

In sum, if plaintiffs could not prevail in *Young*, *Estate of Bonilla*, and *Sibley*, which this Court must follow, then they simply cannot do so here.  Thus, Plaintiffs' claims for deliberate indifference against the CorrectHealth Defendants must be dismissed.

Further, Plaintiffs' authority does not entitle them to relief.  In sum, *Phoenix* is easily distinguishable, and *Guillot* conflicts with the above Fifth Circuit cases.  The Court will take each in turn.

In *Phoenix*, decedent Williams hung himself in a jail cell "[n]ineteen days after he told a correctional officer he was suicidal and five days after being removed from suicide watch by CorrectHealth Lafourche LLC [("CHL")] employee, David Jennings." *Phoenix*, 2021 WL 184909, at *1.  Further,

> Seven days after being placed on suicide watch, Williams was interviewed about his suicidal ideations; he informed either Armond or Jennings that he felt depressed and suicidal, that he had mental health history of bipolar and schizophrenia diagnoses, and that he had been prescribed medications to treat his mental illnesses.

*Phoenix*, 2021 WL 184909, at *2. Additionally, "the mental health note recommended that Williams be continued on suicide watch, that his medications be verified, and that he undergo a psychiatric evaluation upon verification." *Id.* at *7.  Plaintiffs alleged that "Nurse Practitioner Kendra Patrick acted with deliberate indifference by failing to prescribe medications and failing to order an immediate psychiatric evaluation so that Williams could be medicated, which

effectively denied Williams the necessary medications and placed him at substantial risk of harm given his suicidal ideations." *Id.* at *3.

The Court agreed, explaining that, though Patrick was not deliberately indifferent to the risk of suicide, he was deliberately indifferent for failing to treat the decedent by prescribing medications. *Id.* at *8. Specifically, the Court found that Patrick (1) knew about prior visits with the decedent by nursing staff; (2) examined decedent after he had been on suicide watch for over a week and two days and "after he reported mental health history a history of taking prescription medications to treat his mental illness, and that he had been feeling depressed and suicidal;" (3) "when she examined Williams on September 27, [ ] had CHL records that showed that Williams had been on suicide watch since September 18, that he was previously prescribed Invega Sustenna and two other medications for his bipolar and schizophrenic diagnoses, that he was depressed, and that he was previously hearing voices;" and (4) that Patrick could have prescribed medication, and, indeed, "was the only one who could prescribe him medications." *Id.* at *8. Ultimately:

> The only action NP Patrick took -- keeping Williams on suicide watch -- did nothing to treat his serious mental illnesses and was at best a delay of necessary treatment, whether that necessary treatment was psychiatric evaluation or verification of prescription medications, or both. At the pleadings stage -- where the Court must assume that the allegations are true "even if doubtful in fact" -- this suffices to state a claim.

*Id.* The Court concluded:

> Taking the amended allegations as true, the plaintiff alleges facts that NP Patrick was aware that Williams was suicidal and, though unconfirmed, that he self-reported that he had previously been prescribed medication to treat two mental illnesses, schizophrenia and bipolar disorder. In spite of this knowledge and Williams' report that he was depressed, the plaintiff alleges facts indicating that NP Patrick refused to treat him or ignored his complaint and symptoms of serious medical needs in the form of mental illnesses and depression. It is alleged that NP Patrick failed to ensure that Williams was promptly examined by a mental health expert, nor did

she attempt to promptly verify his self-reported diagnoses or prescription medications. To be sure, there are allegations missing that would bolster a failure to treat or failure to assess claim (allegations indicating that Williams was manifesting objective signs of distress or symptoms of his mental illnesses). Nevertheless, there are sufficient facts alleged, taken as true, including that Williams reported being depressed, suicidal, mentally ill, and off of his prescription medications, which suffice to state a plausible deliberate-indifference claim. Cf. Bonilla, 982 F.3d at 307–308 (affirming grant of summary judgment in favor of corrections officer and nurse, finding that "[p]laintiffs identify no cases establishing that adequate medical care requires the distribution of prescription narcotics to an inmate within hours of her intake" and plaintiffs failed to identify signs of distress or requests for medication). The plaintiff's allegations that NP Patrick knew (or failed to verify his report) that Williams had serious medical needs (suffered from mental illnesses), yet afforded him no treatment and failed to take steps to immediately or quickly verify his prescriptions in the face of his self-reports of mental illness, depression, and suicidal ideation suffice as an alleged factual predicate of deliberately indifferent conduct by NP Patrick in her individual capacity.

*Id.* at *9.

The Court finds *Phoenix* to be easily distinguishable. *Phoenix* as a whole makes clear that the offending Nurse Patrick had substantially more information establishing her knowledge that Williams faced a substantial risk of serious harm. Such information included direct admissions by the decedent that he was "depressed, suicidal, mentally ill, and off of his prescription medications," *Id.* But, here, as demonstrated above, the medical records show no such confirmation. Further, *Phoenix* took place over a substantially longer period of time—nineteen days after decedent threatened suicide—versus the instant case, where Claiborne killed himself two days after arriving in prison and less than a day after being examined by Morris, (*SAC* ¶¶ 21–28, Doc. 48.) Thus, this case remains closer to *Young* and *Estate of Bonilla*.

*Guillot* is also favorable to Plaintiffs, but the Court finds that it too does not warrant a denial of the *CorrectHealth MTD2*. In *Guillot*, defendants argued for no deliberate indifference on

the grounds that the decedent "was seen multiple times by medical staff, denied suicidal ideations, and presented 'no other acute signs of symptoms suggesting he needed immediate medical intervention.' " *Guillot*, 2021 WL 5386260, at *11.  Further, these defendants maintained that decedent's "medical records 'unequivocally rebut any contention of deliberate indifference,' " and that the CorrectHealth entities' "failure to diagnosis [decedent] as a suicide risk, as well as to distribute [him] his medication, does not constitute deliberate indifference." *Id.*  Chief Judge Brown of the Eastern District disagreed, finding that Plaintiffs had adequately pled a claim for deliberate indifference to medical needs because (1) a CorrectHealth Jefferson, LLC ("CHJ") employee had noted that decedent "had a prior history of 'Post-traumatic Stress Disorder, Major Depression, and Anxiety,' " (2) that employee had also "noted [decedent's] use of a medication for depression and requested [his] medical records;" (3) other CHJ employees had ordered follow ups as "high priorities" and referred Plaintiff to mental evaluation; and (4) CHJ had failed to give decedent  "his depression medication during his incarceration" despite "signs of serious physical or psychological distress." *Id.*

Putting aside the factual issues about Claiborne's medications highlighted above, there is a larger problem with *Guillot*: it conflicts with *Estate of Bonilla*, *Young*, and the Fifth Circuit case law cited above.  Indeed, *Estate of Bonilla* is not discussed (or even cited) in *Guillot*.  Thus, *Guillot* is not persuasive authority.

Ultimately, as *Estate of Bonilla* explained, "suicide is inherently difficult for anyone to predict, particularly in the depressing prison setting," and the "common thread" in all of the Fifth Circuit precedent discussed above "is a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm." *Id.* at 306 (cleaned up).  "Apart

from lacking support in the case law, the proposition lacks logical force, given the varied, individualized nature of mental illness." *Id.*

However tragic Claiborne's death may have been (and it absolutely was), and however negligent Morris and the other CorrectHealth Employees were (and they certainly were), Fifth Circuit precedent precludes them from being liable for committing any constitutional violation. As a result, CorrectHealth Defendant's motion to dismiss Counts 2, 3, and 4 is granted, and these claims will be dismissed.

### B. Count 6: State Law Respondeat Superior

CorrectHealth Defendants also seek dismissal of Count 6, which is a state law *respondeat superior* claim against CorrectHealth. (Doc. 55-1 at 20.) These defendants say, because the Court dismissed all constitutional claims, Plaintiffs have no other state law claims against them. (*Id.*) Further, to the extent a negligence claim is reasserted, that claim must be dismissed as premature because of the medical review panel. (*Id.* at 21.)

Plaintiff responds that the intentional tort claim was previously dismissed for lack of an underlying constitutional violation. (Doc. 65 at 23–24.) But, here, Plaintiffs have adequately alleged an underlying constitutional violation. (*Id.*) Thus, this claim survives. (*Id.*)

Given the Court's ruling above, the Court agrees with CorrectHealth Defendants. As the Court previously ruled, any negligence claim is premature, and any claim for intentional conduct fails for lack of deliberate indifference. *See Jordan II*, 2022 WL 897549, at *20–21. Thus, this claim will be dismissed.

### C. Leave to Amend

Federal Rules of Civil Procedure 15(a) "requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson*

*Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (cleaned up). However, "[l]eave to amend is

in no way automatic, but the district court must possess a 'substantial reason' to deny a party's

request for leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d

368, 378 (5th Cir. 2014) (quoting *Jones*, 427 F.3d at 994 (citation and internal quotation marks

omitted)). The Fifth Circuit further described the district courts' discretion on a motion to amend

as follows:

> The district court is entrusted with the discretion to grant or deny a
> motion to amend and may consider a variety of factors including
> "undue delay, bad faith or dilatory motive on the part of the movant,
> repeated failures to cure deficiencies by amendments previously
> allowed, undue prejudice to the opposing party . . . , and futility of
> the amendment." [*Jones*, 427 F.3d at 994] (citation omitted). "In
> light of the presumption in favor of allowing pleading amendments,
> courts of appeals routinely hold that a district court's failure to
> provide an adequate explanation to support its denial of leave to
> amend justifies reversal." *Mayeaux v. La. Health Serv. and Indent.
> Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citation omitted). However,
> when the justification for the denial is "readily apparent," a failure
> to explain "is unfortunate but not fatal to affirmance if the record
> reflects ample and obvious grounds for denying leave to
> amend." *Id.* (citation and internal quotation marks omitted).

*Id.*

In addition, the Fifth Circuit has made clear that "[d]enying a motion to amend is not an

abuse of discretion if allowing an amendment would be futile." *Id.* (citing *Briggs v. Miss.*, 331

F.3d 499, 508 (5th Cir. 2003)). An amendment would be deemed futile "if it would fail to survive

a Rule 12(b)(6) motion." *Id.* (citing *Briggs*, 331 F.3d at 508).

Having carefully considered the matter, the Court will deny any leave to amend. First, as

stated above, "repeated failures to cure deficiencies by amendments previously allowed" is a factor

to consider when granting or denying leave to amend, as is undue delay. *Id.* (citation omitted).

Here, Plaintiffs had the benefit of the Court's ruling on CorrectHealth Defendants' original motions

to dismiss, yet they failed to cure the deficiencies of the *First Amended Complaint*. (*See* Doc. 46.) Second, even putting this aside, further amendment would be futile; Plaintiffs have shown, through their failure to properly amend, that they simply lack viable claims and have no further allegations to make, particularly with respect to an underlying constitutional violation by any CorrectHealth Employee.  Consequently, Plaintiffs will be denied leave to amend, and their § 1983 claims will be dismissed with prejudice. *See Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 679 (M.D. La. 2019) (deGravelles, J.) (denying leave to amend when plaintiff should have had notice of issue from court's ruling on original motion to dismiss, and when further amendment would be futile); *Skinner v. Ard*, 519 F. Supp. 3d 301, 321–22 (M.D. La. 2021) (deGravelles, J.) (same); *Martin v. Roy*, No. 20-339, 2022 WL 894599, at *13 (M.D. La. Mar. 25, 2022) (deGravelles, J.) (same).

### IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss the Second Amended Complaint* (Doc. 55) filed by defendants CorrectHealth East Baton Rouge, LLC and defendants Dr. Carlo Musso and Jean Llovet is **GRANTED**, and all claims by Plaintiffs against CorrectHealth Defendants (other than for unlawful conditions of confinement against CorrectHealth) are **DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on <u>March 23, 2023</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**